IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C and 24-118C<br>(Consolidated)<br>Judge Holte |
| ENTERGY LOUISIANA, LLC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED ANSWER AND RESPONSE TO PLAINTIFFS' CROSS-MOTION TO STRIKE**


BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

EVAN WISSER
Senior Trial Counsel
Commercial Litigation Branch,
Civil Division, U.S. Department of Justice

OF COUNSEL:

NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
Trial Attorneys

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy

[redacted]

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................ 2

TABLE OF AUTHORITIES ........................................ 3

ARGUMENT ........................................ 3

II. The United States' Motion for Leave to Amend Our Answer was not Unduly Delayed and Does not Unduly Prejudice Entergy ........................................ 3

A. The United States Filed Our Motion Promptly After Receiving Critical Evidence Supporting the Fraud Allegations in March 2026 ........................................ 3

B. Entergy Has Not Been Prejudiced by the Timing of the United States' Filing ....... 6

II. The United States Satisfied the Requirement under RCFC 9(b) to Plead Fraud with Particularity ........................................ 9

III. The Proposed Affirmative Defense is Not Futile or Offered in Bad Faith ........................ 12

A. The United States' Proposed Forfeiture Defense is Fully Consistent with the Federal Circuit's Interpretation of Section 2514 in *Kellogg Brown & Root* ......... 13

B. The Nonbid Justification Form is an Essential Element of Entergy's Proof in Support of its Claim to Recover the Costs Paid to Holtec ........................................ 15

IV. Entergy's Cross-Motion to Strike is Procedurally Improper and Should be Denied......... 18

CONCLUSION ........................................ 19

[redacted]

# TABLE OF AUTHORITIES

Cases

*Arunachalam v. Int'l Bus. Machines Corp.*,
989 F.3d 988 (Fed. Cir. 2021)........................................................................................ 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................ 10

*Bluebonnet Sav. Bank FSB v. United States*,
67 Fed. Cl. 231 (2005) .................................................................................................... 13

*Carolina Power & Light Co. v. United States*,
115 Fed. Cl. 57 (2014) .................................................................................................... 13

*Energy Nw. v. United States*,
641 F.3d 1300 (Fed. Cir. 2011)................................................................................ 13, 16

*Essani v. Earley*,
No. 13-cv-3424, 2018 WL 3785109 (E.D.N.Y. Aug. 9, 2018),
*report & recommendation adopted*,
No. 13-cv-3424, 2018 WL 4100483 (E.D.N.Y. Aug. 28, 2018) ...................................... 8

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009).................................................................................... 9, 10

*Fisherman's Harvest, Inc. v. United States*,
74 Fed. Cl. 681 (2006) .................................................................................................... 18

*Foman v. Davis*,
371 U.S. 178 (1962).......................................................................................................... 6

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001)........................................................................................ 13

*Hanover Ins. Co. v. United States*,
134 Fed. Cl. 51 (2017) .................................................................................................. 3, 6

*Hardy v. United States*,
153 Fed. Cl. 624 (2021) .................................................................................................. 18

*In re BP Lubricants USA Inc.*,
637 F.3d 1307 (Fed. Cir. 2011).......................................................................................... 9

*Ind. Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005)........................................................................................ 13

[redacted]

*Kamen Soap Prods. Co. v. United States*,
124 F. Supp. 608 (Ct. Cl. 1954) .......... 10, 13, 17

*Kellogg Brown & Root Services, Inc. v. United States*,
728 F.3d 1348 (Fed. Cir. 2013) .......... 2, 14

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*,
464 F.3d 1339 (Fed. Cir. 2006) .......... 12

*King v. United States*,
119 Fed. Cl. 51 (2015) .......... 7

*Landmark Land Co. v. Federal Deposit Ins. Corp.*,
256 F.3d 1365 (Fed. Cir. 2001) .......... 12

*LW Constr. of Charleston, LLC v. United States*,
139 Fed. Cl. 254 (2018) .......... 3

*Meyer Grp., Ltd. v. United States*,
115 Fed. Cl. 645 (2014) .......... 12

*NVF Co. v. New Castle Cnty.*,
276 B.R. 340 (D. Del. 2002) .......... 8

*O'Brien Gear & Machine Co. v. United States*,
591 F.2d 666 (Ct. Cl. 1979) .......... 13, 18

*Shoshone Indian Tribe of the Wind River Reservation v. United States*,
71 Fed. Cl. 172 (2006) .......... 12

*Southern Nuclear v. United States*,
637 F.3d 1297 (Fed. Cir. 2011) .......... 12

*St. Paul Fire & Marine Ins. Co. v. United States*,
31 Fed. Cl. 151 (1994) .......... 6

*Standard Oil Co. of Kan. v. United States*,
47 F. Supp. 120 (Ct. Cl. 1942) .......... 10, 13, 17

*Underwood v. O'Reilly Auto Enters., LLC*,
342 F.R.D. 338 (D. Nev. 2022) .......... 9

*Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee, LLC*,
683 F.3d 1330 (Fed. Cir. 2012) .......... 16

*Williams v. Cost-ULess, Inc.*,
No. 2011-cv-025, 2014 WL 2993667 (D.V.I. July 3, 2014) .......... 8

[redacted]

*Yankee Atomic Elec. Co. v. United States*,
536 F.3d 1268 (Fed. Cir. 2008) ........ 13

Statutes

28 U.S.C. § 2514 ........ 18

Rules

RCFC 9(b) ........ 10

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C and 24-118C<br>(Consolidated)<br>Judge Holte |
| ENTERGY LOUISIANA, LLC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED ANSWER AND RESPONSE TO PLAINTIFFS' CROSS-MOTION TO STRIKE**

Pursuant to Rule 7.2 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests submit this reply in support of our motion for leave to file an amended answer to the complaint filed by plaintiffs System Energy Resource,

[redacted]

Inc., *et al*., and Entergy Louisiana (Entergy), and our response to plaintiffs' cross-motion to strike.

Entergy offers three arguments in its response, none of which provide a basis for the Court to deny our motion.

*First*, Entergy contends that our motion was unduly delayed, resulting in prejudice to Entergy. ECF No. 175 at 29-38. Yet in discussions following the United States's April 22, 2026 disclosure of our intent to assert the forfeiture defense, counsel for Entergy acknowledged that Entergy had flagged this potential defense when the United States first began inquiring more deeply into the circumstances surrounding the Entergy-Holtec contract in late 2024 and early 2025. Entergy cannot now claim prejudice from our assertion of a defense that Entergy itself had flagged in its own case evaluation. Further, Entergy's contentions regarding undue delay are inconsistent with the relevant legal standard, as discussed below.

