IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C and 24-118C<br>(Consolidated)<br>Judge Holte<br>[redacted] |
| ENTERGY LOUISIANA, LLC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO STAY DEADLINE TO RESPOND TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. GLENN GEORGE, PHD AND RESPONSE TO PLAINTIFFS' CROSS-MOTION TO STRIKE DR. GEORGE'S SUPPLEMENTAL REPORT**

TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

ARGUMENT ..... 2

I. The Court Should Defer Consideration of Entergy's Motion to Exclude Dr. George's Testimony Until Motions *in Limine* are Filed During the Pretrial Schedule Under RCFC Appendix A ..... 2

II. The Court Should Deny Entergy's Motion to Strike Dr. George's Supplemental Report ..... 5

A. Entergy Concedes that the Matters Discussed in Dr. George's Report were Already Known to Entergy, Making Supplementation Unnecessary ..... 6

B. If the Court Concludes that Supplementation was Necessary, Dr. George's Supplemental Report Satisfies the Requirements of RCFC 26(e)(2) Because it Addresses Claims of Inaccuracies in the Original Report and it Addresses New Information ..... 6

C. Even if the Court Concludes Dr. George's Supplemental Report was Untimely, Exclusion is not a Proper Remedy Because There is no Harm or Prejudice to Entergy, or any Minimal Harm can be Cured Through a Further Deposition ..... 9

CONCLUSION ..... 12

# TABLE OF AUTHORITIES

## Cases

*Cohen v. United States*,
100 Fed. Cl. 461 (2011) .......... 9, 12

*Deseret Mgmt. Corp. v. United States*,
97 Fed. Cl. 272 (2011) .......... 6, 7, 10

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir.), *cert. denied*, 146 S. Ct. 333, 223 L. Ed. 2d 165 (2025) .......... 4

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
156 F.4th 1289 (Fed. Cir. 2025) .......... 5

*Rogers v. United States*,
96 Fed. Cl. 472 (2011) .......... 9, 11

*Sci. Applications Int'l Corp. v. United States*,
169 Fed. Cl. 346 (2024) .......... 6, 10

*Sci. Applications Int'l Corp. v. United States*,
169 Fed. Cl. 643 (2024) .......... 7, 10

*Scott Timber, Inc. v. United States*,
93 Fed. Cl. 221 (2010) .......... 6, 7, 10, 11

*Zoltek Corp. v. United States*,
71 Fed. Cl. 160 (2006) .......... 9

## Rules

RCFC Appendix A .......... 4

## Other Authorities

*Alta Wind I Owner Lessor C v. United States*,
Fed. Cl. No. 13-402C, ECF No. 378 .......... 3

*Alta Wind I Owner Lessor C v. United States*,
Fed. Cl. No. 13-402C, ECF No. 379 .......... 3

RCFC Appendix A, Rules Committee Notes, 2002 Revision .......... 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C and 24-118C<br>(Consolidated)<br>Judge Holte |
| ENTERGY LOUISIANA, LLC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO STAY DEADLINE TO RESPOND TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. GLENN GEORGE, PHD AND RESPONSE TO PLAINTIFFS' CROSS-MOTION TO STRIKE DR. GEORGE'S SUPPLEMENTAL REPORT**

Defendant, the United States, respectfully submits this reply in support of our motion to stay a response to Entergy's motion to exclude the expert testimony of Dr. Glenn George, and

response to Entergy's cross-motion to strike Dr. George's supplemental report. The United States maintains that the parties' motions *in limine* seeking to exclude expert reports should be filed as part of the pre-trial schedule, after the parties' meeting of counsel and related disclosures, in accordance with the Court's standard practice under RCFC, Appendix A.

Regarding Entergy's cross-motion to strike, the logic of Entergy's argument appears to be that the United States had no obligation to supplement Dr. George's report, but could have presented testimony on the points of supplementation at trial without further disclosure. The United States does not disagree with that outcome – especially since the supplementation is not new or material – but in an abundance of caution, Dr. George chose to supplement his report to satisfy Entergy's concerns as articulated during his deposition. The Court should reject Entergy's attempt to punish the United States for its good faith proactive disclosure of corrections to Dr. George's expert report. Indeed, Entergy's attempt to strike Dr. George's supplemental report directly conflicts with Entergy's proffer of additional expert testimony under similar circumstances at trial in *NorthStar Vermont Yankee, LLC v. United States*, Fed. Cl. No. 18-1209C, which the court permitted. And ultimately, Entergy makes no showing of harm or prejudice resulting from Dr. George's supplement. For all these reasons, the Court should deny Entergy's cross-motion to strike.

## ARGUMENT

### I. The Court Should Defer Consideration of Entergy's Motion to Exclude Dr. George's Testimony Until Motions *in Limine* are Filed During the Pretrial Schedule Under RCFC Appendix A

The United States asks the Court to stay the deadline to respond to Entergy's premature motion *in limine* to exclude the testimony of Dr. George. Entergy asserts that the United States seeks to "flout the Court's authority and rules" by "grant[ing] itself an exemption or at least, an extension of its September 28 response deadline without awaiting the Court's permission." ECF

No. 183 at 13. To the contrary, the motion to stay was a proper procedure for the United States to ask the Court's permission to defer any response to Entergy's motion *in limine* until the Court sets the anticipated schedule for such motions.

Entergy contends that the Court should consider its premature motion *in limine* now because such a motion is not foreclosed by the Court's rules, ECF No. 183 at 14, and because resolving Entergy's motion *in limine* now "could streamline the case and facilitate its resolution through summary judgment or settlement." *Id.* at 13. These are the precise reasons this Court rejected plaintiffs' attempt to file a premature motion *in limine* in the recent *Alta Wind I* litigation. *Alta Wind I Owner Lessor C v. United States*, Fed. Cl. No. 13-402C, ECF No. 379. There, plaintiffs filed a premature motion *in limine*, arguing that the Court's prior order concerning motions *in limine* "did 'not say . . . [p]laintiffs must wait until a certain date before filing' a motion in limine . . . and that resolving their 'motion in limine now will promote economy and efficiency' . . . ." *Id.* (quoting *Alta Wind I*, ECF No. 378 at 1-3). The Court rejected these arguments, explaining that "a single post-discovery motion in limine deadline is sufficient in this case" for the reasons it stated in its prior order. *Id.* at 2. In the prior order referenced, the Court explained that it "[wa]s generally in agreement with the government a single post-discovery motion in limine deadline is sufficient" in response to the United States' assertion that "it makes no sense to have two deadlines for motions in limine, one prior to the close of expert discovery and another more general deadline following a post-discovery conference." *Id.* at 1 (internal quotations and citations omitted). The same logic applies here.

As Entergy notes, the United States acknowledges that motions *in limine* are not expressly referenced in the Court's Appendix A pre-trial procedures. ECF No. 183 at 13. However, in this Court motions *in limine* are scheduled during the pre-trial process as a matter of

course because they make the most sense after the parties have accomplished the prior steps in the pre-trial process. The parties are required to exchange exhibit lists, witness lists (including a description of the matters on which the witnesses will testify), and the parties' contentions of fact and law. RCFC Appendix A, ¶¶ 13-16. The parties are also tasked with attempting to resolve among themselves objections to the admission of testimony or exhibits. *Id.* ¶ 13(c)(2). Motions *in limine* are typically included in this Court's pretrial schedule after these steps. This timing gives the parties a chance to resolve among themselves disputes regarding the admissibility of evidence before filing motions, as well as permitting a party to assess which issues should be resolved through a motion *in limine* as opposed to through oral objections or cross-examination at trial. Entergy's premature motion eliminates the benefits of the pre-trial process set forth in Appendix A, which "reflect those procedures that are considered, in the collective experience of the court and the members of its bar, to be most beneficial in securing the prompt and expeditious resolution of claims and disputes." RCFC Appendix A, Rules Committee Notes, 2002 Revision.

The facts of this case demonstrate the wisdom of the Court's practice to set a single schedule for motions *in limine* as part of the pre-trial schedule. After Entergy's premature motion, discovery continued. The United States' depositions of Entergy's experts revealed substantial basis for the United States' own motions *in limine* on the basis that Entergy's experts are not offering opinions based on the facts of this case. *E.g.*, *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1346 (Fed. Cir.), *cert. denied*, 146 S. Ct. 333, 223 L. Ed. 2d 165 (2025) ("Where, as here, the relevant evidence is contrary to a critical fact upon which the expert relied, the district court fails to fulfill its responsibility as gatekeeper by allowing the expert to testify at

trial."); *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1297 (Fed. Cir. 2025) (affirming the exclusion of an expert whose opinions were "untethered to the facts of this case").