*Second*, Entergy contends that the United States' 137 paragraph proposed pleading is not specific enough regarding the nature of the alleged fraud. ECF No. 175 at 22-28. As explained below, the pleading more than meets the particularity requirements of RCFC 9(b).

*Third*, Entergy contends that, as a matter of law, the alleged falsities in the nonbid justification cannot be considered fraud or attempted fraud in the "proof, statement, establishment, or allowance" or Entergy's claim. ECF No. 175 at 16-22; 28 U.S.C. § 2514. In support of this argument, Entergy relies on a misreading of *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013), which supports the United States' assertion of the forfeiture defense. There is no dispute that Entergy knew it needed to provide a proper justification to support its claim to recover in this litigation the costs it paid to Holtec for dry fuel storage casks. Indeed, Entergy and Holtec spent four months in a protracted discussion of cask

[redacted]

prices in part because Entergy's [redacted] The proposed answer alleges that the nonbid justification form was prepared in full expectation of litigation, and that key Entergy witnesses testified in deposition that the nonbid justification form contained the complete justification for Entergy's decision to accept Holtec's prices. As explained further below, that is sufficient to qualify the nonbid justification as part of the "proof" or "establishment" of Entergy's claim before this Court under section 2514.

## ARGUMENT

### II. The United States' Motion for Leave to Amend Our Answer was not Unduly Delayed and Does not Unduly Prejudice Entergy

#### A. The United States Filed Our Motion Promptly After Receiving Critical Evidence Supporting the Fraud Allegations in March 2026

As explained in our motion, ECF No. 160 at 18-19, a fraud pleading by the United States at the close of fact discovery is not typically held to be unduly delayed because the United States must investigate the relevant facts known to the plaintiff through discovery. *LW Constr. of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 304 (2018); *Hanover Ins. Co. v. United States*, 134 Fed. Cl. 51, 60-61 (2017). Delay is determined not based on when the United States first became aware of the basis of Entergy's claim, but when the facts suggesting fraud were uncovered. *Hanover*, 134 Fed. Cl. at 61 ("Even assuming, without deciding, that defendant was fully aware of the basis for Lodge's and Hanover's claims, the facts suggesting fraud were not uncovered until after discovery began, nor could they have been."). Entergy's response largely ignores this distinction – the facts necessary to substantiate our fraud defense were known to Entergy but not the United States until the completion of fact discovery. Discovery was required for the United States to learn those facts and confirm a sufficient legal basis to assert the forfeiture defense.

[redacted]

Entergy contends that the United States must have known of the basis for our forfeiture defense in late 2024 or early 2025, presumably suggesting that this motion should have been filed then. ECF No. 175 at 29-33. Entergy overreads the United States' disclosure that our suspicions were aroused in the fall of 2024. ECF No. 160 at 19. At that time, the parties had already held discussions about the high prices Entergy had paid for Holtec's dry fuel storage cask systems. During the informal discovery period, Entergy initially explained that the cost increases were the result of [redacted] That was a superficially plausible explanation. However, by the fall of 2024, the United States realized that [redacted] was not the cause of the price increases, based in part on confidential commercial information provided by Holtec in the *Holtec Pilgrim* litigation and analysis of the [redacted]. At that point, the case shifted to formal discovery so the United States could inquire further into the reasons Entergy had agreed to the increased prices.

At the start of 2025, the discovery record did not clearly establish a basis for fraud. The United States began receiving relevant documents through the summer and fall of 2025 and began deposing the relevant witnesses. Through those discovery efforts it became apparent that there was strong disagreement within Entergy about the acceptability of Holtec's prices. Entergy's ultimate decision to accept Holtec's proposal over internal objections supports our defenses that the increased costs are not recoverable. But that is not the same as alleging that Entergy created false evidence to support its claims.

The discovery record began to shift in early 2026. The United States deposed Mr. Bakken, who was the first witness to suggest [redacted] dictated the need to retain Holtec, despite the increased costs. That was a different explanation

[redacted] from the one provided in the nonbid justification form. And additional emails produced on March 26, 2026,[1] revealed evidence [redacted], which Entergy witnesses had denied in depositions. For example, these documents revealed that Entergy was prepared to begin a competitive bid process for the southern fleet procurement in the summer of 2018, [redacted]

The March 2026 email production also contained direct evidence that the Entergy executives who signed the nonbid justification knew that information contained in the document was false. For example, the nonbid justification relies primarily on the allegedly unique [redacted] offered by Holtec's cask system relative to its competitors. A July 18, 2019 email, produced on March 26, 2026, documented that several Entergy personnel, including [redacted], were aware that another vendor, Orano, offered casks with [redacted] This supports the United States' allegation that the [redacted] relied upon in the nonbid justification form could not have been the real reason for Entergy's decision, and that [redacted] knowing that its discussion of Holtec's [redacted] was untrue. This critical piece of evidence supporting the knowledge and intent elements of the fraud defense was unavailable to the United States until March 26, 2026.

Other documents produced in March 26, 2026, provided necessary support for the United States' allegation that Entergy knowingly falsified its nonbid justification form in an attempt to

[1] The March 26, 2026 production contained documents that Entergy only produced in response to the United States' motion to compel, after which the Court required Entergy to run ESI searches with search terms agreed to by the parties.

[redacted]

improve its likelihood of recovery in this case. The March 2026 production disclosed that Entergy sent the draft nonbid justification form to [redacted] While it is not improper for Entergy to solicit [redacted] input, this piece of evidence demonstrates that Entergy knew at the time that the nonbid justification form would likely later serve as part of its proof in this lawsuit, another critical piece of evidence supporting knowledge and intent to defraud.

The United States decided to assert the forfeiture defense, obtained necessary supervisory approvals, and communicated our intent to assert the defense to Entergy within 30 days of obtaining these critical documents in the March 26, 2026 production. This explanation of specific evidence supporting the defense obtained late in discovery is sufficient to demonstrate that our motion is not unduly delayed. *Hanover*, 134 Fed. Cl. at 60-61 (itemizing evidence supporting the forfeiture defense that was obtained over the course of discovery); *accord St. Paul Fire & Marine Ins. Co. v. United States*, 31 Fed. Cl. 151, 154 (1994) ("[D]efendant's reasonable and careful investigation into the merits of its counterclaim, after receiving *all* relevant probative data, for a period of six months, is not *prima facie* indicia of a calculated intent to delay trial nor an intent to injure plaintiff's ability to adequately and effectively prepare its case[;] . . . it reflects a calculated search for the true facts which will facilitate 'a proper decision on the merits.'" (quoting *Foman v. Davis*, 371 U.S. 178, 181 (1962) (emphasis in original)).