As discovery recently revealed, Entergy did not provide its experts with sufficient evidence to support their opinions. In the case of Dr. Borck, a statistician, Entergy provided him with only a few weeks to prepare his report from initial contact. Ex. A (Borck Tr.) 135:2-17. As a result, his statistical analyses are completely untethered from the facts of this case, of which he had no knowledge. Additional expert depositions revealed that Entergy did not provide the full discovery record to any of its experts. Ex. B (Reome Tr.) 11:8-13, 12:15-20.[1] In the case of Entergy's damages expert, Ms. Reome, this omission resulted in her asserting that the record was missing sufficient evidence of purchase orders and invoices to support the statistical analysis of Dr. George, when the United States produced those documents at Entergy's request back in February 2026. *See id.* 65:21-66:11, 68:14-69:6. The United States intends to file motions *in limine* on these matters and potentially others, once the schedule for such motions is set by the Court. The Court should reject Entergy's request to consider its own motion *in limine* in such a piecemeal fashion.

## II. The Court Should Deny Entergy's Motion to Strike Dr. George's Supplemental Report

Entergy's cross-motion to strike Dr. George's report should be denied for three reasons: (1) under the logic of Entergy's argument, no supplementation at all was required under RCFC 26(e)(2); (2) to the extent required, supplementation was appropriate under RCFC 26(e)(2); and (3) even if the supplementation was improper, Entergy has not shown that exclusion is the appropriate remedy under RCFC 37(c)(1).

[1] Entergy's expert Eileen Supko testified similarly but her deposition transcript is not yet available.

**A. Entergy Concedes that the Matters Discussed in Dr. George's Report were Already Known to Entergy, Making Supplementation Unnecessary**

Entergy suggests that the United States improperly invoked RCFC 26(e)(2) because the matters addressed in Dr. George's supplemental report were already known to Entergy. ECF No. 183 at 8. Accepting Entergy's representation, no duty to supplement existed and Dr. George is free to testify on these matters regardless of the existence of his supplemental report. *Sci. Applications Int'l Corp. v. United States*, 169 Fed. Cl. 346, 359 (2024); *Scott Timber, Inc. v. United States*, 93 Fed. Cl. 221, 224-25 (2010). For that reason alone, the Court can deny Entergy's motion as moot because Dr. George can testify on the matters contained within his supplemental report regardless of whether the report itself is stricken.

**B. If the Court Concludes that Supplementation was Necessary, Dr. George's Supplemental Report Satisfies the Requirements of RCFC 26(e)(2) Because it Addresses Claims of Inaccuracies in the Original Report and it Addresses New Information**

Assuming that the Court concludes that some part of Dr. George's supplemental report triggered the duty to supplement under RCFC 26(e)(2), then the report is proper under that rule. *See Deseret Mgmt. Corp. v. United States*, 97 Fed. Cl. 272, 274 (2011) (explaining that "the purposes of a true supplement" include an "indicat[ion] that [the] initial report contained inaccuracies or that [the expert] had discovered new information"). As an initial matter, Entergy's assertion that Dr. George was not responding to new information is incorrect with respect to one portion of his supplemental report. In Section III.F., ECF No. 183-1, ¶¶ 52-59, Dr. George responded to alternative regression analyses that he was presented with for the first time in his deposition. Entergy concedes that it was not improper for Dr. George to produce a supplemental report in response to that information which was newly provided by Entergy. *See* ECF No. 183 at 4-5 (accepting the supplements to the United States' other expert reports to address newly produced information).

With respect to the remaining portions of Dr. George's supplemental report, the United States agrees that, although a party can correct inaccuracies, *Deseret Mgmt.*, 97 Fed. Cl. at 274, a party cannot, through a supplement, introduce new expert opinions or analyses or to fix a prior analysis. ECF No. 183 at 17-21 (citing cases). Here, Dr. George has done no such thing. As Dr. George notes in his supplement, his "modified analysis does not materially affect the results or opinions expressed in the George Report." ECF No. 183-1, ¶ 6. Dr. George re-ran his existing analyses with alternative data points and additional variables that were raised during his deposition. In every instance, he concluded that the substitution of data points or variables did not materially affect the outcome of that analysis or his overall opinions. *Id.* ¶¶ 10, 11, 14, 19, 20, 23, 34, 36, 45, 47, 49. Thus, contrary to Entergy's assertion, Dr. George is not conducting new analyses and forming new opinions. Rather, he is simply showing that Entergy's critiques of his work do not impact his final results, and his analysis and opinions remain unchanged.

This fact distinguishes Dr. George's supplemental report from each of the precedents cited in Entergy's motion, in which the Court precluded an expert from conducting new analysis that changed the expert's opinions and conclusions. Here, all Dr. George has done is show that his analyses and opinions remain exactly the same, notwithstanding the critiques leveled by Entergy. Supplementation of an expert report for this purpose is consistent with this Court's general practice regarding expert supplementation. *Scott Timber*, 93 Fed. Cl. at 227-28 (permitting a party to serve a supplemental report that "introduce[s] no new topics or methodology to the case"). *Cf. Sci. Applications Int'l Corp. v. United States*, 169 Fed. Cl. 643, 673 (2024) (excluding a supplemental report that "does not correct or make complete Dr. Bajaj's existing infringement arguments; it presents entirely new, substantive opinions regarding infringement that were never previously presented"); *Deseret Mgmt.*, 97 Fed. Cl. at 274

(excluding a supplemental expert report that "offers a new theory in support of her earlier report and, for the first time, quantifies the value of the radio station's FCC license and goodwill").

Dr. George's supplementation is also consistent with – and less prejudicial than – Entergy's prior practice in spent nuclear fuel cases. In the last spent nuclear fuel case that proceeded to trial with Entergy as a plaintiff, the United States' opening statement at trial previewed a critique of the statistical model presented by Entergy's economist expert, Frank Graves. Ex. C (*NorthStar Vermont Yankee, LLC v. United States*, Fed. Cl. No. 18-1209C, Trial Tr. (ECF No. 94)) 986:2-8. In response to the United States' critiques in the opening statement at trial, Mr. Graves re-ran his statistical model, mid-trial, to verify that the United States' critiques had no impact on his ultimate results or conclusions. *Id.* at 986:9-988:8. The United States objected that this was an undisclosed opinion. *Id.* at 988:9-10. Entergy's counsel responded that Mr. Graves "heard allegations made about his opinions in his model. . . . [I]t's entire[ly] fair for him to respond to those here in his direct examination, and he doesn't have to write a new expert report to do that." The Court ultimately permitted the testimony because the data underlying Mr. Graves' analysis had been disclosed in discovery, even though he had run an additional analysis in response to the United States' critiques at trial. *Id.* at 993:12-13. Any question about the reliability of that additional analysis was a matter for cross-examination. *Id.* at 993:14-17.

The only difference between Mr. Graves' analysis that Entergy introduced at the *NorthStar Vermont Yankee* trial and Dr. George's analysis in his supplemental report is that the United States disclosed Dr. George's supplemental analysis while expert discovery was ongoing, rather than waiting until trial had begun. Entergy should not be permitted to reverse its prior position from the *NorthStar Vermont Yankee* trial – that conducting additional runs of an

economic analysis to confirm critiques have no impact on the analysis or conclusions is not a new expert opinion.

### C. Even if the Court Concludes Dr. George's Supplemental Report was Untimely, Exclusion is not a Proper Remedy Because There is no Harm or Prejudice to Entergy, or any Minimal Harm can be Cured Through a Further Deposition

Even if the Court is persuaded that some part of Dr. George's supplemental extended beyond the permissible bounds of a supplement under RCFC 26(e)(2), Entergy has not shown that exclusion under RCFC 37(c)(1) is the appropriate remedy. "Striking evidence [under RCFC 37(c)(1)] is a drastic sanction." *Rogers v. United States*, 96 Fed. Cl. 472, 475 (2011) (citing cases); *accord Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 171 (2006) ("Exclusion of evidence is [an] extreme sanction and should be applied only when lesser sanctions are inadequate.").

An untimely expert disclosure is excused if the disclosure is substantially justified or harmless. *Cohen v. United States*, 100 Fed. Cl. 461, 468-69 (2011). The Court evaluates these issues by considering four factors:

> 1) the prejudice or surprise of the party against whom the evidence would have been admitted; 2) the ability of the party to cure that prejudice; 3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and 4) bad faith or willfulness in failing to comply with a court order or discovery obligation."

*Id.* at 469. None of the factors supports excluding Dr. George's supplemental report.

Regarding factors 1 and 2, there is no prejudice or surprise to Entergy, and any minimal prejudice can easily be cured. The United States advised Entergy that Dr. George would issue a supplemental report on August 25, 2026, prior to Entergy's deadline to submit its expert rebuttal reports. ECF No. 183 at 6. Entergy emphasizes that this was only 5 business before Entergy's rebuttal reports were due, failing to mention that its own statistical expert hired to rebut Dr.