**B. Entergy Has Not Been Prejudiced by the Timing of the United States' Filing**

Our motion further explained that every pleading amendment results in some degree of prejudice to an opposing party, and as a result the law requires that Entergy demonstrate undue prejudice, greater than ordinary prejudice, to properly oppose our motion. ECF No. 160 at 19-20. Here, even ordinary prejudice is absent because nearly all the evidence the United States

[redacted]

intends to offer in support of our forfeiture defense will also be introduced at trial to support our other defenses to Entergy's claim for recovery of the Holtec cask costs. The trial evidence will already demonstrate that Entergy knowingly paid Holtec more than it should have for the cask systems due to [redacted] and that the nonbid justification form is inaccurate. The only additional evidence necessary for the forfeiture defense is the proof that the Entergy executives knew that the nonbid justification form was false and knew that the form would be used to support Entergy's claim for recovery in this lawsuit.

The case on which Entergy principally relies to support its claim of undue prejudice, *King v. United States*, 119 Fed. Cl. 51 (2015), is not analogous to this one. There, the United States sought to raise a new defense based on the Government's own information, not information learned from the plaintiffs through discovery. *Id.* at 55-56. Further, the proposed affirmative defense would have substantially expanded the time period at issue in the case and prompted an additional retaliation claim from the plaintiffs. *Id.* at 56-57. Finally, the United States had another procedural avenue available to bring the claims it sought to introduce into the plaintiffs' case. *Id.* at 57. None of these factors are present here. In particular, the United States would have no way to vindicate its interest in holding Entergy accountable for attempting to recover fraudulent claims except through this case.

Even if the Court credits Entergy's prejudice arguments, they cannot provide a basis to deny our motion because any prejudice was caused by Entergy's litigation choices, not by the timing of our motion. Entergy's prejudice arguments focus on the fact that our motion was filed after the close of fact discovery and after the death of Mr. Bakken. ECF No. 175 at 33-38. Entergy fails to disclose its prior admission to the United States that Entergy's counsel was

[redacted]

aware of the possibility we might consider the forfeiture defense by late 2024 or early 2025. Thus, Entergy's choices in discovery were made with full awareness of the possibility that the United States would assert a forfeiture defense. In addition, as described above, much of the critical evidence establishing knowledge and intent was not produced to the United States by Entergy until March 26, 2026, three weeks before the close of fact discovery, and after the United States was forced to file a motion to compel to obtain those documents. Entergy chose not to search for critical documents or not to produce critical documents until the very end of fact discovery. The United States filed our motion less than 30 days after receiving those documents. Any prejudice to Entergy from the timing of our motion was caused by Entergy's own discovery delays.

Nor does Mr. Bakken's unavailability provide a basis to deny our motion. As shown by the cases cited in Entergy's opposition, the key question in assessing prejudice from a witness's death is whether the parties had the opportunity obtain the witness's testimony through a deposition before his death. Entergy relies on two cases that found undue prejudice where a plaintiff sought leave to add new causes of action, expanding the pool of relevant witnesses to include witnesses who had died and were not deposed. *Essani v. Earley*, No. 13-cv-3424, 2018 WL 3785109, at *8 (E.D.N.Y. Aug. 9, 2018), *report & recommendation adopted*, No. 13-cv-3424, 2018 WL 4100483 (E.D.N.Y. Aug. 28, 2018); *Williams v. Cost-ULess, Inc.*, No. 2011-cv-025, 2014 WL 2993667, at *6 (D.V.I. July 3, 2014).[2] Here, Mr. Bakken was deposed prior to his death, mitigating any prejudice.

[2] *NVF Co. v. New Castle Cnty.*, 276 B.R. 340, 356 (D. Del. 2002) addressed prejudice in evaluating a laches argument on a motion for summary judgment, not in a motion to amend a pleading under Rule 15.

[redacted]

Indeed, Entergy misplaces its reliance on *Underwood v. O'Reilly Auto Enters., LLC*, 342 F.R.D. 338 (D. Nev. 2022), which fully supports the United States' position. There, in granting a plaintiff's motion to amend under Rule 15 to add new causes of action, the Court observed that "[a] finding of undue prejudice does not flow automatically from [the death of a party or witness.]" *Id.* at 343. The Court found no undue prejudice because the witness was deposed before his death and other witnesses and documents were available to address the matters relevant to the deceased witness. Here, Mr. Bakken was deposed. The United States is still working with the parties to schedule the deposition of Holtec's CEO, Dr. Singh, who was party to many of the relevant discussions with Mr. Bakken. The document record pertaining to Mr. Bakken is admittedly limited, but that is only because his documents, which were preserved and in existence at the time these cases were filed, were later lost in April 2024. To the extent that document destruction heightens Entergy's prejudice from Mr. Bakken's death, that prejudice was again not caused by the timing of our motion.

Thus, Entergy has failed to demonstrate that the United States' motion to amend our answer was unduly delayed or was the cause of Entergy's claimed prejudice.

## II. The United States Satisfied the Requirement under RCFC 9(b) to Plead Fraud with Particularity

Under RCFC 9(b), any allegation of fraud must be pled with particularity. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009). The main purpose of the particularity requirement is to "assure that only viable claims alleging fraud or mistake are allowed to proceed to discovery" to prevent an unfounded fraud allegation from permitting a party to "us[e] discovery as a fishing expedition." *In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1310 (Fed. Cir. 2011). A party cannot "simply aver[] the substantive elements of [a fraud claim], without setting forth the particularized factual bases for the allegation." *Exergen*, 575 F.3d at

[redacted]

1326-27. The pleading must specify the "who, what, when, where, and how of the material misrepresentation or omission." *Id.* at 1327.

However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." RCFC 9(b). This language "excuses a party from pleading [intent] under an elevated pleading standard." *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). A party only must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Exergen*, 575 F.3d at 1327. And at the pleading stage, the Court can make this reasonable inference without requiring the kind of clear and convincing evidence that is necessary at trial. *Id.* at 1329 n.5. This is consistent with the Court's observation in section 2514 cases that "[f]raud becomes impossible of proof, and cheap indeed, if nothing but a confession by the one obviously guilty will prove it," *Standard Oil Co. of Kan. v. United States*, 47 F. Supp. 120, 141 (Ct. Cl. 1942), and as a result "[o]rdinarily fraud can only be established from circumstances." *Kamen Soap Prods. Co. v. United States*, 124 F. Supp. 608, 620 (Ct. Cl. 1954).