George's opinions, Dr. Borck, was only engaged in the second half of August, providing him with at most two weeks to start and complete his own analysis. Ex. A (Borck Tr.) 135:2-17. In the context of the two weeks that Entergy provided to Dr. Borck to conduct his work on this case, one week of notice concerning Dr. George's supplemental report is hardly disproportionate. Another of Entergy's experts retained to rebut portions of Dr. George's report, Ms. Reome, had not been provided with a copy of supplemental report at the time of her deposition on October 1, 2026, two weeks after Dr. George issued the supplemental report. Ex. B (Reome Tr.) 36:23-37:3. Thus, any prejudice Entergy may assert from Dr. George's supplemental report is temporary and self-imposed by Entergy's refusal to provide that report to its own experts.

Indeed, Ms. Reome's testimony refutes any prejudice argument, as she acknowledged that she would review Dr. George's supplemental report prior to trial so she can respond appropriately. Ex. B (Reome Tr.) 59:11-16. Dr. George's supplemental report "introduce[s] no new topics or methodology to the case," and "there can be no claim of surprise or of an unanticipated change in [defendant's] approach," thus "no harm has been shown" by the disclosure. *Scott Timber*, 93 Fed. Cl. at 227-28; *see also Sci. Applications Int'l*, 169 Fed. Cl. at 358 (finding no prejudice from a late interrogatory disclosure where plaintiffs possessed the information necessary to challenge the defendant's theories at trial). *Cf. Sci. Applications Int'l*, 169 Fed. Cl. at 673 (finding prejudice and harm where a supplemental expert declaration "does not correct or make complete [the expert's] existing infringement arguments; it presents entirely new, substantive opinions regarding infringement that were never previously presented").

Alternatively, any minimal prejudice can be cured by permitting Entergy to take a further deposition of Dr. George. *See Deseret Mgmt.*, 97 Fed. Cl. at 275 ("[A]ny limited harm caused by the delay is lessened still by the court's willingness to allow plaintiff to conduct a second

deposition of Ms. Flynn during the time remaining for discovery in this case."); *Rogers*, 96 Fed. Cl. at 476 n.6 (holding that a party could not establish prejudice by refusing an offer to re-depose an expert witness). Here, although discovery has closed, the parties have agreed to take several other depositions out of time – the United States' depositions of Holtec's executives on October 23 and 31, 2026, and Entergy's forthcoming 30(b)(6) deposition of the United States Department of Entergy and individual depositions of Kurt Espiritu and Constance Barton. Adding one additional deposition to this already agreed-to post-discovery deposition schedule will not cause any prejudice to Entergy or any disruption to the case schedule. A further deposition of Dr. George likely would occur before any of the other remaining depositions.

Regarding the third factor, Entergy has not made any showing of how Dr. George's supplemental report would disrupt the orderly and efficient trial in this case. Indeed, the United States elected to make this early disclosure while expert discovery was still ongoing precisely to preempt any potential argument of disruption to the trial in this case. Entergy's objection is at odds with its own prior practice of disclosing similar additional expert analyses for the first time during trial in *NorthStar Vermont Yankee*. No trial date has yet been set, at least five additional fact depositions remain to be taken, and the Court must resolve several post-discovery motions. Dr. George's supplemental report is a minor addition in light of those other substantial post-discovery activities. *See Scott Timber*, 93 Fed. Cl. at 227 (finding no prejudice or harm where a belated disclosure occurred 124 days in advance of a scheduled trial, providing the party sufficient time to conduct an additional deposition and have its expert prepare a further response prior to trial).

Finally, regarding the fourth factor, there is no evidence that the United States willfully failed to timely disclose Dr. George's supplemental report. Dr. George was deposed on August

4, 2026. Based on his own recollection of matters raised during the deposition, Dr. George decided it made sense to double-check certain aspects of his work. On August 25, 2026, Dr. George communicated to counsel for the United States that he intended to issue a supplemental report, and counsel for the United States promptly communicated that fact to Entergy's counsel on the same day. Counsel for the United States received Dr. George's transcript from the court reporter on August 26, 2026, and with the benefit of the transcript, Dr. George finalized his supplemental report on September 18, 2026. At all times, Dr. George worked promptly to prepare his supplement, and counsel for the United States transparently communicated his intentions to Entergy's counsel as soon as Dr. George made his decisions. There is no credible evidence that the United States acted willfully to withhold Dr. George's supplemental report. *Cf. Cohen*, 100 Fed. Cl. at 474 (finding willfulness where plaintiff's counsel avoiding addressing a theory during an expert's deposition and then raised the theory for the first time in a summary judgment opposition).

## CONCLUSION

For these reasons, we respectfully request that the Court stay the deadline for the United States' to respond to plaintiffs' motion to exclude the expert testimony of Dr. George until, at least, the time for such responses to be filed as part of the future pretrial scheduling order. We further request that the Court deny Entergy's motion to exclude Dr. George's supplemental report.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

LISA L. DONAHUE
Assistant Director

s/Evan Wisser

EVAN WISSER
Senior Trial Counsel
NATALEE A. ALLENBAUGH
DANIEL D. FALKNOR
KRISTIN E. OLSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: 202-616-3682
Email: evan.wisser@usdoj.gov
*Attorneys for the United States*

Dated: October 8, 2026

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 8th day of October, 2026, I sent via email a copy of the foregoing document to plaintiff's counsel, pursuant to paragraph 2 of the Court's Amended General Order No. 2026-01.

s/Evan Wisser

# EXHIBIT A

**In the Matter Of:**

*SER Inc., et al., vs*

*U.S.A., et al.*

*JONATHAN BORCK*

*September 23, 2026*

LEXITAS™

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SYSTEM ENERGY RESOURCES :
INC., et al.,
Plaintiffs, :
v.
:
THE UNITED STATES, Nos. 23-78C & 24-118C
Defendant, :
and (Consolidated)
:
HOLTEC INTERNATIONAL, Judge Holte
Intervenor. :

:
ENTERGY LOUISIANA, LLC
Plaintiff. :
v.
:
THE UNITED STATES,
Defendant, :
and
:
HOLTEC INTERNATIONAL.
Intervenor. :

Deposition of JONATHAN BORCK
Washington, D.C.
Wednesday, September 23, 2026
9:40 a.m., EST.

Job No.: 2026-1038468
Pages: 1 - 150
Reported By: Anne C. Weingart, Stenographer



Deposition of JONATHAN BORCK, held at the offices of:

Steptoe LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

Pursuant to notice, before Anne C. Weingart, Notary Public.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
JENNIFER QUINN-BARABANOV, ESQUIRE
JACOB BENNETT, ESQUIRE
STEPTOE LLP
1330 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036
(202) 429-8027
jquinnba@steptoe.com

ON BEHALF OF PLAINTIFF ENTERGY LOUISIANA, LLC:
SAMUEL O. MORRIS, IV, ESQUIRE
ENTERGY SERVICES, LLC
1340 ECHELON PARKWAY
JACKSON, MISSISSIPPI 39213
(601) 368-5000
smorri5@entergy.com



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF THE DEFENDANT:
VINCENT PHILLIPS, ESQUIRE
EVAN WISSER, ESQUIRE
SENIOR TRIAL COUNSEL
COMMERCIAL LITIGATION BRANCH
U.S. DEPARTMENT OF JUSTICE
P.O. BOX 480
WASHINGTON, D.C. 20044
(202) 616-3682
vincent.phillips2@usdoj.gov
evan.wisser@usdoj.gov

ALSO PRESENT:
COBY BALLARD, ESQ.
WILL MURDOCH

C O N T E N T S


| EXAMINATION OF JONATHAN BORCK | PAGE |
|---|---|
| By Mr. Phillips | 6 |
| By Ms. Quinn-Barabanov | 142 |


E X H I B I T S


| BORCK EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Rebuttal Expert Report of Jonathan C. Borck, Ph.D. | 51 |


(Exhibit attached to transcript.)



P R O C E E D I N G S

Whereupon --

JONATHAN BORCK,

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. PHILLIPS:

Q Good morning, we met a few moments ago, my name is Vince Phillips, I'm the attorney for the department of justice, I will be questioning you today in this deposition. And I understand you're represented by counsel here, is there anyone who is primarily your counsel that you know of or have we sort of squared that away already?
**A Well I mean I want to be precise about this, I don't have any personal attorneys here --**
Q You don't have personal attorneys. Okay.
**A -- but I've been retained as an expert by the attorneys, the clients that are here today.**
Q And is there a particular individual sitting on your side of the table that you respond to primarily in that attorney-client relationship?