The United States has satisfied the requirements of RCFC 9(b) here. The United States alleges [redacted] executed a nonbid justification form that contained materially false statements or other omissions that rendered the document materially false. The proposed amended answer identifies the specific statements and omissions the United States contends are material and false, and the evidence supporting the allegations that the executives had actual knowledge about the false statements and omissions. ECF No. 160-2 ¶¶ 152-171. The proposed amended answer also alleges that [redacted] to the nonbid justification form knew that the United States and this Court would require Entergy to adequately justify its decision to accept Holtec's inflated prices,

[redacted] and that the proposal information submitted by Holtec was likely insufficient to support a claim for reimbursement. *Id.* ¶¶ 85, 102-03, 113, 116, 122, 124-25, 135, 140. More specifically, the proposed answer alleges that [redacted] focused [redacted] In depositions, [redacted], pointed to the nonbid justification form as containing the complete explanation of their claimed reasons for accepting Holtec's proposal, further cementing the fact that Entergy intended to rely on the nonbid justification as part of its proof in these cases to support its recovery for the amounts Entergy paid for the Holtec dry fuel storage cask systems.

The United States also has alleged sufficient facts to infer the necessary knowledge and intent. There can be no question that the United States has stated our fraud allegations with enough specificity for Entergy to determine which individuals allegedly committed which acts with the requisite knowledge and intent to defraud. [redacted], all of whom knew of the material falsities in the nonbid justification form. [redacted], but at a minimum [redacted] all knew that Entergy faced litigation risk in attempting to recover as damages the inflated costs associated with the Holtec contract. [redacted] These facts are sufficient to infer the necessary knowledge and intent.

[redacted]

### III. The Proposed Affirmative Defense is Not Futile or Offered in Bad Faith

Entergy's final argument against our motion is that our allegations, even if true, are legally insufficient to support forfeiture under section 2514. ECF No. 175 at 14-22. Although Entergy disputes many of the United States' factual allegations in its statement of the case, *id.* at 4-11, Entergy correctly does not rely on its factual disputes as a basis to deny the United States' motion. The Court must accept our allegations as true, the same as it would in reviewing a motion to dismiss under RCFC 12(b)(6). *Meyer Grp., Ltd. v. United States*, 115 Fed. Cl. 645, 650 (2014) (citing *Iqbal*, 556 U.S. at 678; *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 71 Fed. Cl. 172, 176 (2006)).

Entergy makes two legal arguments in support of its contention that the United States' proposed amendment is legally futile: (1) the United States' proposed defense conflicts with the Federal Circuit's opinion in *Kellogg Brown & Root*, ECF No. 175 at 16-18, and (2) Entergy is not relying on the nonbid justification form as part of the proof of its claims. *Id.* at 18-21. Both arguments are mistaken.

As an initial matter, Entergy's futility arguments fundamentally ignore the background legal principles informing its damages claims, which Entergy is familiar with. At times, Entergy appears to contend that because it is claiming as damages the actual amount it paid to Holtec, Entergy could not have been attempting to defraud the United States. In doing so, Entergy ignores its evidentiary burdens as a spent nuclear fuel plaintiff to prove that the type and magnitude of the costs it seeks to recover were caused by the breach and were foreseeable at the time of contracting. *Southern Nuclear v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011); *Landmark Land Co. v. Federal Deposit Ins. Corp.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001);

[redacted]

*Carolina Power & Light Co. v. United States*, 115 Fed. Cl. 57, 59 (2014) (citing *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Entergy "[a]s the party with the burden or proof, [must] prove that it is not seeking to recover any improper costs." *Energy Nw. v. United States*, 641 F.3d 1300, 1307 (Fed. Cir. 2011). Without the complete set of evidence necessary to compare Entergy's "condition with full Government performance, the Court of Federal Claims [can] not perform the necessary comparison between the breach and non-breach worlds and thus [can] not accurately assess [Holtec's] damages." *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008) (citing *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001); *Bluebonnet Sav. Bank FSB v. United States*, 67 Fed. Cl. 231, 238 (2005)). The nonbid justification form is a key document establishing these elements of Entergy's affirmative claim for damages. Thus, falsifications to the document fall directly within the ambit of section 2514 as fraud in connection with the "proof" or "establishment" of Entergy's claim.

### A. The United States' Proposed Forfeiture Defense is Fully Consistent with the Federal Circuit's Interpretation of Section 2514 in *Kellogg Brown & Root*

Entergy criticizes the United States for failing to cite to *Kellogg Brown & Root* in our motion. ECF No. 175 at 16. We instead cited more directly relevant appellate precedents concerning the scope and application of section 2514: *O'Brien Gear & Machine Co. v. United States*, 591 F.2d 666 (Ct. Cl. 1979); *Kamen Soap*, 124 F. Supp. 608; *Standard Oil*, 47 F. Supp. 120. But *Kellogg Brown & Root* further supports our claim that Entergy's conduct falls within the type of behavior section 2514 plainly prohibits.

The main significance of *Kellogg Brown & Root* was that it resolved an issue of statutory interpretation that had divided judges of the Court of Federal Claims – whether section 2514 could be invoked in cases where the United States did not allege that any part of the plaintiff's

[redacted]

claim in this Court was fraudulent, but where there was evidence of fraud in the formation or performance in the contract underlying the claim. 728 F.3d at 1365-66. The Federal Circuit rejected the broader reading of the statute that section 2514 applies when "fraud is *practiced* during the contract performance *or* in the making of the claim." *Id.* at 1366 n.18 (quotation omitted) (citing cases) (emphasis in original). Instead, the Federal Circuit affirmed that, to assert the forfeiture defense under section 2514, the United States must allege fraud in the claim that was filed with the Court. *Id.* at 1366.

That is precisely what the United States has alleged here. Entergy committed fraud because it knew it was overpaying Holtec and it knew it was improperly attempting to recover those inflated costs through its damages claim against the United States. Thus, the facts of this case align with the Federal Circuit's description of what was missing in *Kellogg Brown & Root*. There, the United States argued that by proving that a subcontract was executed due to an improper kickback, the Court could presume that invoices seeking reimbursement for the costs of that tainted contract were overstated. *Id.* at 1367. The Court disagreed, holding that the United States was still obligated to allege and prove that the claim was actually inflated, and that the plaintiff knew it was submitting improperly inflated costs. *Id.* That is our allegation here – Entergy knew it was paying inflated costs to Holtec, and Entergy falsified the key justification document to ensure that it could recover in this lawsuit the full amount of the inflated Holtec costs. That is the precise set of allegations the Federal Circuit explained would be necessary to properly allege fraud.