**A I've worked with Ms. Quinn-Barabanov.**
Q Okay. Got you. Have you ever been deposed before, sir?
**A I have.**
Q How many times have you been deposed?
**A It's been 14 or 15 times.**
Q Was that in state court or federal court cases?
**A I have been deposed in state court matters, federal court matters, and in matters before arbitration panels.**
Q All of those depositions were under oath, is that correct?
**A Yes.**
Q And do you understand your obligation here today testifying under oath? And that's a bad question. You understand that you are under oath here today, correct?
**A I do.**
Q And what do you understand that obligation to require of you?
**A To tell the truth to the best of my ability.**



Q Got you. Thank you, sir. So --
**A I'm not an attorney of course, so I don't have a --**
Q I understand, sir, and --
**A I don't have a full -- you know I don't have an attorney's understanding of that.**
Q -- it's a poorly-worded question. I just want to make sure you understand that you are sworn under oath and required to provide truthful and accurate testimony.
So let's sort of lay a couple ground rules here. So you have been deposed before, you understand how this works generally, correct? So what I will do is I'm going to ask you questions and I am entitled to get an answer from you and you are required to provide the answer to the best of your recollection, the most truthful and accurate answer, do you understand that?
**A I understand that, yes.**
Q Okay. Is there any reason today that you couldn't respond truthfully and accurately?
**A No.**

BY MR. PHILLIPS:

Q Have you identified those notable factors that you think could play a role?

**A Well let me point out the three that I identified in paragraph 64. I'd also point out, if we look at my Figure 2, there are a few other features of this dataset as reflected in Figure 2. You can also see this in Dr. George's regression dataset, I think it might be Table 6 in his report if I recall the table correctly. Let me just give you know an example, the [redacted] data points here, there's a [redacted] data point between 2009 and 2012 in my Figure 2, this is Dr. George's figure, which I've reproduced as Figure 2, and it has a certain price, you know on the graph it looks like it's [redacted] I think if I recall correctly it's just below [redacted] dollars if you look at Dr. George's dataset. And then if you go out 10-plus years, there's another [redacted] point that is between 2023 and 2025, that on the graph appears to be [redacted] I think if you look at the underlying dataset, Dr. George's Table 6, it is [redacted]**



**So you know I noticed that those two data points are [redacted], I find that interesting and worthy of further inquiry and note that you know I don't believe Dr. George assesses that.**

Q So this visual observation that you're referring to, have you done any testing in conducting your analysis to do any further inquiry on that data point?

**A Well I wouldn't -- I'm talking right now about a visual identification, that's because I'm looking at Figure 2, but you can see this in Dr. George's Table 6, I don't think it's visual, it's just you can look at the data. I have not investigated that myself, but that is another -- you know to add to what I say in paragraph 64, that's another you know aspect of the data that could play a role, that is worthy of further inquiry. Dr. George didn't look -- didn't appear to me to look at**



**these factors. That's just an example.**

Q Sir, shifting topics here, I'd like to focus a little bit on what you considered and what you've done here. When were you first engaged to offer opinions in this case?

**A I was first contacted in mid August 2026. You know as far as an engagement letter or a retention letter, I forget the date on that, I mean that took a week or two to get going, but I was first contacted in mid August of this year.**

Q When were you provided information that you were asked to look at to conduct your analysis?

**A Approximately the same time, you know after an initial outreach and you know clearing our firms internal conflict check and having -- you know indicating that I was able to do this work, then I started reviewing materials.**

Q You've listed in Appendix C of your report here, this is page C-1, a number of materials considered, is this all of the materials that you considered in performing your analysis in this case?

**A So this is -- yes, and in an important sense**



**this is all of the materials that I considered that are case specific and that I specifically referenced in performing my opinions. I give a little caveat, because in addition to these materials, my opinions are based on my training and experience you know throughout my career and I haven't certainly listed every statistics textbook that I've ever used, even though they form an important part of what I bring to this case.**

Q So other than textbooks, does this Appendix C omit any other documents you've relied on in forming your opinions here?

**A It does not omit any case specific documents, but you know I wouldn't limit my training just to textbooks, I mean I don't mean to be flippant about this, but like there are lecture notes from my professors who taught me statistics, you know I'm not of course listing those materials in my materials considered, but I consider those to be part of my training.**

Q So omitted from Appendix C then if I understand are various materials you may have

# EXHIBIT B

**In the Matter Of:**

*SER Inc., et al. vs*

*U.S.A., et al.*

*KIMBERLY REOME*

*October 01, 2026*

LEXITAS™

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - -X
SYSTEM ENERGY RESOURCES, INC., )
et al., )
Plaintiffs, )
vs. ) Nos. 23-78C
THE UNITED STATES, ) & 24-118C
Defendant, )
and )
HOLTEC INTERNATIONAL, )
Intervenor. )
- - - - - - - - - - - - - - - - -X
ENTERGY LOUISIANA, LLC, )
Plaintiff, )
vs. )
THE UNITED STATES, )
Defendant, )
and )
HOLTEC INTERNATIONAL, )
Intervenor. )
- - - - - - - - - - - - - - - - -X

DEPOSITION OF KIMBERLY R. REOME



DEPOSITION OF KIMBERLY R. REOME

Washington, D.C.
Thursday, October 1, 2026

The deposition of KIMBERLY R. REOME was convened on Thursday, October 1, 2026, commencing at 9:15 a.m., before Karen Brynteson, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public.

Job No: 2026-1038473



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS SYSTEM ENERGY RESOURCES, INC., COOPERATIVE ENERGY, a MISSISSIPPI ELECTRIC COOPERATIVE f/k/a SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, and SYSTEM FUELS, INC.:

SAMUEL O. MORRIS, IV, ESQ.
Entergy Services, Inc.
1340 Echelon Parkway
Jackson, MS 39213
601-368-5476

ON BEHALF OF PLAINTIFF ENTERGY LOUISIANA, LLC:
Langley & Bromberg LLC
2700 U.S. Highway 280, Suite 350E
Birmingham, AL 35223
205-783-5752
BY: ERIC B. LANGLEY, ESQ.
eric@langleybromberg.com



APPEARANCES (Continued):
ON BEHALF OF THE DEFENDANT UNITED STATES:
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
202-616-3682
BY: EVAN WISSER, ESQ.
evan.wisser@usdoj.gov
MIGUEL ESPINO, ESQ.
COBY BALLARD, ESQ.

C O N T E N T S

KIMBERLY REOME EXAMINATION
By Mr. Wisser 6
By Mr. Langley 200

AFTERNOON SESSION - 117

E X H I B I T S

REOME EXHIBIT NO: DESCRIPTION: PAGE NO:
Exhibit 1 Expert Report.............. 7



P R O C E E D I N G S

(9:15 a.m.)

Whereupon--

KIMBERLY R. REOME,

having been first duly sworn/affirmed, was examined and testified as follows:

EXAMINATION

BY MR. WISSER:

Q. Good morning, Ms. Reome.
**A. Good morning.**
Q. Evan Wisser, attorney with the Department of Justice representing the United States in these two cases.
I have handed you what I believe is a copy of the rebuttal expert report that you provided on September 2nd, 2026. Have you had a chance to look at it briefly?
**A. Yes.**
Q. Does it appear to be an accurate copy of your report?
**A. Yes.**
Q. Okay.
MR. LANGLEY: Usual stipulations?
1MR. WISSER: Yes.



(Reome Exhibit 1 was marked for identification.)

BY MR. WISSER:

Q. And you understand, Ms. Reome, you're under oath this morning?
**A. Yes.**
Q. Is there any reason you cannot provide truthful and accurate testimony?
**A. No.**
Q. Let's dive right into the report here.
We will start with the Executive Summary on page 5. In paragraphs 1 and 2, there is one distinction I wanted to ask about.
You state in the first paragraph that Entergy Services, through counsel, requested that you specifically, Ms. Reome, opine on certain topics related to damages.
In paragraph 2, you state that counsel retained HKA Global to assess and quantify Entergy's security costs.
I just wanted to ask about the distinction between those. Is there any overlap or discrepancy in terms of work you personally performed versus work that HKA performed?
**A. No, I didn't intend there to be a**



**discrepancy. Counsel retained HKA for me to express my opinions, which includes security.**
Q. Okay. And when were you first contacted by Entergy?
**A. In June of this year.**
Q. 2026?
**A. Yes.**
Q. Okay. When you were first contacted, what was the scope of your task as you understood it?
**A. Well, first, I had a discussion with counsel about potentially becoming the expert witness, which they then decided, yes, they would like me to do that. And I was asked to review Dr. George's and Mr. Gmyr's reports and come up with my own responsive opinions to those and to perform a security calculation.**
Q. Okay. Did you have any staff assisting you within HKA?
**A. Yes.**
Q. How many people?
**A. I had a primary team of four people. And then that was supplemented by a few other folks from time to time, mostly for quality control of different pieces of our analysis.**