Moreover, *Kellogg Brown & Root* refutes Entergy's suggestion that it cannot be liable for fraud by attempting to recover amounts it actually paid. There, the Court suggested that the deficiency in the United States' claim was that the United States did not allege that the plaintiff

[redacted]

knew it was submitting inflated costs. Entergy's agreement to pay an amount it knew to be inappropriately high, combined with the falsification of the justification to hide Entergy's understanding that it was paying too much, is sufficient to support a defense under section 2514. Thus, *Kellogg Brown & Root* is fully consistent with the United States' invocation of section 2514 here.

### B. The Nonbid Justification Form is an Essential Element of Entergy's Proof in Support of its Claim to Recover the Costs Paid to Holtec

Entergy's other argument for legal futility is that Entergy never intended the nonbid justification form to be used in support of its claim. ECF No. 175 at 18-21. As an initial matter, this is a dispute of fact that is not a proper basis to deny our motion. As outlined in our proposed answer, the United States alleges that Entergy knew it needed to document a valid business justification to support its recovery of Holtec's inflated costs in this lawsuit. Entergy's executives also knew that the relevant staff [redacted] And Entergy's [redacted] Rather than taking any of the legitimate options available – insisting that Holtec lower its prices, moving to a competitive bid, or even accepting Holtec's prices with the acknowledgement that Entergy would not be able to recover the full amount in this lawsuit – Entergy chose to prepare a knowingly false justification document to enhance its likelihood of litigation recovery. Those factual allegations are presumed true (and all find support in the discovery record in any event). That alone is sufficient to reject Entergy's factual dispute that the nonbid justification form was not intended to be used in support of Entergy's claims in these lawsuits.

[redacted]

Even if the Court considers the substance of Entergy's argument that the nonbid justification form was not part of Entergy's proof in support of its claim, that argument is easily refuted. Entergy knew that it had the legal burden to demonstrate that it had not agreed to an excessive payment. The Federal Circuit had previously denied Entergy recovery for excessive state-mandated payments that the Court described as a "form of blackmail." *Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee, LLC*, 683 F.3d 1330, 1346 (Fed. Cir. 2012). The Court explained that it may have been "in the best interests of the company" to make the demanded payment, but it was not foreseeable at the time of contracting that the United States would be required to reimburse Entergy for such gratuitous payments in the event of a breach. *Id.* at 1347-48.

From that experience, Entergy understood that it could not simply defer to its business judgment to justify the amount it chose to pay Holtec. As explained above, Entergy had to justify the amount as reasonable and a foreseeable consequence of the breach and to "prove that it is not seeking to recover any improper costs." *Energy Nw.*, 641 F.3d at 1307. Without the nonbid justification form, Entergy would be unable to meet its burden of proof – there is no other document that purports to explain why Entergy chose to pay the price premium it did. If the nonbid justification document were removed from the record, Entergy would be unable to recover its costs paid to Holtec at all for lack of proof demonstrating its affirmative burden that the costs were foreseeable and caused by the breach. Thus, Entergy's assertion that the nonbid justification is not a key element of its proof must be rejected in light Entergy's evidentiary burdens in spent nuclear claims.[3]

---

[3] The [redacted] specifically cited the nonbid justification form as the key document that explained Entergy's reasons for accepting the excessive prices Holtec was charging. [redacted] ("[The] sole source

[redacted]

Finally, Entergy is incorrect to suggest that the false nonbid justification form is somehow distinct from other corporate records that the Court has relied on to support a finding of forfeiture under section 2514. In both *Standard Oil* and *Kamen Soap*, plaintiffs' claims were initially denied by the United States due to the absence of corporate records supporting them. In response, the plaintiffs falsified the necessary records and submitted them in support of their claims – in *Standard Oil* the falsified corporate documents were board meeting minutes, 47 F. Supp. at 136-39, and in *Kamen Soap* the falsified corporate documents were interoffice memoranda. 124 F. Supp. at 620-21. The only difference here is that Entergy, with its long experience in spent nuclear fuel cases, knew that the United States would request something like the nonbid justification form to support its claim for the Holtec costs, and so Entergy generated the false document before the United States asked for it. The issue is not whether the document is an "authentic" document as opposed to a forgery, as Entergy contends. The issue is whether the document was falsified by Entergy to support its claim. The only difference between the nonbid justification form here and the meeting minutes in *Standard Oil* or the memoranda in *Kamen Soap* is that the falsification here occurred before the United States requested the document instead of after.

Ultimately, the statute does not support Entergy's efforts to finely parse which exact kinds of documents give rise to section 2514 liability. The statute speaks in broad terms – "A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof,

---

justification would have been a document – and I signed it after reading it very carefully at the time – the document and the logic and the reasoning behind the decision."); [redacted] ("I used this type of justification to . . . document why you make that decision, and you don't spend time and money going to bid."); [redacted] ("SGB was a new process, and I want to reinforce that process as a critical step in the decision-making process. The reason for that is that the rationale is laid out clearly, the justifications are laid out clearly . . . .").

[redacted]

statement, establishment, or allowance thereof." 28 U.S.C. § 2514. In *O'Brien Gear & Machine*, the Court of Claims, remarking on Congress' intent in the original 1863 legislation, explained that "[t]he breadth of the application of the section is repeatedly seen in the forcible quality of the phrases used." 591 F.2d at 679. The United States alleges that the nonbid justification form was falsified as part of the proof that Entergy was required to offer in support of its claim. That is sufficient to invoke the forfeiture defense under section 2514.

## IV. Entergy's Cross-Motion to Strike is Procedurally Improper and Should be Denied

"A motion to strike must be directed to a 'pleading,' which term has been construed narrowly by the courts. Other court documents may not be attacked by a motion to strike. In particular, a motion to strike may not be used to strike another motion." *Fisherman's Harvest, Inc. v. United States*, 74 Fed. Cl. 681, 690 (2006) (citations omitted). The Court reached the same conclusion in *Hardy v. United States*, 153 Fed. Cl. 624, 626-27 (2021), one of two cases cited in support of Entergy's cross-motion to strike. The only other authority relied upon by Entergy is a Federal Circuit opinion in which the court struck offensive and irrelevant material that was included in a brief filed by a *pro se* litigant. *Arunachalam v. Int'l Bus. Machines Corp.*, 989 F.3d 988, 999-1002 (Fed. Cir. 2021). The United States assumes that Entergy is not comparing our motion to a *pro se* filing.

The United States requests that Entergy's cross-motion be denied and that the Court preclude Entergy from filing a reply in support of its procedurally improper cross-motion. The Court should instead treat the cross-motion to strike as part of Entergy's response to our motion. *See Fisherman's Harvest*, 74 Fed. Cl. at 690 ("The Court treats the arguments contained in Plaintiffs' motion to strike as a response to Weeks Marine's motion.").