Q. And who were the four on that primary team?
**A. Five people.**
Q. Who were the five?
**A. Patrick Jensen, J-e-n-s-e-n, Lisa Allen, A-l-l-e-n, Caitlin Crook C-a-i-t-l-i-n, Thomas Sweeney, S-w-e-e-n-e-y, and Madison Kohm, K-o-h-m.**
Q. Just as an aside, because I am also handling current pending litigation filed by Holtec Pilgrim that I know HKA is involved in. I believe Jensen is involved in that litigation too?
**A. I believe he is.**
Q. I believe Caitlin is also involved?
**A. I believe she is.**
Q. I don't remember the other three names. Do you know if the other three are involved in that litigation?
**A. I understand Mr. Sweeney is involved in that. I do not think Ms. Allen or Kohm are involved in that as far as I know.**
Q. Okay.
**A. Actually, Ms. Kohm might be. I am not actually sure.**
Q. Okay. Do you recall roughly how many total hours HKA has billed to Entergy up to the



point that you provided your rebuttal report?
MR. LANGLEY: Are you talking about in connection with this matter?
BY MR. WISSER:
Q. For this rebuttal report and your engagement with Entergy in these cases.
**A. The number -- I looked it up a few days ago -- was 2600 hours. That was through around when I looked it up, so last week or so. We haven't yet billed for September services.**
Q. And do you know roughly how much you personally have billed?
**A. About 250. Again, including September, which we have not billed yet.**
Q. Okay. What was the process for transfer of documents to HKA after the engagement in June of 2026?
**A. We would ask for, when I say "we" -- my team and I would ask for certain documents, certain types of documents, groups of documents, and we would receive those documents.**
Q. Were you provided a complete set of deposition transcripts from these cases?
**A. I believe so. We listed all of the deposition transcripts and all the exhibits we had**



**received. I think those are all of the deponents.**
Q. Okay. Do you know if you or your team read all of the deposition transcripts?
**A. Yes. I did not personally read every single one. I read some of them or portions of some of them but my team read all of the deposition transcripts.**
Q. Okay. In terms of the documents produced in the case, do you know if a complete production was provided to HKA?
**A. I don't know one way or the other. My team asked for certain documents, and we were provided with the documents that we requested.**
Q. Okay. What was the typical process for identifying what documents --
MR. LANGLEY: Sorry, if we can pause for a second.
(Brief pause.)
BY MR. WISSER:
Q. Thanks. We can go back on.
Ms. Reome, what was the process by which you or your team would identify documents that you would like to see out of the discovery record?
**A. In general, we asked for the documents that Dr. George had reviewed and that Mr. Gmyr had**



**received, and then it was an iterative process -- we asked for all of the deposition transcripts and exhibits. It was an iterative process then, we would ask for more documents as certain things came up or we had questions.**
Q. Were there any particular topics that you focused on in those document requests?
**A. The topics that are ultimately relevant to my opinion.**
Q. Were there any documents that Entergy's counsel specifically provided to you beyond what you had requested?
**A. I am not sure. Not that I -- not that I can specifically recall.**
Q. Do you know if you or your team did any sort of general searching across the production database?
**A. I asked my team and we did not have access to, like, a searchable database. It was more of a request and receive type of a process.**
Q. Okay. Did -- outside of HKA, did you speak to anyone in the work leading up to your report?
**A. Yes. I spoke to a number of Entergy or former Entergy personnel. And I spoke to the other**

**2026. Scott Kelley was deposed in August of 2026. Gregory Maret was deposed in August of 2026. And was your cut-off March, I believe?**
Q. March, yes.
**A. Joy Russell was deposed in March of 2026. Robert Tindal was deposed in April of 2026.**
Q. Do you know --
**A. That is what is on my list.**
Q. Do you know who any of those people work for, off the top of your head?
**A. Yes. Now I am recalling who I just listed out.**
Q. We can go one by one.
**A. Right. Thomas Duberville, I am actually not recalling him.**
Q. Glenn George?
**A. Glenn George is one of the experts in this case.**
Q. Mark Gmyr?
**A. Mark Gmyr is an expert in this case.**
Q. Jeff Heckenberger?
**A. He is an Entergy employee.**
Q. He have Evrin Kalfazade.
**A. I believe is with Holtec.**
Q. Scott Kelley?



**A. He is with Entergy.**
Q. Gregory Maret?
**A. He is an expert in this case.**
Q. Joy Russell?
**A. She is with Holtec.**
Q. Robert Tindal?
**A. I think Robert Tindal is with Holtec.**
Q. Okay. I will represent to you, since I am sure this gets well beyond your level of review, but that the productions that Entergy made after the United States requested more thorough ESI searches typically have the Bates range starting ENG-GIV beginning with 8-something. So they are at 80,000s in terms of the Bates counts.
I don't recall that I saw any of those documents specifically cited in your report. Are you aware of any of those documents?
MR. LANGLEY: Are you asking if she is aware of those documents are out there --
BY MR. WISSER:
Q. Yeah. Have you seen any documents?
MR. LANGLEY: -- or referenced in her report?
BY MR. WISSER:
Q. Have you seen any documents that you



recall with a Bates range beginning with an 8 in the 80,000 range?
**A. I don't know what the Bates ranges are of the documents I reviewed. And I am not aware of the specific production you're talking about. We did try to be thorough in this list of documents considered, although sometimes things slip through the cracks that we did review that didn't make it on to the list, but we intended this to be a thorough list.**
Q. Okay. Were you aware that Holtec produced about 40,000 pages of documents in these cases?
**A. I'm aware that Holtec had a production for this case.**
Q. Okay. And I didn't see any of Holtec's production Bates here, which would be Holtec_GG. Do you recall if you reviewed any of Holtec's productions?
**A. Yes. A lot of the documents we have had multiple Bates numbers on there. So they would have a Holtec range and maybe an Entergy range or a DOE type of range. Sometimes we would just have to pick which range we were using.**
**I don't think we intended it to be one**



**way or the other, but we did ask for -- my understanding of the DOE claims dataset-type documents that Dr. George reviewed, when we asked for those documents, we received them in a batch of DOE claims dataset and a batch of Holtec, essentially.**
Q. Okay. Are you aware that the United States has filed a motion for leave to amend our answer in this case?
**A. I am aware that there's a motion pending.**
Q. Okay. Have you reviewed the United States' proposed amended answer?
**A. I have not.**
Q. Have you been provided that document?
**A. No.**
Q. Okay. I think you mentioned you reviewed Dr. George's and Mr. Gmyr's reports on behalf of the government in these cases. Is that right?
**A. Yes.**
Q. Okay. Did you review Mr. Maret's report at all?
**A. I did.**
Q. Okay. Are you aware that about two weeks after you issued your report, Dr. George issued a supplemental report?

37

A. **No, I'm not aware of that.**
Q. Were you provided that report?
A. **No.**
Q. Okay. Let's close out Appendix C. Just a couple of questions on page 9. The second to last section you have is Publications, Numbers 588 to 591.
Are these the only publications that you're specifically relying on in support of your opinions?
A. **Yes. And I am not necessarily relying on all of these. I do cite to the publication marked as Number 588 and 590, I think I specifically cite to in my report. The other ones were just general textbooks I still have from my MBA program, as is 588, by the way, but that I just happened to look at because they were about statistics and things like that that were relevant to this case, but I don't cite it -- I did not cite them, but I considered them.**
Q. Okay. Particularly for the statistics elements, are there any other statistical texts that you are relying on or referencing as part of your analysis beyond what's listed here?
A. **No.**

38

Q. And just one final question. Did you speak to anyone from Holtec as part of your efforts in developing this opinion, beyond the documents and the evidence in the case?
A. **No.**
Q. Did you speak with anyone on your team at HKA who is also working on the Holtec/Pilgrim case about any information related to that case?
A. **No.**
Q. Okay.
A. **Well, I will amend that answer. I didn't even know if HKA had filed a report on the Holtec case or not. And I did ask Mr. Jensen that and he said that he had.**
Q. Okay.
A. **He and Mr. Metcalfe had. But that's as far as I know about what's going on in the Holtec case.**
Q. Okay. Did Mr. Jensen describe anything to you about the contents of that report?
A. **No.**
Q. Did you ask to see that report at all?
A. **No.**
Q. Do you think that there is any information in that report that would be relevant to

39

your opinions here?
MR. LANGLEY: Object to the form.
**THE WITNESS: I don't think so.**
BY MR. WISSER:
Q. Okay. Why do you say you don't think so?
A. **Because I was asked to review Entergy's claim and respond to Dr. George's and Mr. Gmyr's opinions.**
Q. Okay. And I think one of the things you opine on is sort of the overall effort to undertake a market price evaluation for Holtec cask pricing. Is that right?
A. **I'm responding to Dr. George's assessment of that, yes.**
Q. I think one of your opinions or at least a background opinion you offer is that it's difficult or potentially impossible to perform such a market price analysis. Is that a fair characterization?
A. **I would characterize it more that I reviewed the underlying data that Dr. George relied upon and concluded that the data did not lend itself to the analysis that he performed.**
Q. Do you believe that it is possible to identify a market price for Holtec's HI-STORM FW

40

casks?
A. **I think it's difficult, based on the facts and circumstances of the data available.**
Q. Do you believe there's a methodology that would permit such an analysis?
A. **There could be a methodology to permit that analysis. I believe that Dr. George's analysis did not sufficiently consider all of the facts and circumstances.**
Q. What methodology would you use to determine the market price for a Holtec dry fuel storage cask?
A. **I was not asked to perform that analysis.**
Q. I understand. What methodology would you use to perform that task?
A. **I did not come up with a methodology for performing that task.**
Q. How many years have you performed spent fuel expert testimony?
A. **Expert testimony? I believe the first testimony I provided on a spent nuclear fuel case was in 2009.**
Q. Okay. Beyond spent fuel cases, as part of your other expert work, have you ever been asked to perform market pricing analyses?