[redacted]

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that Court grant our motion for leave to file an amended answer.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

s/Evan Wisser
EVAN WISSER
Senior Trial Counsel
NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-3682
evan.wisser@usdoj.gov
*Attorneys for the United States*

OF COUNSEL:

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Office of the General Counsel

Dated: September 18, 2026

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 18th day of September, 2026, I sent via email a copy of the foregoing document to plaintiff's counsel, pursuant to paragraph 2 of the Court's Amended General Order No. 2026-01.

s/Evan Wisser

TP.One
Court Reporting
A LEXITAS COMPANY

# Transcript of [redacted]

Thursday, December 4, 2025

***System Energy Resources, Inc. v. The United States***

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 162022

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SYSTEMS ENERGY RESOURCES, INC., ET AL. PLAINTIFFS

VS.

THE UNITED STATES DEFENDANTS

AND

HOLTEC INTERNATIONAL INTERVENOR

---

ENTERGY LOUISIANA, LLC PLAINTIFF

VERSUS

THE UNITED STATES DEFENDANTS

AND

HOLTEC INTERNATIONAL INTERVENOR

*************************************************

DEPOSITION OF [redacted]

*************************************************

APPEARANCES NOTED HEREIN

TAKEN AT WISE, CARTER, CHILD & CARAWAY
401 EAST CAPITOL STREET
JACKSON, MISSISSIPPI
ON DECEMBER 4, 2025
AT APPROXIMATELY 9:00 A.M.

REPORTED BY: AMANDA M. WOOTTON, CSR, RPR
Court Reporter & Notary Public
Amanda Wootton Reporting, LLC
eMail: amanda@awreporting.net
338 Indian Gate Circle
Ridgeland, Mississippi 39157
601.573.0961

APPEARANCES:

Samidh Guha, Esquire
Venable, LLP
151 West 42nd Street
New York, NY 10036
sguha@venable.com

Robin F. Bromberg, Esquire
Langley Bromberg
2700 US-280, Suite 350E
Birmingham, Alabama 35233
robin@langleybromberg.com

Charles E. Ross, Esquire
Wise, Carter, Child & Caraway, P.A.
401 E. Capital Street, Suite 600
Jackson, Mississippi 39201
cer@wisecarter.com

Samuel O. Morris, IV, Esquire
Entergy Services, LLC
Jackson, Mississippi
smorri5@entergy.com

Evan Wisser, Esquire
United States Department of Justice
P. O. Box 480
Washington, D.C. 20044
evan.wisser@usdoj.gov

Attending via Zoom:

William M. Sullivan, Jr., Esquire
Jay Silberg, Esquire
Drew Navikas, Esquire
Johnna Purcell, Esquire
Pillsbury, Winthrop, Shaw Pittman, LLP
1200 Seventeenth Street NW
Washington, DC 20036-6131
wsullivan@pillsburylaw.com

Also Appearing: Matthew McQuillen - Beacon Group, LLC
Miguel Espino - Beacon Group, LLC



* * * * * *

TABLE OF CONTENTS

Appearances 2
Examination by Mr. Wisser 7
Conclusion of Deposition 248
Certificate of Reporter 249



E X H I B I T S

Exhibit No. 1: ENGGIV65845 41
Exhibit No. 2: Bates No. WFIII41187 49
Exhibit No. 3: Bates No. WFII41147 58
Exhibit No. 4: Bates No. WFIII41188 - WFIII41190 63
Exhibit No. 5: Bates No. WFIII41204 80
Exhibit No. 6: WFIII41185 83
Exhibit No. 7: Bates WFIII41193 85
Exhibit No. 8: WFIII 41195 90
Exhibit No. 9: Bates No. WFIII 41199 and WFIII 41200 94
Exhibit No. 10: Bates No. WFIII41194 96
Exhibit No. 11: Holtec 4156 to Holtec 4166 99
Exhibit No. 12: Bates No. Holtec 4172 - Holtec 4173 100
Exhibit No. 13: WFIII41150 - WFIII41162 101
Exhibit No. 14: ENGGIV65959 - ENGGIV65968 125
Exhibit No. 15: ENGGIV65831 - ENGGIV65832 127
Exhibit No. 16: Holtec4197 - Holtec4199 135
Exhibit No. 17: ENGGIV65995 144
Exhibit No. 18: ENGGIV66908 146



E X H I B I T S

Exhibit No. 19: Bates No. WFIII 40863 - WFIII40877 149
Exhibit No. 20: ENGGIV66932 158
Exhibit No. 21: Holtec3 - Holtec5 167
Exhibit No. 22: WFIII 40885 - WFIII40887 171
Exhibit No. 23: WFIII41201 177
Exhibit No. 24: WFIII41202 177
Exhibit No. 25: ENGGIV60200 - ENGGIV60203 177
Exhibit No. 26: WFIII39221 - WFIII39221 236
Exhibit No. 27: ENGGIV60377 - ENGGIV60389 236

Page 162

you the opportunity to help me understand it.

I can appreciate that as a motivating factor for the ultimate decision as to which vendor to choose. I don't think that's an unreasonable position to take.

The difficulty I have is why was that a reason not to leverage the prices downward with Holtec? Wouldn't that still be in the company's best interest?

MR. GUHA: Objection.

You can answer.

A I don't know if they would have leveraged it down or not.

MS. BROMBERG: Objection. Lack of foundation.

MR. ROSS: I join in that.

A Can you ask the question again?

MR. WISSER: (Continuing.)

Q Yes. [redacted]

A So in your question there is the assumption it would. I have no idea whether it would or wouldn't

Page 163

have. Didn't see the need to do it.

[redacted]

Q And, again, I appreciate that. I'm not trying to accuse anyone of malfeasance. I'm trying to understand where in the thought process these decisions were made.

So I guess my reaction to your statement, though, is you can't know if they would have lowered the prices if you didn't ask, right?

A I can't know if they would or wouldn't.

Q There is no way to know.

A No.

MR. GUHA: Can we take a two-second break when you have -- because I have a question I want to ask when you're at a logical point.

MR. WISSER: Give me one second. Yeah, let me try to follow up on a couple more things here, and then we can do a break.

MR. GUHA: Sure.

MR. WISSER: (Continuing.)

Q So I'm going to ask this question without a

Page 164

document because we don't have documents for this, so I'm going to ask this first.

There is a gap in the productions that are provided to us. We have virtually no documents between June 2019 and September 9th of 2019 on this topic.

My question to you -- I know you have nothing to do with the litigation that I'm asking about.

My question to you is simply from your memory, was there any reason why e-mail traffic would have ceased for three months on this activity in that time period?