**counsel had provided an alternate regression, but if HKA performed that, I was not aware of that.**
BY MR. WISSER:
Q. So you don't know if HK actually did that or not?
**A. I do not know one way or the other.**
Q. Okay. Let's go to page 21. You have a section beginning little Roman letter (i), "Dr. George Misuses Escalated Prices By Comparing Them to the Newly Negotiated Contract Prices."
And then I think I walk through a couple of instances that you say that assert or support that opinion, you know, [redacted] in subsection (a) on page 22, [redacted] in subsection (b) on page 24. And those are the only two that you identify as part of that category of critique; is that correct?
**A. Correct. Although I noted to myself when I was preparing for this that there's Subsection iii, which starts on page 26, where I say, "I identified errors in Dr. George's use of the 'DOE claims dataset," that within points A and B in that section that relate to [redacted] and [redacted] that I talked about some of the escalation issues in those two -- for those two utilities as well.**



Q. So is it your opinion that in those two, they suffer from the same critique you identified that Dr. George has identified a mere escalation as an independent price value?
**A. [redacted] did have that issue. And what I state about [redacted] is that it's possible that could be a similar issue there.**
Q. Okay. Let's start with [redacted], 22 to 23. Did Dr. George's supplemental report adequately addressed this concern?
**A. As I said earlier, I wasn't aware that Dr. George had a supplemental report, so I don't know.**
Q. Okay. And if it addressed that concern, would that resolve your concern for this section?
MR. LANGLEY: Object to the form.
**THE WITNESS: It would depend on what he said. I would have to analyze that.**
BY MR. WISSER:
Q. Okay. For the [redacted], did Dr. George's supplemental report resolve that concern for you?
**A. Again, I have not seen --**
MR. LANGLEY: Object to the form.
**THE WITNESS: -- Dr. George's report, so**



**I don't know.**
BY MR. WISSER:
Q. Do you believe it would have been helpful for you to see that to see if your concerns were resolved?
MR. LANGLEY: Same objection.
**THE WITNESS: If I'm asked to review and respond to Dr. George's supplemental report, I will do that.**
BY MR. WISSER:
Q. Do you intend to offer testimony at trial without the benefit of Dr. George's supplemental report?
**A. I believe if we were to proceed to trial, I would want to know of Dr. George's supplemental report, so I can respond appropriately.**
Q. Turning to the next section, little Roman (ii) on 25, you state that, the DOE claims dataset was not complete.
It appears that the only data point that you've identified missing is the [redacted] contract. Is that right?
**A. That was the only specific one I was able to determine based on, like, what has been produced in this matter. So that's the one point. But then,**



**separately from that, we're sort of relying on a negative assurance, like, DOE says these are the dataset, and that's what I was able to review.**
**I don't know if there's other information out there.**
Q. Okay. First, just speaking about the [redacted] contracts, did Dr. George's supplemental report include that in his updated dataset?
**A. I'm not aware one way or the other, as I have not reviewed that.**
Q. Okay. For the notion that developing confidence that this is the complete dataset, what do you understand to be the scope of the dataset that Dr. George was intending to present?
MR. LANGLEY: Object to the form.
**THE WITNESS: Well, as I describe in paragraph 59, Dr. George didn't know if he had all of the contracts. And he assumed what he was provided came from companies that had settled with DOE for spent nuclear fuel costs, but he didn't know which utilities were included in that or not.**
BY MR. WISSER:
Q. And in paragraph 59, it's specifically referencing HI-STORM FW contracts, correct?
**A. Yes.**

**government. And one of the data points on here is [redacted]. So I don't know if that is part of the set or not.**

Q. So you don't know i[redacted] is a litigating case or a settlement case?

**A. I do not know.**

Q. Okay. Other than[redacted], do you have any question about any of the others?

**A. No.**

Q. Okay. For the settlement process, you understand, I assume, that there is an annual claim process?

**A. Yes.**

Q. And that there's a timeline established in the settlement agreement, but it's retrospective for one year that a utility will gather up costs incurred within a particular year and then the following year submit that for reimbursement. Correct?

**A. Yes.**

Q. Based upon your experience in assisting the clients that HK works with, do you understand that DOE requires those utility companies to submit the contracts or purchase orders or invoices or the same sort of documentary support to evidence the



costs that they are claiming?

**A. Yes.**

Q. All right. Is there any reason to believe that a utility would fail to provide a contract as large as a dry fuel storage contract and recoup those costs from DOE?

MR. LANGLEY: Object to the form.

**THE WITNESS: I wouldn't have reason to think that the utility would not provide it. I don't know if that's included in what has been produced to me in this matter.**

BY MR. WISSER:

Q. So your question is less did the utility provide it to DOE and more did -- further down the chain in the document process; is that fair?

**A. Yes. And also I am not aware of the timing of certain -- certain of these matters. So at least with some of the utilities that I have worked with in the settlement process, there is a provision that they only need to file every three years, so there's been times for some of my clients where they have not filed every year because they didn't incur -- they didn't load casks that year. They didn't incur that much money. And so they kind of accumulate up until some point. So I am just not**



**aware for these utilities.**

Q. And I take that point. Perhaps if we were at the extreme range of 2023, there may be some fuzziness there, but if we're focusing particularly on the time period at issue here, say, '17, '18, '19, information that would have been available to Entergy when it was making its own decisions, do you have any reason to believe that costs incurred as of 2019 would not have showed up eventually in the DOE claim file by 2025?

MR. MORRIS: Object to form.

MR. LANGLEY: Object to form.

**THE WITNESS: Again, there may be a several-year lag, maybe back to 2022 or so, of cost data that might not be available to DOE. What I am unaware of, and I don't think Dr. George was aware of -- or at least he testified he was not aware of -- is how complete of the information was that DOE had provided or DOJ had provided to Dr. George to review. Those are the contracts and change orders and so forth that I received is what George had received.**

BY MR. WISSER:

Q. And what I am trying to do is just probe a little more specifically where that concern lies,



because, as we have been discussing, there is a process. There are multiple steps here.

So I think we have established that your concern is not so much on what the utilities -- whether what the utilities submitted was comprehensive, at least up until, you know, a potential couple year lag at the end as we discussed.

**A. Right.**

Q. Is your concern that DOE may not have adequately retained what the utilities submitted?

MR. MORRIS: Objection, asked and answered.

**THE WITNESS: My concern is more what DOE provided to Dr. George and knowing there's other information available. So, for example, I pointed out that I don't believe he was provided invoices or he was provided maybe a few invoices here and there, but that wasn't part of his review. And if he had reviewed the invoices, he would have understood this escalation issue more thoroughly.**

**There's also a few points throughout the report where I point out I don't have that document. So, for example, on page 28, under the section referring to [redacted] there is a purchase**

**order -- there are two purchase orders that refer to a [redacted]. And I have not received either of those documents. So I couldn't confirm what I was looking for in following the document trail.**

BY MR. WISSER:

Q. Okay. So then, just to make sure I am isolating the precise step where you do have a concern, your concern is did DOE via DOJ provide to Dr. George the complete claims file for all of these utilities. Is that where your concern lies?

**A. Yes.**

Q. Okay. If Dr. George did, in fact, receive the complete claims file and he made judgments or his team made judgments about what was necessary to support his analysis, would that resolve that concern, at least about the completeness of the information he was provided?