MS. BROMBERG: Objection.

MR. GUHA: Objection.

A I have no idea.

MR. WISSER: (Continuing.)

Q Okay. Do you recall whether you made a decision to stop communicating by e-mail during that time period?

A I would have not done that.

Q Okay.

A And I don't recall doing it. But, as a matter of course, I would have not done that.

Q Okay. In -- on July 18th, 2019, there was a

Page 165

meeting that was convened by Mr. Griffin with the members of the team in which Mr. Griffin communicated that [redacted]

Do you recall anything like that as direction you would have given?

A I don't recall when the decision was made, but there was a decision made by the leadership to continue on negotiating with Holtec and sole source. I don't remember the timing.

Q Would that have been before or after the sole source justification memo?

MS. BROMBERG: Objection.

MR. GUHA: Objection.

A I don't recall. But sole source justification would have been a document -- and I signed it after reading it very carefully at the time -- the document and the logic and the reasoning behind the decision. I just don't recall the timing.

MR. WISSER: (Continuing.)

Q And I'm just trying to get a sense of the relative sequence.

Do you know if that direction to proceed directly with Holtec would have preceded or been after the execution of the sole source justification?

Page 194

would have had to have been comfortable with what's written in it, or [redacted] wouldn't have signed it.

Q Okay. Did you have any understanding as to -- well, let me ask a philosophical question.

What is the --

MR. GUHA: I'll just object to this.

MR. WISSER: (Continuing.)

Q Do you have understanding in general about why a form like this is prepared to document a decision to proceed on a non-bid basis?

MR. GUHA: Object.

A This isn't an unusual thing in process at, frankly, any of the companies I worked for. If you make a decision to go non-bid, you have to document your decision-making so that it can be reviewed later if it is in question, just as it is today.

MR. WISSER: (Continuing.)

Q And that was my next question. I guess there are many people I could speculate.

But was there any general understanding as to who was in mind who might have reason to look at this after the fact?

A I expected rate regulatory scrutiny at the time.

Q Okay. And, certainly, we're sitting here

Page 195

today reviewing this in the context of litigation, correct?

A Yes.

Q And would it be consistent with Entergy's practices that a document like this would be used to explain its decision-making for those purposes too?

MR. GUHA: Objection.

MR. ROSS: Object to the form. He said at the time it was rate regulatory from his standpoint.

A From my perspective, it was rate regulation.

MR. WISSER: (Continuing.)

Q Okay. Do you believe it is inappropriate to reference this document to support the decision in a litigation context?

MR. GUHA: Objection.

MR. ROSS: Objection. I don't know what you're asking.

MR. WISSER: (Continuing.)

Q Based upon your knowledge of this document, do you think it is an inappropriate use of the document?

MS. BROMBERG: Objection.

MR. GUHA: Objection.

MR. ROSS: Objection.

Page 196

A I think the document stands on its own.

MR. WISSER: (Continuing.)

Q Do you think that it is a correct document in explaining the reasons for the decision?

A Yes, or I wouldn't have signed it.

Q All right. So let's look at the full document here.

Again, we'll start with No. 2, same element of the form. "Describe the unique features that make this product or service available only from this supplier."

Let me ask, just before we get into the explanation here. What do you understand the question being asked by this element of the form to be?

A It's asking you why the supplier is the preferred supplier. I mean, I'm using different words. But, to me, that's what it is. Why is it that you're selecting this supplier.

Q And when it refers to unique features, what do you understand that threshold to be?

A I don't know that I have a threshold that I could define for unique.

Q I guess what I'm trying to get is, to be a unique feature, does it have to be only available from the supplier that's being selected?

Page 197

MR. ROSS: I object. Asked and answered.

A I think if you read -- again, I think we're wordsmithing the sentence, but that's okay. It's unique features; it's plural. So it's really looking at the system in aggregate and why you're choosing the supplier you're choosing.

MR. WISSER: (Continuing.)

Q And, again, I don't think -- as you say, we're wordsmithing. I don't think intention here --

A No. I just think it's actually a sum of the words, as opposed to one word. I think it is paragraphs. And as they're written, I think they do do it, describe why this particular supplier is the one that we chose to sole source.

Q And I appreciate your reference to it could be multiple features or elements.

A Yes.

Q What I'm trying to get at is I read this as suggesting that whatever combination of aspects are being considered or described is something that only that particular supplier could provide.

A Yeah. That's not my understanding of the form.

Q Okay. So what is your understanding, then?

Page 198

A I used this type of justification to -- again, I can't remember if it is Entergy or elsewhere. But you have two or three suppliers that can, in theory, do the same thing, but one of them is far better than the other, and you have an experience base with them. And you document why you make that decision, and you don't spend time and money going to bid.
Q Okay. So let's look at the response that's here. I don't plan on reading every word here and going through it. But I don't want you to feel like I am omitting something that you believe is relevant. So I'll highlight some lines and phrases and sentences. But if you feel like I've missed something or there's something else that in fairness should be considered, please feel free to volunteer that.
So the starting sentence says, '[redacted]
Do you see that?
A Yes.
Q I think we've talked about this a fair amount.

Page 199

But was that in fact one of the reasons you understood to go with Holtec, [redacted]
A [redacted]
Q Okay. And then it says that, [redacted]
Do you see that?
A Uh-huh. (Affirmative response.)
Q Was that referring to the Holtec system used under the old contract or the higher capacity system being proposed under the new contract?
A I believe it's the old contract.
Q Okay. [redacted]
A If you change vendors, you have to go back and completely re-analyze all of the equipment to use a new vendor. Just telling me -- I mean, earlier you mentioned -- I didn't know this -- that the cask from the competitor was the same size and weight.
That's interesting, but that's a very small part of the calculations and the reviews that would

Page 200

need to be done. [redacted]
Q Okay. I'll skip down a little bit to -- there is a sentence that begins, [redacted]
Do you see that?
A Yes.
Q Okay. [redacted]
Again, I think you've discussed that a number of times as a risk factor in a new vendor, correct?
A Yeah.
Q Was that not an element that would need to be considered for the higher capacity Holtec casks?
A Over time it would be analyzed, but it wasn't an immediate need.
Q And I think that refers back to the conversation we were having a little earlier, that there was a planned transition period for the Holtec contract?

Page 201

A Sorry. Yes.
Q That's fine.
Okay. So by undergoing that phased transition, the existing casks could be used for a while while that transition work was undertaken?
A Yes. And that's what happened.
Q Okay. And I'll ask again in this context. I think you already told me the answer before.
But were you familiar with the work done by Mr. Gears [redacted]
A I don't remember seeing, no.
Q Okay. Then it says, [redacted]
Do you see that?
A Yes.
Q But, again, you're not familiar with the work done by Mr. Gears to perform that analysis?
A What you showed me that Mr. Gears did is not an analysis of what -- this is a detailed technical analysis, licensing review submissions to the NRC for approval. So it's that much paper, instead of a single page.