**A. That would be relying on Dr. George's determination of what was complete. I would want to do my own determination as to whether it was complete or not.**

Q. But I think you said you weren't asked to do an affirmative opinion in these cases, correct?



**A. No, but if you're asking me to determine if a dataset is complete, I'm pointing out that it was not complete.**

Q. Okay.

**A. And I'm -- and then your other premise in your hypothetical was that if Dr. George said it was complete, then would I agree it was complete, and I would not necessarily.**

Q. Right. So what I was asking, though, is -- and I just want to make sure I understand which step gives you pause. If Dr. George was provided the complete claims file by DOE, every single shred of paper DOE has ever received, and if Dr. George made selections about what documents were adequate or sufficient to support the data points he was using, do I understand your concern is you are not able to validate Dr. George's selection of those documents versus others that may be in the dataset?

MR. LANGLEY: Objection.

MR. MORRIS: Objection to form, mischaracterizes Dr. George's testimony.

MR. LANGLEY: And asked and answered.

BY MR. WISSER:

Q. I just don't want to misunderstand.

**A. Now I have lost your question a little**



**bit.**

Q. Sure.

**A. But let me try to restate it.**

Q. Okay.

**A. If Dr. George makes selections from -- if Dr. George in your hypothetical was provided a complete set of everything DOE has in the settlements --**

Q. Right.

**A. -- and then if I was also provided the same information that he was provided, we could independently make our own decisions as to what the appropriate documents to look at were.**

**If, on the other hand, Dr. George makes a selection from what he is provided and I only receive what he has selected, I cannot confirm that he has selected the right information.**

Q. Okay. So your concern under that scenario would be you are unable to validate for yourself that his selections are the appropriate selections. Is that fair?

**A. Yes.**

Q. Okay. All right.

Let's go back to the report, Section Roman (iii), starting on page 26, where you have an



additional category of errors that I think you referred to more broadly as double-counting or treating as independent data points, data points that are really related or the same.

Is that a fair summary of this section?

**A. Dr. George double-counted or triple-counted the same price and in one instance used an incorrect price.**

Q. So i[redacted], there's a question about the accuracy of the [redacted] and [redacted] data points, whether those are truly independent of each other, and then whether the [redacted] data point is accurate.

Is that fair?

**A. Yes.**

Q. Okay. Did Dr. George's supplemental report adequately address this concern?

**A. I have not reviewed Dr. George's supplemental report.**

Q. Okay. For the double-counting of the [redacted] data points, I think you note that the [redacted] data point does not appear independent of the other fleet data points that he is using. Is that right?

**A. Well, I'm referring to Dr. George's**

# EXHIBIT C

A. No, that doesn't surprise me. That strikes me as a legal strategy of saying, "I don't need to rely on a mechanism that requires an economist to explain the market, to justify it." If I could have -- if by happenstance my OFF rights were enough to cover me, then I can show that I wouldn't have incurred the costs at my site that I'm requesting compensation for.

It doesn't mean that in reality they wouldn't have exchanged, because then they could have even done as well or better, but we don't have that but for world to observe, so they would say at least I would have been good enough with OFF here.

**Q. All right. Let's talk about your assumptions for the cooling period of fuel. You ran your base case model here assuming that DOE picked up fuel cooled less than five years, correct?**

A. I did. I assumed you could do it within one -- after one year.

**Q. Okay. You didn't do that in some of the earlier cases. Is that right?**

A. That's correct.

**Q. Why the change?**

A. Well, primarily because I was asked by counsel to evaluate whether a one-year cooling solution would have been feasible and what it would have cost, and so I



adjusted the model for that purpose.

**Q. Okay. Were you here on the first day of trial to hear the opening statements of the parties?**

A. I was.

**Q. And did you hear government counsel talk about how dramatically different a one-year versus a five-year assumption would be?**

A. Yes, I did.

**Q. Have you done some thinking about that or do you have some reactions to that?**

A. Yes. There's a couple of ways of why that's an exaggeration of what really was the consequence of a one-year versus five-year. Generally moving to one year makes "must move" conditions arise a little earlier, because now I could move it one year after I shut down, so it compresses movement demand a little earlier, and that could, in principle, change the height of the "must move" curve and it could become a deal where that would start to impinge against the supply and it was costly and so on.

In fact, it's a very, very tiny change in the "must move" curve to move from one to the other. So I have looked at that and I have also looked at why that is, and it's because there isn't very much of that --

**Q. Well, before we get to that, what about the**



**amounts of short-cooled fuel, let's call it. Are you saying that all of a sudden now, under your current version of the model, DOE is taking one-year cooled fuel all the time from every plant?**

A. No. There was sort of an indication that this means that essentially everything is a hot cask and the industry is operating under a much more complex and possibly dangerous condition. That is not true.

The only place where one-year cooled fuel becomes even an issue of being "must move" is when a plant is totally shut down. An operating plant that hits a fuel pool condition has hot fuel because it just discharged it, but it always puts that in the spent fuel pool, and it always has much older fuel that it could take out if it needs to keep rotating fuel out and fuel in. So there's never any hot fuel or less than one-year cooled or short-cooled fuel at an operating plant.

So it only arises when somebody shuts down, and then it only arises for the last two discharges or so from the plant, because the discharges are about an 18-month cycle, and after three of those, it's five years cooled. So maybe two discharges, 2 1/2, out of a shutdown plant's entire inventory, would be short cooled, and a typical shutdown plant might have, as here, say 500 tons, of which maybe 50 for Vermont Yankee



would be short-cooled.

So even when it happens, it only happens at shutdown plants, and it's a small percentage of their total. So it -- it doesn't create a massive shift towards wanting to handle hot fuel all over the place, and, in fact, I've looked at that, and it essentially doesn't happen at all in the first 10 or 15 years of the program.

MS. JANTZEN: Objection. This is an undisclosed opinion.

MR. FAGG: He is just reacting the opening statements of government counsel. That's entirely fair.

MS. JANTZEN: Are we moving on to a slide that compares the two?

MR. FAGG: We can do that. Let's go to slide number 12. He performed a sensitivity between five-year cooled and ten.

THE COURT: Ten. And was the sensitivity part of the expert opinion that you got in the expert report?

MS. JANTZEN: The sensitivity was. The particular results here that he's discussing were not disclosed.

THE COURT: The results of -- I guess I'm confused as to which results.

MS. JANTZEN: Of the sensitivity analysis that he

performed on the short-cooled fuel.

MR. FAGG: Sure they were, Your Honor. I mean, I can talk -- the pages of the report talks about it.

MS. JANTZEN: And I am familiar with the pages of the report. I'm talking about the actual numerical results of that analysis and how it affects the program starting back in 1998 and every single year of the program.

THE COURT: Mr. Fagg?

MR. FAGG: Well, Your Honor, you know, Mr. Graves was sitting here. He heard allegations made about his opinions in his model. I think it's entire fair for him to respond to those here in his direct examination, and he doesn't have to write a new expert report to do that. I think this falls within -- you know, the Government can't have it both ways. You can't criticize Mr. Graves and then not allow him to respond.

THE COURT: I'm with you on that. I just want to know what are the sensitivity results that he is about to discuss that were not disclosed. I think it's fair game if he was sitting in the courtroom to have a reaction to the allegation that this was new or would change his opinion drastically from past rounds of this litigation, but I want to focus on what is undisclosed.

MS. JANTZEN: And to be particular, it is the



exact amount of short-cooled fuel that is being moved in his model for each year. Those results were not disclosed. That's what I'm concerned about.

MR. FAGG: I mean, he knows what he knows. He's just describing, and, again, responding to this, but, I mean, we don't -- you know, he's performed a sensitivity that the Government has had for a couple years about the lack of a difference -- a material difference between five-year and one-year cooled fuel, and he's just describing that, and the fact that he's -- he knows some details about it I think is not prejudicing the Government, nor is it anything that's untoward or falls into the area of impermissible, undisclosed opinion.

THE COURT: Okay. What are the facts about it that he knows?

MR. FAGG: I gather he just said --

THE COURT: I'm still missing what the problem is.

MR. FAGG: I gather it's because he just said there was no short-cooled fuel in the first ten years of the program, which I think I can look at the charts and figure that out, but I guess that seems to be the Government's problem here.

MS. JANTZEN: Well, the charts that would say that would have underlying data showing exactly how much



short-cooled fuel, if any, was moved in the first ten years of the program, and we did not receive that data from Mr. Graves, and that is the undisclosed portion.

I understand that he has a conclusion and he has an opinion that's generally reflected here, but the underlying data that supports that is not what -- is what has not been disclosed.

THE COURT: Wouldn't that be part of the sensitivity analysis?

MS. JANTZEN: Exactly, but it was not.

THE COURT: Okay.

MR. FAGG: I think there's a significant misunderstanding going on here. Mr. Graves just testified that, at an operating plant, there is not going to be any short-cooled fuel moved, and that's just common sense, because there's a lot of old fuel, and I don't know what there is to disclose about that.