[redacted]

LEXITAS™

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C & 24-118C (Consolidated)<br><br>Judge Holte |
| ENTERGY LOUISIANA LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

ORAL DEPOSITION OF

[redacted]

THURSDAY, FEBRUARY 5, 2026

REPORTED BY: DEBRA A. DIBBLE, FAPR, RDR, CRR, CRC,

JOB NO. 2026-1010992

2

REMOTE ORAL DEPOSITION OF [redacted], produced as a witness at the instance of the Defendant, the United States, and duly sworn, was taken in the above-styled and numbered cause on the above-referenced date, from 9:03 a.m. to 4:36 p.m. MST, before Debra A. Dibble, CSR, CCR, RDR, CRR, Fellow of the Academy of Professional Reporters, Notary Public, reported by realtime stenographic means at Treasure Mountain Inn, 255 Main Street, Park City, Utah, pursuant to Rule 330 of the United States Court of Federal Claims.

3

P P E A R A N C E S:

WISE CARTER CHILD & CARAWAY, P.A.
BY: CHARLES E. ROSS, ESQUIRE
cer@wisecarter.com
Heritage Building, Suite 600
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5562
Counsel for Plaintiffs System Energy Resources, Inc., et al.

LANGLEY & BROMBERG LLC
BY: ROBIN F. BROMBERG, ESQUIRE
robin@langleybromberg.com
2700 U.S. Highway 280
Suite 350E
Birmingham, Alabama 35223
(205) 783-5750
Counsel for Entergy Louisiana, LLC

UNITED STATES DEPARTMENT OF JUSTICE
BY: EVAN WISSER, ESQUIRE
evan.wisser@usdoj.gov
P.O. Box 480
Ben Franklin Station
Commercial Litigation Branch, Civil Division
Washington D.C., 20044
(202) 616-3682
Counsel for Defendant

LSO PRESENT:
Tiffany Schleser, Beacon Group, LLC
Miguel Espino, CPA, LitCon Group

4

INDEX


| | |
|---|---|
| APPEARANCES | 3 |
| PROCEEDINGS | 11 |
| XAMINATION OF [redacted]: | |
| BY MR. WISSER | 11 |
| BY MR. ROSS | 247 |
| CERTIFICATE | 253 |


5

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mail(s), Subj: RE: Question for earnings call, ENGGIV0000079745-ENGGIV0000079747 | 34 |
| Exhibit 2 | E-mail(s), Subj: RE: DFS, ENGGIV0000065845 | 41 |
| Exhibit 3 | E-mail(s), Subj: RE: Southern fleet DFS Contract, ENGGIV0000080351-ENGGIV0000080353 | 44 |
| Exhibit 4 | E-mail(s), Subj: RE: SBG DRY Fuel Storage Contract Strategy 3.2018.docx, ENGGIV0000066910-ENGGIV0000066913 | 60 |
| Exhibit 5 | E-mail(s), Subj: RE: Southern fleet DFS Contract, ENGGIV0000080378-ENGGIV0000080380 | 63 |
| Exhibit 6 | E-mail(s), Subj: RE: Dry Storage Casks, WFIII0000041187 | 68 |

[redacted]

74

**proposal from Holtec, what was your understanding as to the input SGB would have provided pre-proposal in this particular case?**

A. They would have provided the input on the strategy proposed at the SGB, and the stakeholders would have reviewed that.

**Q. What information would have been reviewed if there were no proposal on the table about whether to go bid or no bid?**

A. Well, it would have been the various merits of that, in a paper form.

**Q. Can you think of any examples of the merits?**

A. Well, I mean, it's technical commercial. There -- it's laying out the strategy with all of the complex issues that these big services in hardware, especially in nuclear, especially in nuclear fuel, especially in used nuclear fuel, would examine, so...

It could be technical, operational, commercial. It could be risk included. So I just -- my point was I was reinforcing the SGB process, and the fact that a bid or no bid decision had not been made; and therefore, the appropriate rationale had to be put forward to make that

75

decision, and the earlier that is in the process, the better the decisions usually are.

**Q. And I appreciate that. And I think I understand that piece of it. I think what I'm trying to make sure I understand is your perspective on is the extent to which that decision could be made without any proposal information, which I understand your testimony to say might be appropriate, so I'm just trying to get a sense as to what would be the considerations that Entergy would rely on in a vacuum with no proposal that would nonetheless be sufficient to justify a bid/no bid decision?**

MR. ROSS: Objection, asked and answered.

THE WITNESS: Sorry?

MR. ROSS: Objection, asked and answered. You can answer.

A. I think I've already answered it. It depends on the specific circumstances.

I think it depends on the range of issues. Usually the commercial part is later in the process, when you decide to no bid and negotiate or bid and negotiate.

So I think there was information

76

available on Holtec's offerings. They were an incumbent. I think largely speaking, we understand -- we understood, as Entergy, this supplier better than any other options.

BY MR. WISSER:

**Q. All right. Let me follow up on just a few specifics and then you can let me know if they're relevant or not.**

A. Yep.

**Q. Entergy in-house challenges in transitioning to a new supplier, would that be a relevant consideration of a bid/no bid decision before even having a proposal in hand?**

MS. BROMBERG: Objection to form.

MR. ROSS: Object, vague. Do you understand the question?

MR. WISSER: I'll restate.

BY MR. WISSER:

**Q. And again, so what I'm trying to do is, I want to get as much specific information as you can.**

A. I understand.

**Q. So when you say there might be considerations that are, let's call them proposal agnostic, that would drive strategy over bid/no bid.**

A. Yeah, proposal could include lots of

77

things, so...

**Q. Right. And I want to make sure I'm clear about my predicate here. I'm talking about your response** [redacted]

A. No, I think my response was SGB was a new process, and I want to reinforce that process as a critical step in the decision-making process. The reason for that is that the rationale is laid out clearly, the justifications are laid out clearly and there is a challenge process. They're given assurance so that you're making the best business decision you possibly can, taking into account all of the different technical, commercial, all of the factors that go into something like this, especially when handling, you know, nuclear fuel. It's a radiator and it's extremely dangerous and a very delicate operation.

**Q. So let me make sure I understand your testimony then because that wasn't what I took away from your previous answer. So let me try and see if I can clarify.**

A. Okay.

**Q. When you were writing here you preferred**