THE COURT: Go ahead.

MS. JANTZEN: And then his work papers should reflect that, but they don't, because his work papers don't reflect any distinction between the age of the fuel that's being moved.

MR. FAGG: I think we're moving into cross examination here, Your Honor.

THE COURT: So my understanding was that there



was no short-cooled fuel moved in the first ten years. Did I understand that testimony correctly?

MR. FAGG: That's what I heard.

THE COURT: Okay. So what -- what data would you want to be disclosed if the answer is zero?

MS. JANTZEN: Well, we --

THE COURT: -- for ten years?

MS. JANTZEN: So that's what we are unable to test the basis of because the data does not identify the age of the fuel that's being moved. If we go through his whole economic sequencing, his net exchanges, the site results, everything he's talked about, kind of the belly of the model, there is no distinction there -- there is no identifying the age of fuel.

And so as those of us who are receiving all this data, to go through and identify what -- if there was, in fact, short-cooled fuel moved in that time period, we can't do that. He probably knows because it's his information, but that was not disclosed to us.

THE COURT: Okay. So the issue is he's saying that no short-cooled fuel was moved in the ten years, but you cannot verify that representation because --

MS. JANTZEN: That's correct.

THE COURT: -- the data doesn't break it down in the first ten years?

MS. JANTZEN: The data doesn't -- I don't think the data breaks it down at all over the program, but that's correct. It doesn't identify the age of the fuel that is being moved.
MR. FAGG: Nor does it need to. We're well past --
THE COURT: Wait, I'm sorry, I just want to finish this. So did you get the data? Was the data disclosed, that data that you're talking about that doesn't make distinctions between the two?
MS. JANTZEN: Yes.
THE COURT: Okay. So I don't think we have a disclosure issue, okay, because the data was disclosed, but I understand the point that you want to make, and I think I do agree with Mr. Fagg that that's something that you would raise on cross examination to test the credibility or reliability of the modeling.
MS. JANTZEN: Okay.
THE COURT: Okay?
MS. JANTZEN: Thank you.
THE COURT: So overruled.
Continue.
BY MR. FAGG:
**Q. Let's don't wait.**
**Mr. Graves, why do you not need to -- well, first of all, did you go in and figure out the age of the fuel that was being moved?**



A. Yes, I have done that. It's easy to do because you know how much fuel is at each site and how old it is.
**Q. Okay. But did you need to do that for modeling purposes for this exercise?**
A. No, not -- unless you want to be very, very, very specific, and especially in the outyears.
I will make one clarification. It's not that there's none moved, but there's virtually none, and the reason is it only happens with a recently shutdown -- totally shutdown plant, and there's only one or two in the first few years, so there's a few tons, and you can tell that just from who gets shut down, and then that doesn't happen for ten years or so, and then we get into a wave of shutdowns later on. So that's when more short-cooled fuel starts to get moved.
**Q. Okay. Let's go back to -- so you performed a sensitivity, right, on five-year versus short-cooled fuel?**
A. Yes, in the first instance on how much impact that has on net demand, which is what this graph shows.
**Q. Okay. And elaborate a little bit more about the impact, or lack thereof, of different assumptions about cooling time.**



A. Sure. My -- I provided a sensitivity in my report which showed that instead of having analyzed everything at one-year cooling as the time that you had to wait after you shut down until you started moving waste, you had to wait five years, and that tends to cause what was the dark blue line there on the graph here on the left to move out slightly to the right, to the teal line, because you have to wait a little bit longer to cool, and the reason it doesn't move very far is because there is not that much short-cooled fuel.
And so what you see is that there is really very little difference in the size, shape, or relative position of the net demand compared to the total supply, so it has a very de minimus effect on the total market to run one way or the other. Either way, the market has lots of engineering capacity, of programmatic capacity to deal with it.
So assuming that it's feasible as a handling matter -- which I understand from other sources and I am not testifying about it -- the program can easily do it.
**Q. Okay. So other than the sort of obvious impact for an individual plant, you would have to wait five years, but on -- in terms of the function of the market, is the -- does the assumption of short-cooled versus five-year cooled fuel materially change the way you've been testifying about this market for 20-plus years?**



A. No, not at all, and it's not a big change in my model either relative to -- with or without that, it's an easy feature to play with in the model that the Government can play with on their own.
**Q. Okay, all right. Did you do another sensitivity involving pool capacities, Mr. Graves?**
A. I did, yes.
**Q. All right. Do you want to go ahead and flip to the next demonstrative, Number 12 here. First of all, before we get there, why -- why pool capacity sensitivity? Why is that something that you have to take a look at?**
A. When you run out of pool capacity because the discharges are filling it up, you need to build something new. So that determines the time of your need for program acceptances. So if the pool capacities are in error or were changing, then my initial -- my results at any point in time might not be quite accurate.
**Q. Okay. Has the Government persistently criticized your assumptions about pool capacities over the years?**
A. Yes. There's been a suspicion that I didn't have the right capacities for a long time. I used what the SFSR called the maximum capacities, but it also listed

other measures of those, such as licensed capacity, which was often a bit less -- but not always, sometimes it was a bit more -- and we know since then some pools have had impairments because of fuel quality storage problems. So the SFSR pool capacities are not identical to what has materialized, but they are pretty close.

**Q. Okay. And what conclusions have you drawn from the pool capacity sensitivity that you did here?**

A. So if the pools were smaller, then the demand would be higher sooner, and so that's what you see here, is that the blue line, which is the one that arises -- the dark blue line, sorry -- that arises when you use the SFSR's maximum capacities, and it shoots that to a reduced version in which I've chosen the least amount of reported capacity at every facility, and actually also allocated that shortfall to other facilities, that small percentage change.

It's about -- I forget -- about an 8 percent reduction in total program -- of pool capacities around the industry. That raises the demand a little bit, and it does cause a little bit of change back in the early years, because instead of you -- the program clearing to be able to handle everybody's next move by 2004, it's more like 2005 or '6. So it delays things a little bit because the pools are filling up faster.



But by the time we get out to 2014, '15, the Vermont Yankee period of interest, again, we see all that huge band of slack above the "must move" mountain. So it has no consequence right now, and it would really only have modest consequence in the very early years.

**Q. Okay. I think you mentioned this a little bit earlier, but in the early cases, spent nuclear fuel damages cases that you were involved in, you did a whole lot -- a whole lot more sensitivity -- I'm not saying that right -- you did many more sensitivities. Is that fair to say, Mr. Graves?**

A. Yes, that's true.

**Q. Why not here? Why not do all those same sensitivities for this version of the model?**

A. This goes back to the point that we made earlier about I was doing what is called comparative static analysis in those early studies, where I said here's a performance under a given set of expectations. If you want to wonder what would happen if different conditions prevailed, you change the assumptions that go into that same model, and you run it under -- as though you had a different vision of the future, and then you see how much different the results look.

So initially that was the way both the Government and us and then -- and the Plaintiffs treated



uncertainty about the program, is to say, well, would it matter if we had known this in advance or not? So I did a lot of sensitivities around that.

Now I'm actually adjusting the model every year to what are the then new prevailing conditions in the industry, and that captures the bulk of the things that people wondered about. What if discharges happen? What if there are shutdowns? What if there are license extensions?

Well, rather than pretend like we knew for sure that was going too happen, I waited until the year where you actually did know that was going to happen, and I showed how much that changes the program from the way it was run the previous year. So I'm just basically asking the same questions but in the time frame in which they would have become ripe.

**Q. Okay. What about sensitivities for storage costs or assumed costs for at-reactor storage. Why didn't you do sensitivities or dig deeper on that for this case?**

A. Probably because those were studied so carefully in the past. One thing we found in many studies that varied storage costs was they don't matter after the -- after the program moves into the period of slack, the program is -- has sufficient capacity to avoid anyone's need to build something new, because the program had



enough capacity to take it away before you would have had to -- even including putting an extra cask on your ISFSI, it doesn't have to do that.

So it doesn't matter what it would have cost. The solution is the same. If it would have cost more, you would have been even more eager to have the program take it out than I showed in my analysis, and there's no change in price that would change the type of solution that the market could have achieved.

**Q. Okay, all right. Mr. Graves, let's again shift gears, and I want to go through a number of sort of critiques that we've seen from the Government in the filings in this case. So let's go to Demonstrative Number 13.**

MS. JANTZEN: And, Your Honor, I would just like to note that it seems like we're going into the rebuttal report here --

MR. FAGG: No, we're not.

MS. JANTZEN: -- and if that is the case, you know, we don't object to Mr. Graves presenting his opinions all at once for the purpose of economy, but we object to him being recalled for any purpose other than our expert providing, you know, new opinions at this point.

MR. FAGG: To be crystal clear, we are not going