IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C and 24-118C<br>(Consolidated)<br>Judge Holte |
| ENTERGY LOUISIANA, LLC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

**DEFENDANT'S MOTION FOR LEAVE TO FILE CORRECTED DOCUMENTS**

Defendant, the United States, respectfully submits this motion for leave to file corrected versions of ECF No. 160 (defendant's motion for leave to file an amended answer) and ECF No. 180 (defendant's reply in support of motion for leave to file an amended answer). Holtec

consents to this motion. Counsel for plaintiffs indicated that plaintiffs did not object to the corrections identified in this motion but that plaintiffs intended to file a response to the motion.

In discussions among counsel, Holtec International has expressed concerns with certain allegations made in these two filings, and Holtec's inability to formally respond as a non-party. *See* ECF No. 173 (notice filed by Holtec International indicating that it would not file a response to the United States' motion). In particular, Holtec International contends that certain statements in these filings could be read to suggest allegations that Holtec International had an intent to defraud the United States. In subsequent discussions, counsel for the United States clarified that the fraud allegation presented in our proposed amended answer is focused on Entergy's actions with respect to the nonbid justification form. In these filings, the United States is not alleging any intent to defraud on the part of Holtec. Given Holtec's status as a non-party without standing to formally respond to the United States' motion, the United States has agreed to file this motion for leave to file corrected documents to eliminate any ambiguity about the nature of the United States' allegations.

As reflected in the attachments, the United States asks for leave to submit corrected versions of ECF Nos. 160 and 180, which incorporate the following changes:

- ECF No. 160 (motion) at page 11: [redacted]

- ECF No. 160 (motion) at page 23: "On multiple occasions [redacted]

- ECF Nos. 160-1, 160-2 (proposed amended answer, redline and clean) ¶ 58: "Entergy executives focused on [redacted]

- ECF Nos. 160-1, 160-2 (proposed amended answer, redline and clean) ¶ 116: [redacted]

- ECF Nos. 160-1, 160-2 (proposed amended answer, redline and clean) ¶ 153: [redacted]

- ECF No. 180 (reply) at page 11: "More specifically, the proposed answer alleges that Entergy engaged in ~~the~~ protracted negotiations with ~~between Entergy and~~ Holtec ~~were focused~~ [redacted]

For these reasons, we respectfully request that the Court grant this motion for leave to file corrected documents as described above.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

LISA L. DONAHUE
Assistant Director

s/Evan Wisser
EVAN WISSER
Senior Trial Counsel
NATALEE A. ALLENBAUGH
DANIEL D. FALKNOR
KRISTIN E. OLSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: 202-616-3682
Email: evan.wisser@usdoj.gov
*Attorneys for the United States*

Dated: October 9, 2026

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 9th day of October, 2026, I sent via email a copy of the foregoing document to plaintiff's counsel, pursuant to paragraph 2 of the Court's Amended General Order No. 2026-01.

s/Evan Wisser

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | No. 23-78C<br>Judge Holte |

**DEFENDANT'S MOTION FOR LEAVE TO FILE AMENDED ANSWER**


BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

EVAN WISSER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
(202) 616-3682

OF COUNSEL:

NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
JOSHUA D. TULLY
Trial Attorneys

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy

[redacted]

## TABLE OF CONTENTS


TABLE OF CONTENTS ........ 2

TABLE OF AUTHORITIES ........ 3

STATEMENT OF THE ISSUE ........ 2

STATEMENT OF THE CASE ........ 2

I. Procedural History ........ 2

II. Summary of Relevant Facts ........ 4

A. General Background ........ 4

B. Entergy Begins Efforts to Procure New Southern Fleet Dry Fuel Storage Contract ........ 5

C. In Parallel, Entergy Agrees to Sell Northern Fleet Nuclear Sites to Holtec ........ 7

D. Entergy Executives Become Involved in Southern Fleet Dry Fuel Storage Procurement ........ 8

E. Entergy Prepares and Executes a Nonbid Justification Form for the Holtec southern fleet dry fuel storage contract ........ 14

ARGUMENT ........ 17

I. Legal Standard ........ 17

II. This Motion For Leave To Amend Our Answer Is Not Unduly Delayed ........ 18

III. No Party Will Suffer Undue Prejudice From Our Amendment To Our Answer ........ 19

IV. The Proposed Affirmative Defense Is Not Futile Or Offered In Bad Faith ........ 21

CONCLUSION ........ 24

[redacted]

# TABLE OF AUTHORITIES

Cases

*A&D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) ..... 17, 18

*Alta Wind I Owner-Lessor C v. United States*,
125 Fed. Cl. 8 (2016) ..... 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 21

*California by and through Yee v. United States*,
145 Fed. Cl. 802 (2019) ..... 18

*Datascope Corp. v. SMEC, Inc.*,
962 F.2d 1043 (Fed. Cir. 1992) ..... 18

*Duke Energy Progress, Inc. v. United States*,
135 Fed. Cl. 279 (2017) ..... 15, 16

*Effingham County Bd. of Educ. v. United States*,
9 Cl. Ct. 177 (1985) ..... 17

*Foman v. Davis*,
371 U.S. 178 (1962) ..... 17, 18

*Hanover Ins. Co. v. United States*,
134 Fed. Cl. 51 (2017) ..... 18, 19, 20

*Hess v. United States*,
537 F.2d 457 (Ct. Cl. 1976) ..... 17

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*,
464 F.3d 1339 (Fed. Cir. 2006) ..... 21

*Lanigan v. LaSalle National Bank*,
108 F.R.D. 660 (N.D. Ill. 1985) ..... 20

*LW Constr. of Charleston, LLC v. United States*,
139 Fed. Cl. 254 (2018) ..... 18, 19, 20

*Meyer Grp., Ltd. v. United States*,
115 Fed. Cl. 645 (2014) ..... 21

*Shoshone Indian Tribe of the Wind River Reservation v. United States*,
71 Fed. Cl. 172 (2006) ..... 21

[redacted]

*Sonoran Tech. & Prof'l Servs., LLC v. United States*,
133 Fed. Cl. 401 (2017) ........................................................................................... 17

*St. Paul Fire & Marine Ins. Co. v. United States*,
31 Fed. Cl. 151 (1994) ............................................................................ 17, 19, 20, 21

*Standard Oil Co. of Kan. v. United States*,
47 F. Supp. 120 (Ct. Cl. 1942), *cert. denied* 319 U.S. 749 (1943) ......................................... 22

*State of Alaska v. United States*,
15 Cl. Ct. 276 (1988) ................................................................................... 17, 18, 20

*Te-Moak Bands of W. Shoshone Indians v. United States*,
948 F.2d 1258 (Fed. Cir. 1991)........................................................................... 17, 18

*Veridyne Corp. v. United States*,
86 Fed. Cl. 668 (2009) ........................................................................................... 20

Statutes

28 U.S.C. § 2514 ........................................................................................... 1, 2, 17

Rules

RCFC 15(a)(2) ........................................................................................... 1, 17

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 23-78C |
| THE UNITED STATES, | ) | Judge Holte |
| Defendant, | ) | |
| and | ) | |
| HOLTEC INTERNATIONAL, | ) | |
| Intervenor. | ) | |

**DEFENDANT'S MOTION FOR LEAVE TO FILE AMENDED ANSWER**

Pursuant to Rule 15(a)(2) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests leave to file an amended answer to the complaint filed by plaintiffs System Energy Resource, Inc., *et al.*, (Entergy). Our proposed amended answer, including a redline comparison to our original answer, is attached to this motion. We propose to raise a new affirmative defense that Entergy's claim should be forfeited entirely due to fraud, pursuant to 28 U.S.C. § 2514. Entergy has not consented to our request to amend our answer.

The parties' June 22, 2026 status report stated that the United States would defer filing our motion for spoliation sanctions and "any other substantive motion it may choose to file," which implicitly included this motion, until after September 18, 2026, to facilitate settlement discussions. The United States first advised Entergy of our intent to file this motion on April 22, 2026. The parties then jointly moved on May 5, 2026, to stay discovery by 30 days to permit the

[redacted]

parties to discuss potential settlement. Since the May 5th stay motion, Entergy has not yet presented any formal settlement proposal to the United States. The parties last held a discussion regarding potential settlement on July 16, 2026. Based on these facts, the United States' position is that there are no ongoing settlement discussions to facilitate through further delay in filing this motion, and so we are filing this motion now.

## STATEMENT OF THE ISSUE

Whether the Court should grant leave to allow the United States to file an amended answer to assert an affirmative defense that the claims brought by the plaintiffs are forfeited due to fraud, pursuant to 28 U.S.C. § 2514.

## STATEMENT OF THE CASE

### I. Procedural History

This case concerns a claim for contract damages brought by Entergy subsidiaries as owners of the Grand Gulf Nuclear Station, filed on January 20, 2023. ECF No. 1 (Compl.). Entergy alleges that it incurred costs to manage spent nuclear fuel at Grand Gulf that the United States Department of Energy (DOE) was required to remove under the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste in 1983, Contract No. DE-CR01-83NE44368 (Standard Contract). Compl. ¶¶ 1-2. As relevant to this motion, Entergy seeks reimbursement for costs paid to Holtec International for spent fuel management services, including the purchase of dry fuel storage casks, under a 2020 contract executed between Entergy and Holtec. These casks are used to store the spent nuclear fuel assemblies temporarily at Grand Gulf until DOE performance.

The United States' expert, Mark Gmyr, has calculated that, out of Grand Gulf's $72,806,478 claim, $17,559,297 is claimed for payments to Holtec under the 2020 dry fuel

[redacted]

storage contract to purchase dry fuel storage casks and ancillary equipment. The United States' expert Glenn George, Ph.D., of Bates White, has opined that the amount Entergy paid to Holtec for these dry fuel storage casks was [redacted] the prevailing market price, and that Entergy's decision to pay these inflated prices was not commercially reasonable and did not reflect true arms-length bargaining between Entergy and Holtec. Relying on this and other evidence, the United States intends to present several defenses against Entergy's attempt to claim these $17.5 million in payments to Holtec for dry fuel storage casks and ancillary equipment – that Entergy cannot prove that its decision to pay these inflated prices was caused by the United States' breach or was foreseeable at the time of contracting, and that Entergy's decision to agree to these inflated prices was unreasonable.

In addition to these defenses, the United States now intends to present an affirmative defense of forfeiture due to fraud under 28 U.S.C. § 2514. In the summer of 2024, after reviewing Entergy's initial productions, the United States flagged the exorbitant Holtec cask prices as a source of concern. During the informal discovery process under which the parties began this case, counsel for the United States asked Entergy for an explanation of the high cask prices. On more than one occasion, counsel for Entergy said that Holtec's cask system prices had increased due to [redacted] in the years leading up to the 2020 contract. The United States knew that Entergy's initial explanation was implausible, both because the price increase was far larger than any [redacted] in recent years and because Holtec's dry fuel storage contracts already contain escalator clauses to account for increased raw materials costs.

Investigating further, on November 15, 2024, the United States served a set of requests for production, including RFP No. 26: "Please produce all documents relating to any bid or proposal received from Holtec for services performed at Grand Gulf, including but not limited to

[redacted]

your evaluation and any negotiation of the pricing for such services." In response to this request, Entergy produced a nonbid justification form that its executives signed in November 2019, purporting to state the reasons why Entergy was accepting Holtec's increased cask system prices without pursuing any bid process or market testing. After production, Entergy's counsel and numerous Entergy witnesses pointed the United States to that nonbid justification form as providing the definitive justification for Entergy's decisions. After nearly two years of additional extensive discovery, the United States alleges that the nonbid justification form was knowingly falsified to aid Entergy's efforts to recover the amounts paid to Holtec as damages in this lawsuit.

## II. Summary of Relevant Facts

The attached amended answer includes all our detailed allegations, supported by the discovery record in this case. We provide here a brief overview of those allegations.

### A. General Background

In the early 2010s, Entergy owned nine nuclear power plant sites. Four plants were in the southeastern U.S., including Grand Gulf Nuclear Station, the plant for which Entergy seeks reimbursement of spent nuclear fuel management costs in this case. These four plants were referred to as Entergy's "southern fleet" and were managed by one Entergy subsidiary. The other five plants were in the northeastern U.S. These were referred to as Entergy's "northern" fleet and were managed by a different Entergy subsidiary.

In 2009, Entergy executed two contracts with Holtec International to provide dry fuel storage services at Entergy's nuclear power plants, one contract for the northern fleet and one contract for the southern fleet. Each contract was in effect for 10 years, through 2019. Under the contracts, Holtec supplied dry fuel storage cask systems to all Entergy sites. The contracts

[redacted]

specified a base price for the cask systems in 2009, and escalation methodology based on published cost indices, which would automatically adjust the 2009 base prices annually over the 10-year contract term. The pricing terms were the same in both contracts, and the escalation methodology was very similar. For most sites across the two fleets, Holtec supplied its HI-STORM 100 cask system, with a capacity of 24 or 32 spent nuclear fuel assemblies from Entergy's pressurized water reactors (PWR) and a capacity of 68 spent nuclear fuel assemblies from Entergy's boiling water reactors (BWR).[1] For Palisades Nuclear Generating Station in the northern fleet, Entergy supplied its higher capacity HI-STORM FW cask system, with a capacity of 37 PWR spent nuclear fuel assemblies.

In the mid 2010s, Entergy decided to sell its northern fleet nuclear power plants due to deteriorating economic conditions for nuclear power. As a result, Entergy did not execute a new fleetwide dry fuel storage contract for the northern fleet when the 2009 contract expired at the end of 2019. Instead, as each plant was sold, Entergy executed a plant-specific dry fuel storage services contract with Holtec that would convey with the plant to the buyer.

### B. Entergy Begins Efforts to Procure New Southern Fleet Dry Fuel Storage Contract

Entergy retained ownership of its southern fleet, which required a new dry fuel storage services contract to replace the Holtec contract expiring at the end of 2019. In June 2018, Entergy had a team begin working on the procurement effort. The procurement effort was led by David Murphy and his subordinate, Wayne Madkin, who worked in Entergy's Supply Chain group. Mr. Murphy was supervised by Glenn Griffin, Entergy's Director of Supply Chain for

[1] The casks themselves are the same size, but the dimensions of pressurized water reactor assemblies are boiling water reactor assemblies are different, such that the same cask system can hold more boiling water reactor assemblies.

[redacted]

Operations and Generation activities. The procurement effort was ultimately supervised by John Lindley, Entergy's Vice President and Chief Supply Officer.

The procurement effort was also informed by a technical team, the individuals responsible for executing dry fuel storage activities for the southern fleet. The technical input was provided primarily by Charles Gears, Entergy's fleetwide manager of dry fuel storage services, supported by his subordinate Suzanne Leblang. Mr. Gears was supervised by two directors, Scott Kelley and Devon Price. The technical input to the procurement effort was ultimately supervised by Jeff Heckenberger, Entergy's Vice President of Fleet Outage Services, Chris Costanzo, Entergy's Senior Vice President of Nuclear Operations, and Chris Bakken, Entergy's Chief Nuclear Officer.[2]

In the summer and fall of 2018, the staff level team identified concerns with the existing southern fleet dry fuel storage contract that should be addressed in any new contract. These included concerns that Holtec's prices were higher than what Entergy should be paying and that the contract lacked adequate mechanisms to address Holtec performance deficiencies, which were substantial under the 2009 southern fleet contract. The staff level team concluded in June 2018 that the upcoming contract should be procured through a competitive bid process to help secure improved terms in the new contract. The team began preparing paperwork to present that recommendation for approval by Entergy executives through a formalized process Entergy had recently implemented, the Nuclear Supplier Governance Board.

[2] This motion and the attached answer periodically distinguish between Entergy "executives" and "staff level" personnel. As used by the United States, the "executives" category comprises [redacted] The "staff level" category comprises, [redacted]. The "staff level" category comprises, [redacted]

[redacted]

### C. In Parallel, Entergy Agrees to Sell Northern Fleet Nuclear Sites to Holtec

During this same time period in 2018, Entergy and Holtec were negotiating over the sale of Entergy's northern fleet plants. Four of the five plants were scheduled to be shut down and decommissioned.[3] At the time, Holtec was looking to begin a new line of business doing the work of decommissioning nuclear power plant sites, and Holtec expressed an interest in the four sites that Entergy intended to shut down. Holtec ultimately acquired three of the four sites – Palisades, Pilgrim Nuclear Power Station, and Indian Point Energy Center. Entergy and Holtec agreed to a staggered closing schedule where Pilgrim would close on July 31, 2019, Indian Point would close on one reactor in 2020 and one reactor in 2021, and Palisades would close in 2022.

Palisades presented a particular problem for Entergy. Nuclear Regulatory Commission regulations require that all nuclear power plants provide "reasonable assurance that funds will be available" to decommission the site. 10 C.F.R. § 50.75(a). Entergy, like most utilities, meets this requirement by establishing a decommissioning trust fund for each nuclear power plant site. *See id.* § 50.75(e)(1). The trust fund for Pilgrim had excess funds, in part because when Entergy acquired Pilgrim, Entergy required its former owner to contribute additional capital to the fund. The Palisades trust fund, however, was projected to have $200 million less than necessary to fully decommission the site, raising the prospect that Entergy would be required to make a similar capital contribution to facilitate a sale.

Instead, Holtec presented what was described as an attractive offer in deposition testimony by Mr. Bakken, Entergy's Chief Nuclear Officer, and Peter Norgeot, Entergy's Senior Vice President responsible for overseeing the northern fleet divestment. Holtec offered to accept the $200 million liability associated with Palisades without requiring any capital contribution by

---

[3] The fifth, FitzPatrick Nuclear Power Plant, was sold to Exelon and still operates today.

[redacted]

Entergy, if Holtec could also acquire Pilgrim and its overfunded trust fund as well. Holtec planned to use the excess Pilgrim funds to cover the Palisades shortfall. Entergy agreed to this proposal, but Mr. Norgeot was concerned about the closing schedule, because Holtec would get Pilgrim and its overfunded trust fund before accepting Palisades and its trust fund liability three years later. On March 29, 2018, the parties agreed that at the Pilgrim closing on July 31, 2019, Holtec would provide a $200 million support services agreement to support decommissioning activities. In essence, once the Pilgrim deal closed on July 31, 2019, Entergy's Palisades liability would be resolved.

### D. Entergy Executives Become Involved in Southern Fleet Dry Fuel Storage Procurement

Entergy announced the sale of Pilgrim and Palisades to Holtec on August 1, 2018. That same day, Mr. Murphy, who was leading the southern fleet dry fuel storage procurement effort, wrote to his superiors, Mr. Griffin and Mr. Lindley. Referencing the announcement, Mr. Murphy advised that he had spoken with Mr. Heckenberger, the executive in charge of the dry fuel storage operational team, and based on that call he asked whether they should proceed with the recommendation to begin the bid process. Mr. Murphy acknowledged that he was not privy to strategic parts of the business that could impact the bid/no bid decision.

The procurement team continued their due diligence, identifying contracting goals and conducting research into alternative vendors, but the ultimate decision of whether to conduct a competitive procurement was delayed while Entergy and Holtec continued to negotiate over the northern fleet plant sales. During that time, in October 2018, [redacted] Then, on December 11, 2018, Mr. Madkin directed Holtec's sales

[redacted] representative for Entergy, Thomas Duberville, that Holtec should submit a proposal to renew the contract, [redacted] In January 2019, the procurement staff prepared documentation for executive review, stating that [redacted] Amended Answer ¶ 73.

As outlined in detail in the attached amended answer, Holtec proposed exorbitant price increases for its dry fuel storage casks in its proposal on February 25, 2019. Under the 2009 contract, Holtec's cask system prices increased on average [redacted]. Holtec's proposal offered the same casks with [redacted] between 2019 and 2020. Over the life of the proposed contract, this increase would cost Entergy [redacted] more compared to the current contract baseline, and [redacted] more compared to the contract prices Holtec offered to Entergy for the individual northern fleet plants in 2018. Entergy began the procurement process expecting to use its purchasing leverage to force Holtec to reduce its prices, not to pay a [redacted]

On March 20, 2019, Mr. Heckenberger met with Mr. Duberville individually and expressed surprise at the magnitude of the price increases. He said [redacted] to DOJ as part of this lawsuit and to the utility regulators who approved Entergy's consumer prices. Mr. Duberville then spoke with Mr. Murphy, who said he suspected there were higher level negotiations ongoing between Entergy and Holtec, so he didn't know what was on or off the table, but in his view the prices were too extreme to stay where they were. Mr.

[redacted]

Murphy then told Mr. Duberville that Entergy leadership would ultimately make the decision about whether to proceed to bid or not.

On March 21, 2019, the day after Mr. Duberville's conversations with Mr. Heckenberger and Mr. Murphy, Entergy and Holtec reached agreement on a Letter Agreement outlining each party's commitments if the Pilgrim sale did not close on July 31, 2019. The following week, Mr. Bakken asked for the timeline to closure on the dry fuel storage contract, noting that it was "pretty urgent" he receive an update. Amended Answer ¶ 96. The procurement team provided materials to Mr. Bakken with the bottom line that [redacted] Amended Answer ¶ 97. In response, Mr. Bakken told Mr. Lindley, who was the ultimate supervisor of the supply chain team, "[m]ay be best if you and I have a chat." *Id.*

After further discussions among Entergy executives, on April 5, 2019, Entergy agreed to give Holtec a do-over. Holtec explained to Mr. Bakken that the price increases were due to the increase in raw material prices, especially [redacted].[4] Holtec also offered to show Mr. Bakken benchmarks to support the pricing. Entergy executives Mr. Heckenberger and Mr. Costanzo would lead further discussions with Holtec, specifically advising that any "[d]eal needs to withstand public scrutiny." Amended Answer ¶ 102. A formal letter sent from Entergy to Holtec expressed concern about significant price increases without objective basis" and reminded Holtec that "any Entergy agreement regarding spent fuel storage will need to withstand

[4] Entergy's due diligence later in the negotiation process would show that raw material increases justified, at most, a [redacted] increase above the 2019 contract baseline, not [redacted] increase Holtec was seeking. Even then, Entergy noted that Holtec used domestic steel indices in its contracts with Entergy but used foreign steel to manufacture its casks, resulting in arbitrage profits Holtec.

[redacted]

prudency reviews and public scrutiny associated with our cost recovery mechanisms." Amened Answer ¶ 103.

Holtec responded with a second proposal on April 23, 2019, with the same prices as before and additional attempts at justification that did not satisfy Entergy. The procurement team began preparing for a quick pivot to a competitive bid, but Entergy executives chose to give Holtec a third chance. Entergy requested an executives-only meeting, at which Mr. Heckenberger told Pierre Oneid, a Holtec senior executive, that Mr. Heckenberger had "discussed our proposed pricing with Entergy legal and was shot down." Amended Answer ¶ 113. At that meeting, the Entergy and Holtec executives agreed that Holtec would provide a third proposal which would offer to transition Entergy to Holtec's higher capacity casks at increased prices but maintain the price per cell equivalent to the existing contract. That is, switching from a HI-STORM 100 MPC-68 cask to a HI-STORM FW MPC-89 cask could be used to justify a [redacted] increase (the percentage increase from 68 to 89), while switching from a HI-STORM 100 MPC-32 cask to a HI-STORM FW MPC-37 cask could be used to justify a [redacted] increase (the percentage increase from 32 to 37). [redacted] Amended Answer ¶ 116.

Holtec's third proposal executed the plan agreed to at the executives' April 23, 2019 meeting, but even then the Holtec prices were higher than the arbitrary price per cask assembly equivalency that had been agreed to. Mr. Heckenberger sent multiple texts to Mr. Oneid complaining that if Holtec could not meet the equivalent price per fuel assembly commitment, it would put them back in the box they did not want to be in, presumably referring to a scenario

[redacted]

[redacted] Mr. Heckenberger specifically said that "we are willing to concede the efficiency for larger casks as part of the calculation but anything over that is going to be a problem in terms of our supply chain process in a regulated utility and a sole source justification to renew or extend the current contract." Amended Answer ¶ 125.

After several weeks of intensive discussions yielded no progress, the Entergy staff level procurement team again began for a quick pivot to a competitive bid, one full year after the team had first settled on a bid process as the preferred course of action. They developed more details about the cask system offered by a Holtec competitor (NAC), began the process of developing a bid specification, and evaluated what casks Entergy might need to preorder to meet dry fuel storage needs at each site in the event of a transition.

In June 2019, Mr. Bakken sent Dr. Singh the procurement team's pricing analysis showing that the high-capacity price casks did not maintain pricing parity with the existing contract on a per assembly basis. Mr. Bakken wrote to Dr. Singh, "[a]nother topic to discuss. As expected, we will have to find a way through this. Chat tonight." Amended Answer ¶ 134. Mr. Bakken then traveled alone to Holtec's headquarters in Camden, NJ on June 17, 2019, to meet with Dr. Singh and other Holtec personnel. Returning from that meeting, Mr. Bakken said that [redacted]. Mr. Murphy and Mr. Gears both viewed the [redacted] with suspicion, with Mr. Murphy observing that the [redacted] Amended Answer ¶ 135.

[redacted]

Mr. Heckenberger, Mr. Griffin, and Mr. Kelley accompanied Mr. Bakken to Holtec's headquarters on June 28, 2019. Mr. Bakken met individually with Dr. Singh while the other [redacted]. Below is an excerpt of the document shown at the meeting:

[redacted]

Someone from Entergy asked [redacted] which Holtec said it could provide after the meeting. Entergy knew its 2019 Palisades contract price for the PWR cask system was approximately [redacted] (the separately negotiated price for the Palisades shutdown casks was lower). In response to this request, Holtec [redacted]

Notably, Entergy ultimately accepted Holtec's proposal to remove the [redacted] clause from the 2020 southern fleet dry fuel storage contract. That clause had been included in both the 10-year northern and southern fleet dry fuel storage contracts executed between Entergy and Holtec in 2009. If retained, the clause would have permitted Entergy to [redacted]

[redacted] for the HI-STORM FW PWR (MPC 37) casks (compared to the [redacted] contracted price) and between [redacted] for the HI-STORM FW BWR (MPC 89) casks (compared to the [redacted] contracted price).

### E. Entergy Prepares and Executes a Nonbid Justification Form for the Holtec southern fleet dry fuel storage contract

After returning from the Camden meeting and receiving the additional (if inadequate) price information provided by Holtec, Entergy executives began preparing a nonbid justification form to document the reasons for contracting with Holtec at the proposed prices without a bid process. The prices agreed to were only marginally lower than the opening prices that Entergy had told Holtec were far too extreme to be acceptable. Multiple Entergy witnesses testified in depositions that [redacted]

On July 18, 2019, Mr. Heckenberger convened a meeting with the dry fuel storage procurement team, advising them that there would be no further consideration of a bid process. The executives circulated a draft nonbid justification form for discussion. Mr. Gears's notes from the meeting [redacted] Amended Answer ¶ 140. This meeting occurred 13 days before the closing of the Pilgrim sale to Holtec, at which point Holtec was obligated to deliver its agreement to cover the $200 million shortfall in the Palisades decommissioning trust fund. At this meeting, the executives explained that Entergy needed to accept Holtec's prices on a sole-source basis because [redacted]

The individuals most responsible for managing the procurement process had no involvement in the preparation of the nonbid justification form. The United States conducted depositions of every Entergy employee involved in the procurement process. None have claimed

[redacted]

responsibility for drafting the nonbid justification form. Based on the available evidence, it is likely that the initial draft was written by [redacted].

On September 16, 2019, the nonbid justification form was submitted to the NSGB, which approved in an October 1, 2019 meeting. The nonbid justification form was brief, two pages in total, and repeated the statement from the July 18, 2019 meeting that Entergy could not contemplate a vendor transition in light of [redacted] The formal minutes of the NSGB meeting have been lost due to Entergy's failure to take adequate steps to preserve them, but Entergy did preserve and produce an email [redacted] The NSGB did discuss [redacted].

After approval by the NSGB, the nonbid justification form [redacted] The substance of the executed form is meaningfully different from the version that was reviewed and approved by the NSGB. [redacted] The executed nonbid justification form [redacted] and which was not a subject of discussion or analysis by the procurement team at any point previously. The executed nonbid justification contains numerous other material falsities, as described in the attached amended answer at paragraphs 151-171. The nonbid justification was fully signed on November 18, 2019, six weeks after the NSGB approval.

[redacted]

Ultimately, the nonbid justification did not accurately describe the reasons that Entergy chose to pay the exorbitant prices demanded by Holtec. The reasons provided in the document were false, and Entergy personnel knew they were false at the time. The document [redacted] in the discovery record. First, Entergy executives [redacted] Entergy was offloading a $200 million liability at no cost within the parameters of the plant sales. Entergy staff estimated that Entergy was overpaying Holtec by [redacted] over the course of the southern fleet dry fuel storage contract. Second, Entergy executives [redacted]

Either explanation would have provided the United States with a plausible substantive defense to Entergy's claims because the marginal costs associated with foregoing a bid process (the overpayment to Holtec) would have been caused by factors other than DOE's breach. *Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279, 288-89 (2017) (holding that marginal costs associated with poor plant management were not recoverable as damages against the United States in spent nuclear fuel cases).[5] The executives' decision [redacted]. The executives' decision [redacted]

[5] Entergy would have been aware of this then-recent decision by the Court of Federal Claims when finalizing its nonbid justification form.

[redacted]

Based upon this information learned during discovery, as alleged in the attached amended answer, the United States requests leave to amend its answer to assert a new affirmative defense of forfeiture due to fraud, pursuant to 28 U.S.C. § 2514.

## ARGUMENT

### I. Legal Standard

Under RCFC 15(a)(2), other than shortly after the relevant pleadings are filed, a party seeking to amend a pleading prior to trial must obtain either its opponent's consent or the Court's leave. However, "[t]he court should freely give leave when justice so requires." *Id.* Thus, RCFC 15 "is liberally construed, and courts generally grant leave to amend if there is no 'apparent or declared reason' not to permit amendment." *Sonoran Tech. & Prof'l Servs., LLC v. United States*, 133 Fed. Cl. 401, 403 (2017) (quoting *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014)). *Accord State of Alaska v. United States*, 15 Cl. Ct. 276, 279 (1988) ("[L]eave to amend should be freely permitted absent sufficient explicit reasons indicating that it should be denied." (citing *Hess v. United States*, 537 F.2d 457, 461 (Ct. Cl. 1976))).

Explicit reasons to deny leave to amend typically include, "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Te-Moak Bands of W. Shoshone Indians v. United States*, 948 F.2d 1258, 1260 (Fed. Cir. 1991) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).[6] In the absence of these apparent or declared reasons, the leave sought should, as the

[6] This Court follows relevant precedents interpreting Fed. R. Civ. P. 15, which mirrors the language in RCFC 15. *St. Paul Fire & Marine Ins. Co. v. United States*, 31 Fed. Cl. 151, 153 n.2 (1994) (citing *Effingham County Bd. of Educ. v. United States*, 9 Cl. Ct. 177, 179-80 (1985)).

[redacted]

rules require, be "freely given." *A&D Auto Sales*, 748 F.3d at 1158 (quoting *Foman*, 371 U.S. at 182). When a party seeks to amend a pleading before trial, "'mere delay, without some showing of prejudice, bad faith or futility, [is] insufficient to deny a motion to amend' . . . ." *California by and through Yee v. United States*, 145 Fed. Cl. 802, 811 (2019) (quoting *Alaska*, 15 Cl. Ct. at 280).

None of the typical reasons exist here to justify denying our motion for leave to amend our answer.

**II. This Motion For Leave To Amend Our Answer Is Not Unduly Delayed**

"Although delay itself is an insufficient ground to deny amendment, if the delay is 'undue' the [Court] may refuse to permit amendment." *Datascope Corp. v. SMEC, Inc.*, 962 F.2d 1043, 1045 (Fed. Cir. 1992) (internal citations and quotations omitted). Determination of undue delay generally turns on how long the party seeking amendment waited after learning information underlying the amendment and why this occurred, *Te-Moak*, 948 F.2d at 1261-64, because "[a] party should move to amend its pleading 'as soon as the necessity for altering the pleading becomes apparent,' *i.e.*, 'at the earliest opportunity.'" *Hanover Ins. Co. v. United States*, 134 Fed. Cl. 51, 60 (2017) (quoting *Alta Wind I Owner-Lessor C v. United States*, 125 Fed. Cl. 8, 11 (2016)). A significant delay is one that is measured in years. *LW Constr. of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 279 (2018) (quotation omitted) (citing cases). *Cf. Hanover Ins.*, 134 Fed. Cl. at 61 (finding no undue delay when 223 days elapsed between the time the United States uncovered facts supporting fraud in discovery and when the United States raised fraud claims through its motion for leave to amend its answer).

The United States' request to amend the answer and assert an affirmative defense based in fraud was not unduly delayed here. Like similar cases where the United States alleges fraud in response to a claim, we only learned of the fraudulent nature of Entergy's claim through the

[redacted]

course of discovery. *E.g.*, *LW Constr.*, 139 Fed. Cl. at 304; *Hanover Ins.*, 134 Fed. Cl. at 60; *St. Paul Fire & Marine Ins.*, 31 Fed. Cl. at 152-53.

As summarized above, the United States first became suspicious of Entergy's claim in the fall of 2024. The parties engaged in further discovery through the spring of 2026. By the close of fact discovery on April 15, 2026, the United States had deposed all of the potentially relevant Entergy witnesses except for one (Scott Kelley was located in Romania and his deposition was delayed until August 11, 2026). In addition, Entergy continued to produce highly relevant documents through March 25, 2026. After reviewing all the relevant documents and witness testimony, the United States concluded that fraud was the only possible explanation for Entergy's otherwise inexplicable decision to accept Holtec's exorbitant prices.

At that point, counsel for the United States began the process to obtain the necessary supervisory approvals to assert a fraud-based affirmative defense. That approval was provided on April 21, 2026. Counsel for the United States advised counsel for Entergy of our intent to raise this defense the next day, on April 22, 2026. The United States then agreed to defer filing this motion at Entergy's request to facilitate settlement discussions, and this filing comes now that it is apparent that settlement discussions are not ongoing. There can be no reasonable dispute that the United States acted promptly and without undue delay in seeking to amend the answer to assert an affirmative defense based in fraud.

## III. No Party Will Suffer Undue Prejudice From Our Amendment To Our Answer

More than ordinary prejudice is required to overcome the presumption in favor of allowing amendments because virtually every amendment results in some degree of prejudice to an opposing party as a result of the potential for additional discovery and trial delay. *St. Paul Fire & Marine Ins.*, 31 Fed. Cl. at 153; *Lanigan v. LaSalle National Bank*, 108 F.R.D. 660, 661

[redacted]

(N.D. Ill. 1985). The non-moving parties, System Energy Resources, Inc., *et al.*, bear the burden of demonstrating that *undue* prejudice justifies denying our motion. *Hanover Ins.*, 134 Fed. Cl. at 62 (citing *Veridyne Corp. v. United States*, 86 Fed. Cl. 668, 681 (2009)).

Generally, arguments that the amendments will require additional discovery, even potentially extensive discovery, is not a basis to deny a motion for leave to amend. *LW Constr.*, 139 Fed. Cl. at 279-80 (citing *Alaska*, 15 Cl. Ct. at 280); *Veridyne*, 86 Fed. Cl. at 681 ("The cost . . . and burden of undertaking additional discovery do not substantiate the level of prejudice needed to overcome the liberal standard of RCFC 15(a)(2)."). Issues that may arise from additional discovery requests can be addressed through later motions pursuant to RCFC 26, if necessary. *Alaska*, 15 Cl. Ct. at 280. Similarly, delays in the case do not establish undue prejudice where, as here, the motion to amend is filed while discovery is still open and a trial date has not yet been set. *Hanover Ins.*, 134 Fed. Cl. at 62. *See also Alaska*, 15 Cl. Ct. at 280 (granting a motion for leave in part because trial was not imminent); *St. Paul Fire & Marine Ins.*, 31 Fed. Cl. at 154 (finding no undue prejudice "in the absence of a firm trial date or a trial date in the distant future").

Here, there is no undue prejudice to Entergy that could justify denying our motion to leave to amend our answer. Indeed, in conversations after the United States disclosed our intent to file this motion, counsel for Entergy admitted that they had flagged this potential defense back in 2025. There can be no credible argument that Entergy was unable to take proper discovery because it was not on notice as to the issues presented in this motion. In addition, no trial date has been set. To the extent this amendment requires additional trial preparations, all parties have ample time to accommodate those preparations. Thus, this amended pleading does not impose any undue prejudice on either party.

[redacted]

## IV. The Proposed Affirmative Defense Is Not Futile Or Offered In Bad Faith

An amended pleading may be denied due to futility only if "a party's proposed amendment is facially meritless and frivolous . . . ." *St. Paul Fire and Marine Ins*., 31 Fed. Cl. at 155. To assess an amendment's futility, the Court applies the same standard as in a motion to dismiss, assuming the truth of the facts alleged and evaluating whether the well-pleaded factual allegations plausibly entitle the party to relief. *Meyer Grp., Ltd. v. United States*, 115 Fed. Cl. 645, 650 (2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 71 Fed. Cl. 172, 176 (2006)).

The proposed amended answer more than meets the standard of facial plausibility, assuming that the alleged facts are true. Under 28 U.S.C. § 2514, "[a] claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance" of that claim. The Court of Federal Claims possesses jurisdiction to find fraud or attempted fraud, and to render judgment of forfeiture. *See, e.g.*, *O'Brien Gear & Machine Co. v. United States*, 591 F.2d 666, 671-73 (Ct. Cl. 1979); *Ingalls Shipbuilding, Inc. v. United States*, 13 Cl. Ct. 757, 760-67 (1987), *rev'd on other grounds*, 857 F.2d 1448 (Fed. Cir. 1988). "The forfeiture statute includes not necessarily fraud *in factum,* but any *attempted* fraud against the United States. Such attempt must include a 'deliberate, knowing intent to deceive the court into making a decision favorable to the plaintiff.'" *Farkas v. United States*, 57 Fed. Cl. 134, 146 (2003), *aff'd*, 95 F. App'x 355 (Fed. Cir. 2004).

[redacted]

The court has found intend to defraud when the plaintiff generated false documents that were submitted in support of its claim. *Id.*; *O'Brien Gear & Mach.*, 591 F.2d at 672. Section 2514 "provides for forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim," *Kamen Soap Products v. United States*, 124 F. Supp. 608, 129 Ct. Cl. 619, 641 (1954), which can include "conduct or the making of a false or misleading statement with the intent to deceive the Government . . . ." *DeRochemont v. United States*, 23 Cl. Ct. 87, 89 (1991) (internal quotation omitted). Fraudulent conduct can also include the falsification of corporate records with the goal of supporting a monetary damages claim against the United States. *Standard Oil Co. of Kan. v. United States*, 47 F. Supp. 120, 137-41 (Ct. Cl. 1942), *cert. denied* 319 U.S. 749 (1943).

To prevail under a forfeiture defense, the defendant must also show by clear and convincing evidence that the claimant (1) knew it submitted claims that were false, and (2) it intended to defraud the government by submitting those claims. *Alcatec, LLC v. United States*, 100 Fed. Cl. 502, 517 (2011), *aff'd*, 471 F. App'x 899 (Fed. Cir. 2012). Proof of "negligence or ineptitude" is not sufficient to meet the clear and convincing evidence standard; the court must find an intent to deceive the government. *Id.* Although the evidence of fraud must be clear and convincing, it can be established through circumstantial evidence. *Id.*; *Kamen Soap*, 124 F. Supp. at 620. "About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts." *Alcatec*, 100 Fed. Cl. at 517 (quoting *Kamen Soap Prods.*, 124 F. Supp. at 620).

Here, the United States has alleged the existence of numerous false statements in the nonbid justification form. Indeed, many essential statements purportedly justifying Entergy's decision to avoid a competitive bid and contract directly with Holtec are disproven by the

[redacted]

extensive contemporaneous record. In particular, there is no evidence that [redacted] any time until the final execution of the document in November 2019. Several Entergy witnesses have acknowledged other inaccuracies in the document in deposition testimony. One witness, Devon Price, testified that if the purported "unique" elements of Holtec's new casks were not in fact new or necessary, it would require a reassessment of the entire justification.

The United States also alleged that these false statements in the nonbid justification form were made in support of Entergy's present claim with the purpose of deceiving the United States and the Court. As early as March 2019, [redacted] On multiple occasions Entergy's [redacted] Even after ultimately settling on the [redacted] as adequate justification, Entergy felt it necessary to add other false reasons to the nonbid justification form.

Most tellingly, Entergy [redacted] and Entergy [redacted]. Both of these points provides the United States with a causation defense against Entergy's claim. In particular, the [redacted] provides ample evidence that the document was falsified with the intent to improve the changes of recovery in Entergy's present lawsuit.

[redacted]

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that Court grant our motion for leave to file an amended answer.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

s/Evan Wisser
EVAN WISSER
Senior Trial Counsel
NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
JOSHUA D. TULLY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-3682
evan.wisser@usdoj.gov
*Attorneys for the United States*

OF COUNSEL:

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Office of the General Counsel

Dated: August 14, 2026

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 14th day of August, 2026, I sent via email a copy of the foregoing document to plaintiff's counsel, pursuant to paragraph 2 of the Court's Amended General Order No. 2026-01.

s/Evan Wisser

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al., Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, Defendant, | ) | No. 23-78C<br>Judge Holte |
| and | ) | |
| HOLTEC INTERNATIONAL, Intervenor. | ) | |

**DEFENDANT'S FIRST AMENDED ANSWER AND AFFIRMATIVE DEFENSE**

For its answer to the complaint, defendant, the United States admits, denies, and alleges as follows:

1. The allegations in the first and second sentences of paragraph 1 are plaintiffs' characterization of their case to which no answer is required. Denies the allegation contained in the third sentence of paragraph 1 for lack of knowledge or information sufficient to form a belief as to its truth.

2. The allegations contained in paragraph 2 are plaintiffs' characterization of their case or a legal conclusion to which no answer is required. To the extent a response to these allegations is required, they are denied for lack of knowledge or information sufficient to form a belief as to their truth.

3. Denies the allegations in paragraph 3 for lack of knowledge or information sufficient to form a belief as to their truth.

[redacted]

4. Admits the allegations of paragraph 4.

5. The allegations contained in paragraph 5 are a legal conclusion to which no answer is required.

6. The allegations contained in paragraph 6 are conclusions of law to which no answer is required. To the extent a response to these allegations is required, they are admitted to the extent they are consistent with the court decisions cited, which are the best evidence of their contents.

7. Admits the allegations in paragraph 7 to the extent they are consistent with the standard contract published at 10 C.F.R. § 961.11, the contents of which are the best evidence thereof, and any construction of which is denied.

8. Admits the allegations contained in paragraph 8 to the extent supported by the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 8.

9. Denies the allegations contained in the first sentence of paragraph 9; avers that the Department of Energy and the nuclear industry together developed the Standard Contract. Admits the remaining allegations of paragraph 9 to the extent they are consistent with the contents of the standard contract published at 10 C.F.R. § 961.11, the contents of which are the best evidence thereof, and any construction of which is denied.

10. Admits the allegations in the first sentence of paragraph 10 to the extent they are consistent with the contents of the standard contract published at 10 C.F.R. § 961.11, the contents of which are the best evidence thereof, and any construction of which is denied. The remaining allegations in paragraph 10 constitute conclusions of law to which no response is required; to the extent a response is required, they are denied.

[redacted]

11. The allegations contained in the first and third sentences of paragraph 11 constitute conclusions of law and plaintiffs' characterization of the case, to which no response is required. To the extent a response to these allegations is required, they are denied. Admits the allegations contained in second sentence of paragraph 11 to the extent supported by the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, which is the best evidence of its contents; otherwise denies the allegations.

12. Admits the allegations in paragraph 12 to the extent they are consistent with the contents of the Final Interpretation of Nuclear Waste Acceptance Issues, the contents of which are the best evidence thereof, and any construction of which is denied.

13. Admits the allegations in paragraph 13 to the extent they are consistent with the contents of the court decisions cited, the contents of which are the best evidence thereof, and any construction of which is denied.

14. Admits that DOE has not yet begun the disposal of SNF under the standard contract published at 10 C.F.R. § 961.11. The remaining allegations contained in paragraph 14 are plaintiffs' characterization of this action to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

15. Admits the allegations in paragraph 15 to the extent they are consistent with the contents of the court decisions cited, the contents of which are the best evidence thereof, and any construction of which is denied.

16. Admits the allegations contained in paragraph 16 to the extent supported by the decisions issued by the Court and the United States Court of Appeals for the Federal Circuit in the "First-Round" case.

[redacted]

17. Admits the allegations contained in paragraph 17 to the extent supported by the decisions issued by the Court and the United States Court of Appeals for the Federal Circuit in the "Second-Round" case.

18. Denies that the "Third-Round" case was resolved following a trial and subsequent appeal. Avers that it was resolved on offer of judgment. Otherwise admits the allegations contained in paragraph 18 to the extent supported by the decisions issued by the Court and the United States Court of Appeals for the Federal Circuit in the "Third-Round" case.

19. The allegations contained in paragraph 19 constitute conclusions of law, to which no response is required. To the extent a response to these allegations is required, they are admitted to the extent consistent with the contents of the court decisions cited, the contents of which are the best evidence thereof, and any construction of which is denied.

20. Denies the allegations contained in paragraph 20.

21. Defendant incorporates by reference its responses to paragraph 1 through 20 of the complaint as though stated here in full.

22. The allegations contained in paragraph 22 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied for lack of knowledge or information sufficient to form a belief as to their truth.

23. The allegations contained in paragraph 23 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

24. The allegations contained in paragraph 24 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

25. Defendant incorporates by reference its responses to paragraph 1 through 24 of the complaint as though stated here in full.

[redacted]

26. The allegations contained in paragraph 26 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied. Avers that, at the direction of Congress, DOE is pursuing Federal consolidated interim storage for the acceptance of spent nuclear fuel (SNF) from the commercial industry using a consent-based siting process. DOE received appropriations for FY 2021 ($20M), FY 2022 ($20M), and FY 2023 ($53M) to fund such activities.

27. The allegations contained in paragraph 27 are conclusions of law to which no response is required. To the extent a response to these allegations is required, defendant admits that expenditures to date from the Nuclear Waste Fund have been less than the level of receipts into the Nuclear Waste Fund; otherwise denies the allegations in paragraph 27.

28. The allegations contained in paragraph 28 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied; defendant avers that the Department of Energy has not accepted any commercial spent nuclear fuel and/or high-level radioactive waste under the auspices of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270.

29. The allegations contained in paragraph 29 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

30. Defendant incorporates by reference its responses to paragraph 1 through 29 of the complaint as though stated here in full.

31. The allegations contained in paragraph 31 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

32. The allegations contained in paragraph 32 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

[redacted]

33. The allegations contained in paragraph 33 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

34. Denies that plaintiff is entitled to the relief set forth in the prayer for relief immediately following paragraph 33 or any relief whatsoever.

35. Denies each and every allegation not previously admitted or otherwise qualified.

**AFFIRMATIVE DEFENSES**

**28 U.S.C § 2514 - Forfeiture of Fraudulent Claims**

A. General Background

i. *Relevant Parties and Nuclear Plants*

36. Entergy Corporation is a company engaged in the business of generating and distributing electric power. At times relevant to this defense, Entergy owned and operated a fleet of nuclear power plants across several states.

37. Entergy presently owns and operates a fleet of nuclear power plants in the southern United States – Arkansas Nuclear One Units 1 and 2 in Russellville, Arkansas; Grand Gulf Nuclear Station in Port Gibson, Mississippi; River Bend Station in St. Francisville, Louisiana; and Waterford 3 Steam Electric Station in Killona, Louisiana. These plants, referred to as Entergy's "southern fleet," are located in states with regulated electricity markets subject to similar state-level regulatory environments.

38. Entergy formerly owned and operated a fleet of nuclear power plants in the northern United States – Vermont Yankee Nuclear Power Plant in Vernon, Vermont; James A. FitzPatrick Nuclear Power Plant in Scriba, New York; Indian Point Energy Center in Buchanan, New York; Pilgrim Nuclear Power Station in Plymouth, Massachusetts; and Palisades Nuclear Generating Station in Covert, Michigan. These plants, referred to as Entergy's "northern fleet,"

[redacted]

were located in states with deregulated electricity markets subject to similar state-level regulatory environments.

39. Entergy sold the plants comprising its northern fleet in a series of transactions between 2017 and 2022. Entergy sold FitzPatrick to Exelon Generation on March 31, 2017. Entergy sold Vermont Yankee to subsidiaries of NorthStar Group Services on January 11, 2019. Entergy then sold Pilgrim and Indian Point to a joint venture owned by Holtec International and SNC-Lavalin. Pilgrim was sold on August 27, 2019, and Indian Point on May 28, 2021. Holtec later ended the joint venture with SNC-Lavalin and assumed full ownership and responsibility for Pilgrim and Indian Point, after which Entergy sold Palisades to Holtec on June 28, 2022.

40. Nuclear power plants generate power from the fission of uranium, which heats water to power a turbine. Uranium pellets are loaded into metal tubes that are arrayed in a lattice structure into a "fuel assembly," and multiple fuel assemblies are loaded into the power reactor to generate a self-sustaining chain reaction of nuclear fission. Fuel assemblies are engineered and constructed differently depending on whether they will be used in a boiling water reactor (BWR) or a pressurized water reactor (PWR). In BWR plants, the heat generated by the nuclear fission reaction boils water in the reactor to generate steam, which then spins a turbine to generate electricity. In PWR plants, the heat generated by the nuclear fission reaction heats water that is kept under pressure to prevent it from boiling. That pressurized water then transfers heat to a second, isolated set of water that boils and spins a turbine to generate electricity. Entergy's current and former nuclear fleets include both BWR and PWR plants.

41. After a few years within the reactor, a nuclear fuel assembly becomes "spent" and can no longer efficiently support the nuclear fission chain reaction necessary to generate power. Nuclear power plants remove those spent nuclear fuel assemblies and place them in a storage

[redacted]

pool (spent fuel pool) to cool, after which they can be loaded into storage cask systems, removed from the spent fuel pool, and stored elsewhere on site. Nuclear power plants must periodically remove spent fuel assemblies from the spent fuel pool and into dry fuel storage to ensure that there is sufficient space in the pool for the placement of new spent fuel assemblies as the plant continues operation.

42. At times relevant to this defense, Entergy contracted with Holtec International to provide dry fuel storage cask systems at its northern and southern nuclear fleets. Holtec's dry fuel storage systems include a canister, containing an internal scaffolding structure to hold individual spent fuel assemblies. The canister also contains a neutron poison, a material designed to absorb the neutrons emitted by the still radioactive spent fuel assemblies, to prevent a runaway fission chain reaction. Spent fuel canisters are engineered to hold certain numbers of either BWR or PWR assemblies. Canisters are then placed inside a metal and concrete overpack, which helps contain the heat and radiation generated by the spent fuel assemblies.

ii. *Entergy-Holtec Contracts for Dry Fuel Storage Executed Prior to 2019*

43. On February 2, 2009, Entergy and Holtec executed a 10-year contract for spent nuclear fuel dry storage services at Entergy's southern fleet, including the purchase of dry fuel storage cask systems (HI-STORM 100). The contract provided a discount for up to eight cask systems ordered in 2010, after which the parties agreed on base prices for the cask systems offered. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 PWR cask system (canister and overpack), with the option to provide a canister that could hold either 24 or 32 spent fuel assemblies. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 BWR cask system (canister and overpack), with a canister that could hold 68 spent fuel assemblies.

[redacted]

44. The 2009 southern fleet contract contained an agreed-upon escalation methodology, tied to specific Bureau of Labor Statistics indices, to calculate the selling price for the dry fuel storage casks systems in subsequent years after 2010. As of 2019, the prices in the 2009 contract had escalated to roughly [redacted] per HI-STORM 100 PWR cask system and [redacted] per HI-STORM 100 BWR cask system, an average aggregate increase of roughly [redacted] over the life of the 2009 contract.

45. The 2009 southern fleet contract also contained a [redacted]. Entergy had the right [redacted] Entergy exercised this right [redacted]

46. On April 1, 2009, Entergy and Holtec executed a very similar 10-year contract for spent nuclear fuel dry storage services at Entergy's northern fleet, including the purchase of dry fuel storage cask systems. Just as with the southern fleet, the northern fleet included a discount for initial cask system purchases in 2010, after the parties agreed on base prices for the cask systems offered. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 PWR cask system (canister and overpack), with the option to provide a canister that could hold either 24 or 32 spent fuel assemblies, the same price agreed to for the southern fleet. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 BWR cask system (canister and overpack), with a canister that could hold 68 spent fuel assemblies, again the same price agreed to for the southern fleet.

[redacted]

Different from the southern fleet contract, the northern fleet contract also offered higher capacity casks for use at Palisades, the HI-STORM FW cask system, which included a canister capable of holding up to 37 PWR spent fuel assemblies. After a discount for initial purchases, Entergy agreed to pay Holtec [redacted] per HI-STORM FW PWR cask system beginning in 2011.

47. As in the 2009 southern fleet contract, the 2009 northern fleet contract contained an agreed-upon escalation methodology, tied to specific Bureau of Labor Statistics indices, to calculate the selling price for the dry fuel storage casks systems in subsequent years after 2010. The selected indices and weights were virtually identical between the northern and southern fleet contracts. The one exception was the selection of indices for the neutron absorber material used in the canisters. The southern fleet contract specified the [redacted] while the northern fleet contract specified a weighted combination of the [redacted]

48. The 2009 northern fleet contract also contained [redacted]

49. As discussed in more detail below, in the mid-2010s Entergy decided to sell the nuclear plants in its northern fleet. To facilitate those sales, at various times Entergy and Holtec removed individual plants from the scope of the 2009 northern fleet 10-year contract for dry fuel storage services and executed standalone contracts for each plant. As relevant to this defense, on

[redacted]

July 26, 2018, Entergy and Holtec executed a standalone contract for Palisades, the site that had begun using the newer HI-STORM FW cask system. In this contract, Entergy agreed to pay Holtec a fixed price of [redacted] which could increase to [redacted] per cask system depending on the need for additional features.

50. On February 8, 2019, Holtec provided to Entergy a spreadsheet showing the historical movement of cask system prices under escalation provisions in the 2009 contracts for northern and southern fleets. That spreadsheet showed that, applying the escalation provisions from the 2009 contract, the Palisades cask systems would have cost [redacted] in 2018 under the 2009 northern fleet contract. Instead, Entergy agreed to pay Holtec a base price of only [redacted] when renegotiating the Palisades contract in 2018, [redacted] less than what Entergy would have been required to pay Holtec under the contract already in place for Palisades.

51. When the 2009 northern fleet contract was amended in 2011 to include the sale of HI-STORM FW casks, Palisades was an operating plant. When the new 2018 contract was executed, Palisades was planning to shut down, and the 2018 contract was intended to provide dry fuel storage cask systems sufficient to store all of the remaining fuel at the site. In depositions, witnesses for both Holtec and Entergy testified as to the general understanding in the industry that dry fuel storage cask systems typically cost less for shut down sites because the scope is more certain. That is, the dry fuel storage contract price for operating plants incorporates the uncertainty regarding future events inherent in an operating plant. As noted above, the 2018 shutdown price Holtec charged Entergy at Palisades was [redacted] less than the 2018 operating price Holtec was charging Entergy at Palisades under the 2009 base contract for the northern fleet.

[redacted]

iii. *Entergy-Holtec Contract for Dry Fuel Storage at the Southern Fleet Executed in 2020*

52. On May 15, 2020, Entergy and Holtec executed a new dry fuel storage contract for Entergy's southern fleet, which Entergy continued to own and operate after selling its northern fleet plants. Under this contract, Entergy agreed to pay Holtec a new base price of [redacted] for HI-STORM FW PWR (MPC 37) casks. Entergy also agreed to pay Holtec a new base price of [redacted] for HI-STORM FW BWR (MPC 89) casks.

53. When the northern fleet contract fully expired in 2019, the final escalated price for HI-STORM FW PWR (MPC 37) casks under that contract was [redacted] There was no existing price under any Entergy fleetwide operating contracts for the HI-STORM FW BWR (MPC 89) casks, but under the 2009 contracts for both the northern and southern fleets, the price difference between PWR casks and BWR casks ranged between [redacted] and [redacted], depending on the particular escalation year. Conservatively taking the higher [redacted] price difference, and applying it to the HI-STORM FW PWR (MPC 37) 2019 cask prices reflected in the Entergy-Holtec northern fleet contract, the equivalent 2019 cask prices for the HI-STORM FW BWR (MPC 89) would have been [redacted]

54. Entergy's southern fleet contract price for the HI-STORM FW PWR (MPC 37) casks, [redacted], exceeded the price for the same cask under the just-expired northern fleet contract by [redacted], or [redacted]. Entergy's southern fleet contract price for the HI-STORM FW BWR (MPC 89) casks, [redacted], exceeded the implied price for the same cask based upon the just-expired northern fleet contract by [redacted], or [redacted].

55. To reiterate, between 2009 and 2019, Holtec's dry fuel storage cask prices under the Entergy northern and southern fleet contracts increased on average [redacted]. Holtec

[redacted]

then requested that Entergy agree to an approximately [redacted] increase in HI-STORM FW cask system prices in one year, between 2019 and 2020.

56. The extensive discovery record in this case shows that Entergy employees and executives knew that the cask system prices in the Entergy-Holtec southern fleet 2020 dry fuel storage contract were too high. Entergy personnel estimated that over the life of the contract, Entergy would pay Holtec at least [redacted] more than necessary.

57. Entergy expected that these expenses would ultimately be borne by Federal taxpayers through these present lawsuits, as well as future lawsuits while the contract was in effect.

58. Lower-level Entergy employees attempted to persuade Holtec to lower their prices or, alternatively, to persuade Entergy executives to authorize a competitive bid process. Entergy executives focused on [redacted]

59. Ultimately, Entergy executives directed the preparation of a nonbid justification memo to explain why it was appropriate to contract with Holtec at inflated prices. The nonbid justification memo was submitted to the United States in this case as providing the necessary support for Entergy's claim for reimbursement of the Holtec contract costs. The nonbid justification form contains several materially false statements, presenting a fundamentally false picture of the reasons Entergy chose to agree to Holtec's inflated prices. The true reasons, if properly documented, would have supported the United States' defenses to Entergy's claim. Entergy's falsification and submission of the nonbid justification form gives rise to the United States' affirmative defense of forfeiture under 28 U.S.C. § 2514.

[redacted]

60. The following sections summarize the relevant facts demonstrating the falsity of the nonbid justification form.

61. The following sections refer to various individuals involved in the dry fuel storage contracting process at Entergy. The organization chart below identifies the primary individuals and their relationship to each other in Entergy's corporate structure. The names marked with asterisks had the most direct involvement in the Holtec negotiation process. The names above the dashed lined are individuals referred to as senior Entergy executives in this answer. The names below the dashed line are individuals referred to as staff level employees in this answer.

[redacted]

[redacted]

B. Entergy-Holtec Contract Negotiation Process

i. *Pre-Proposal Discussions – June 2018-February 2019*

62. The Entergy-Holtec 2009 southern fleet contract for dry fuel storage services expired at the end of 2019. In June 2018, ahead of the upcoming expiration, Entergy personnel, including Mr. Gears, Ms. Leblang, Mr. Murphy, and Mr. Madkin, met to "discuss the agreements with Holtec and align on the path forward" regarding the procurement process. Mr. Murphy sent a summary email after the meeting, in which he stated his understanding that "we are all in agreement on the need to bid the work if only to send a message to Holtec and drive pricing." Mr. Murphy then advised the group that the final decision would be made by the Nuclear Supplier Governance Board (NSGB), a new executive-level board that would make a decision on the procurement strategy. Mr. Murphy instructed the team to begin developing a white paper to support the presentation to the NSGB.

63. On August 1, 2018, Entergy issued a press release announcing their agreement to sell two northern fleet plants, Pilgrim and Palisades, to Holtec.

64. Also on August 1, 2018, Mr. Murphy sent an email to his immediate and second-level superiors in the supply chain group, Mr. Griffin and Mr. Lindley. Mr. Murphy said that he had spoken with Mr. Heckenberger, and based on that call he wanted input from Mr. Griffin and Mr. Lindley about whether they should present a recommendation to put the southern fleet dry fuel storage contract out to bid "in light of the news today." Mr. Murphy acknowledged that "there are still strategic parts of the business that could impact this [bid/no bid decision] that I am not privy to and are not shared."

65. In response, Mr. Murphy's immediate supervisor, Mr. Griffin, asked if Mr. Murphy had quantified the potential benefit of bidding. Mr. Murphy responded that the "benefit

[redacted]

is to drive competitive pressure to Holtec to improve where we are." He cited high costs and performance concerns. He specifically noted that Entergy could leverage the volume of business it was providing Holtec to "drive better pricing, reduce mark-ups . . . , and improve performance." Mr. Murphy then cited a recent example where Entergy bid work for the Vermont Yankee ISFSI. Holtec's pricing was "$5 million more than the lower bidder even though they could use existing resources at the site, needed less training, and should be more efficient (things that should have made them very competitive). Their cost was high because they outsourced the whole job and marked it up 20%-30%." Mr. Griffin responded that, based on the information Mr. Kelley provided, the decision on whether to bid the southern fleet dry fuel storage contract was "worthy of a conversation."

66. Mr. Lindley, Mr. Murphy's second-line supervisor, then responded suggesting that Mr. Murphy consult with the team handling the northern fleet plant sales to see if there were any terms in the contracts with Holtec for the northern fleet sales that would impact the procurement decision. Mr. Murphy said he would do so.

67. Through the fall of 2018, Mr. Murphy, Mr. Madkin, Mr. Gears, Ms. Leblang, and others at Entergy worked to develop the plans for the southern fleet dry fuel storage procurement. These efforts included outreach to other utilities, including Exelon, which had recently transitioned some plants to Holtec dry fuel storage cask systems. Several Entergy employees, including Mr. Madkin and Mr. Gears, had been evaluating the capabilities of another competitor, NAC International, and in early October Entergy staff discussed with NAC potential opportunities for NAC to do work for the southern fleet.

68. On October 17, 2018, Mr. Murphy asked Mr. Madkin and Mr. Gears to begin drafting a white paper "to be used in support of a brief to [Mr.] Bakken and [Mr.] Lindley to get

[redacted]

their thoughts on the options of bid or bilaterial negotiations with Holtec." Mr. Murphy further noted that [redacted] Mr. Murphy asked that the white paper address "the impact (positive and negative of a potential bid award of [dry fuel storage] to someone other than Holtec. What i[t] means in regards to licensing, site work to convert, equipment to procure, other site impacts (training, impacts on planned campaigns, etc.), how we would approach this commercially with NAC or Orano (get them to switch us for free as part of a long term commitment, etc.), the advantages/disadvantages of the change, and any relevant OE we can get (such as impact of other plants/fleets converting, the recent Exelon experience, etc.)."

69. The next day, October 18, 2018, Mr. Madkin prepared a preliminary draft of the white paper requested by Mr. Murphy. The draft identified the main "concern" prompting a decision that the southern fleet dry fuel storage contract [redacted] The draft identified factors in favor of a bid process, including [redacted] The draft cons listed, as the first consideration against a bid process, [redacted]

70. While the staff level team was engaged on the items identified by Mr. Murphy, the executive-level conversation between Entergy and Holtec was different. Even though the team was still working to prepare the bid/no-bid white paper to present to Mr. Bakken and Mr. Lindley for decision, during the week of October 12, 2018, [redacted]

[redacted]

[redacted]

71. At some point after October, the executive preference [redacted] was communicated to the staff-level team. On December 11, 2018, Mr. Madkin spoke with Thomas Duberville, Holtec's on-site liaison with Entergy, and advised him that Holtec should submit a proposal to renew the contract, which [redacted]

72. On January 3, 2019, Mr. Madkin re-sent to Mr. Gears the preliminary draft white paper he originally sent on October 18, 2018, but he acknowledged "the circumstances have changed since the last time we discussed this project. Maybe we should reflect that in this document?"

73. An updated version of the white paper was distributed on January 11, 2019, which [redacted] The updated white paper acknowledged that [redacted] Nonetheless, the white paper identified risks of a bid process, primarily that [redacted] The updated draft identified as further risks the need to evaluate [redacted] and the [redacted]

[redacted]. Mr. Gears added further material to the draft on January 15, 2019, [redacted] and a list of [redacted], including [redacted] and [redacted]

74. Also on January 11, 2019, Steven Scheurich, one of the Entergy executives involved in the northern fleet sale process, wrote to Peter Norgeot, the senior Vice President with responsible for the fleetwide divestment process. Mr. Norgeot had no role in the management of the southern fleet. Mr. Scheurich advised Mr. Norgeot that Entergy's supply chain team had requested a proposal from Entergy for the southern fleet dry fuel storage contract. Mr. Scheurich stated that [redacted] apparently unaware of [redacted] Mr. Scheurich suggested that Mr. Norgeot have a [redacted] Mr. Norgeot responded saying that he had [redacted] Mr. Norgeot then stated that he [redacted]

75. This January 11, 2019 email exchange was forwarded to Mr. Lindley, who acknowledged the direction and said that he [redacted] Mr. Lindley then forwarded the thread to Mr. Griffin and Mr. Madkin, advising that [redacted] directing them to confer with Mr. Scheurich to [redacted]

[redacted]

[redacted]

76. In further follow up to the January 11, 2019 email thread, Mr. Murphy, who had been leading the efforts for the southern fleet dry fuel storage procurement, reassured Mr. Lindley that he had been engaged with Mr. Scheurich and the team handling the northern fleet sales, including the [redacted] Mr. Murphy specifically stated that his team had been [redacted]

77. Mr. Murphy further informed Mr. Lindley that he had advised Holtec that Entergy "will in no way re-sign and extend the current deal" and that "[t]he fear of going out to bid and the desire of NAC and Orano to get the business is our most critical point of leverage." Mr. Murphy reported that after "ongoing discussions with Holtec on performance, current contract issues, and how we need to do business differently going forward," Holtec had "offered to provide a first step proposal to us that would address the points of our discussions." Mr. Murphy stated that the team's plan was to use the anticipated proposal form Holtec as "a point of discussion with them and a point to help us finalize our bid/no-bid decision," and that afterward the team would come to the NSGB for concurrence. In response, Mr. Lindley asked for more information about the NAC alternative, and Mr. Murphy said his team could provide that information.

ii. *First Holtec Proposal – February-March 2019*

78. On February, 25, 2026, Holtec submitted its proposal to Mr. Madkin for a new contract for dry fuel storage services at Entergy's southern fleet. That evening, Holtec's CEO,

[redacted]

Krishna Singh, sent a copy of the proposal directly to Mr. Bakken and Mr. Norgeot. Mr. Norgeot testified that he had no role in the southern fleet dry fuel storage contracting process, but he was responsible for Entergy's overall northern fleet divestment strategy, including the sale of Pilgrim, Palisades, and Indian Point to Holtec. Dr. Singh stated that he would call both Mr. Bakken and Mr. Norgeot the next day "to touch base."

79. The February 25, 2019 proposal was reviewed by Entergy's staff level team over the following three weeks. Personnel involved in the review included Ms. Leblang, Mr. Gears, and Mr. Kelley on the technical side, and Mr. Madkin, Mr. Murphy, and Mr. Shampy on the supply chain side. To inform this review, the staff level personnel reviewed Entergy's contracts with Holtec for dry fuel storage at the northern fleet and technical information about alternative casks available from NAC.

80. The staff level review culminated in a three-page white paper submitted by Mr. Murphy to Mr. Heckenberger on March 19, 2019. Mr. Murphy stated that, as planned, the team would be going to the NSGB for direction on how to proceed in light of the Holtec proposal.

81. The March 19, 2019 white paper recapped the set of issues discussed between Entergy and Holtec in the fall off 2018, and which Entergy expected would be addressed in the February 25, 2019 proposal, including a "[r]eduction in cask pricing" for the new contract, "pricing improvements based on Holtec's stated efficiencies," "a performance mechanism to address NRC violations and equipment/quality issues," and Holtec's markups on subcontracted work.

82. The March 19, 2019 white paper concluded that Holtec's February 25, 2019 proposal "was not in line with expectations and did not address items long under discussion." The first critical element was the pricing – despite Entergy's request for lower prices, in the new

[redacted]

[redacted] southern fleet contract and the recently executed northern fleet contracts. The white paper observed that for every cask type, the proposal sought a one-year price increase greater than the total price increase across the prior 10-year contract for the southern fleet. The white paper included a detailed cost comparison on the third page, which showed that, over the anticipated duration of the contract, the new prices would cost Entergy [redacted] more than the current contract prices and would cost Entergy [redacted] more than the prices Holtec had offered Entergy for the northern fleet plants just one year earlier.

83. The March 19, 2019 white paper identified a number of other issues with the Holtec February 25, 2019 proposal – the pricing was twice as high as unsolicited bids provided by NAC in connection with the northern fleet contracting process; the contract attempted to lock in the prices through the entire life of the plants, which was more favorable to Holtec than what had been negotiated for the northern fleet in 2018; the proposal lacked liquidated damages or other provisions addressing NRC violations or quality issues, as Entergy had requested; and Holtec had not made any changes to its subcontractor markups, which Entergy had identified as excessive [redacted]

84. In a separate document, also drafted on March 19, 2019, the staff level team prepared a list of items Entergy would want to see in a future dry fuel storage contract with Entergy. Mr. Murphy stated that Mr. Heckenberger had requested this information to "support some further discussions he will have." This March 19, 2019 list of "DFS Contract Considerations" included the following negotiation requests – cask pricing should "match or improve upon what is in NDO contracts;" "establish [liquidated damages] for NRC violations received that are caused by Holtec work (engineering analyses and/or licensing documents that

[redacted]

the NRC doesn't accept);" [redacted] and, if Entergy accepts Holtec's proposal for a contract extending through the life of the southern fleet plans, Entergy should include a provision to renegotiate pricing for the end-of-live spent fuel pool defueling "as was done for NDO contracts."

85. After receiving these various materials from Mr. Murphy on March 19, 2019, on March 20th Mr. Heckenberger had a conversation with Mr. Duberville, Holtec's on-site liaison at Entergy's offices. According to notes from the meeting taken by Mr. Duberville, Mr. Heckenberger "expressed his concern over the prices presented in our proposal." Mr. Heckenberger stated that Holtec needed to consider "the DOJ who holds Entergy's feet to the fire for every DOE reimbursement, and the PUC [public utility commission]. He said that we already know how difficult it can be to justify costs to the DOJ," and that it was going to be [redacted] to DOE . . . ." Mr. Heckenberger was "surprised that [Holtec] took this approach . . . . No one saw this coming (referring to the price increases). In his mind it [throws] the no-bid process up in the air."

86. At Mr. Heckenberger's suggestion during the March 20, 2019 conversation, Mr. Duberville next walked over to speak with Mr. Murphy. According to notes from that meeting taken by Mr. Duberville, Mr. Murphy "admitted that he knows (or suspects) that there are a lot of conversations, discussions, negotiations going on at levels that are way far above him" and Mr. Duberville. Mr. Murphy stated, and Mr. Duberville agreed, that "given all the activities that Holtec is involved [with] at Entergy, he can only surmise as to what is on or off the table." Regardless, Mr. Murphy said "he just can't imagine that the prices [Holtec] submitted would stay as they are; in his opinion, the prices are just too extreme." Finally, Mr. Murphy acknowledged

[redacted]

that, based on his experience, [redacted]

87. Mr. Duberville forwarded his meeting notes to his superiors at Holtec and summarized other key points from the February 25, 2019 proposal that Entergy was considering– the large volume of casks contemplated by the new proposal; for the HI-STORM FW PWR (MPC 37) cask systems, difference between the [redacted] price in the southern fleet proposal and the [redacted] price agreed to one year earlier for Palisades in the northern fleet; and for the HI-STORM 100 PWR (MPC 32M) cask system, the difference between the [redacted] price in the southern fleet proposal and the [redacted] price agreed to one year earlier for northern fleet plants.

88. Mr. Duberville concluded his report to his superiors at Holtec by saying "it['s] hard for me to recommend a next step as I don't really know what other discussions might be taking place. Dr. Singh [Holtec's CEO] may already know all about this and he may be working through Chris Bakken [Entergy's Chief Nuclear Officer]."

iii. *Entergy-Holtec Northern Fleet Negotiations – March 2019*

89. Mr. Murphy's suspicion relayed to Mr. Duberville on March 20, 2019 that there were other negotiations occurring far above him was correct.

90. In the next few days following Mr. Duberville's conversations with Mr. Heckenberger and Mr. Murphy regarding the unacceptability of the prices in Holtec's February 25, 2019 proposal, senior Entergy and Holtec executives resolved a major sticking point in the negotiation for the sale of Pilgrim and Palisades from Entergy to Holtec.

[redacted]

91. Under Nuclear Regulatory Commission regulations, owners of nuclear power plants must provide "reasonable assurance that funds will be available" to decommission the site. 10 C.F.R. § 50.75(a). Entergy, like most utilities, meets this requirement by establishing a decommissioning trust fund for each nuclear power plant site. *See id.* § 50.75(e)(1). Entergy deposits in the trust a portion of the money earned from the power generation at the site, saving over time so that at the end of the plant's life there will be enough funds in the trust to pay for decommissioning.

92. Due to poor economic conditions for nuclear power in the 2010s, Entergy shut down Palisades 13 years before its planned license expiration. That meant that the Palisades trust fund was missing 13 years of planned contributions. Entergy and Holtec both estimated that the Palisades trust fund would be $200 million short of the amount required to decommission the site. The Pilgrim trust fund, by contrast, was overfunded by more than $200 million, in part because Entergy required Boston Edison Company to deposit additional money into the trust fund when Entergy acquired Pilgrim in 1999. Thus, Entergy and Holtec agreed on a paired deal – Holtec would acquire both Palisades, with its $200 million unfunded trust fund liability, and Pilgrim, with its overfunded trust fund, which was more than sufficient to cover the shortfall at Palisades.

93. Entergy and Holtec later agreed that Holtec would purchase the two reactors at Indian Point as well, and the parties agreed on 4-year paced closing schedule. They would close on the sale of Pilgrim's single nuclear reactor and its overfunded trust fund first, in July of 2019. Then they would close on the two Indian Point reactors in 2020 and 2021. Finally, they would close on the single Palisades reactor and its underfunded trust fund in 2022.

[redacted]

94. Mr. Norgeot, who led these negotiations from Entergy's side, had serious concerns that Holtec would get Pilgrim and its overfunded trust fund first and then have little incentive to close on the Palisades site and its underfunded trust fund three years later. To mitigate that concern, Mr. Norgeot insisted that Holtec agree to some form of closing assurance, which would require Holtec to cover the $200 million Palisades shortfall regardless of whether that deal closed. The parties agreed that Holtec would provide a $200 million closing assurance note for the Palisades transaction.

95. In March 2019, as the Entergy staff were evaluating Holtec's southern fleet dry fuel storage contract, Entergy and Holtec executives were negotiating over a Letter Agreement, ultimately executed on March 21, 2019, outlining each party's commitments in the event that the Pilgrim deal did not close by July 31, 2019 as scheduled. On March 29, 2019, Mr. Scheurich, who was involved in the northern fleet sale negotiations, wrote to Mr. Lindley that "we reached agreement on certain terms with Holtec on 3/21 which improves the potential to transact on the Contract Date (7/31/19)."

iv. *Entergy Rejects Holtec's First Proposal – March-April 2019*

96. The same week that Mr. Scheurich reported that Entergy and Holtec had reached agreements that increased the likelihood of closing the Pilgrim transaction on the July 31, 2019 contract date, Mr. Bakken inquired with Mr. Lindley about the status of the southern fleet dry fuel storage contract with Holtec. On March 26, 2019, Mr. Bakken asked Mr. Lindley for an update, stating that "[w]e received a bid late last month and I'd like to understand timeline to closure and any concerns you might have." Mr. Lindley responded that he would "look in to this," and Mr. Bakken replied "[i]t's pretty urgent."

[redacted]

97. Mr. Murphy supplied a high-level summary to pass along to Mr. Bakken, with the bottom line that [redacted] After Mr. Lindley forwarded this information, Mr. Bakken responded to say "[m]ay be best if you and I have a chat." Mr. Lindley and Mr. Bakken agreed to speak that evening, on March 26, 2019.

98. The next day, March 27, 2019, Mr. Lindley provided comments to Mr. Murphy on the white paper that the Entergy staff had prepared to support the NSGB review, and which Mr. Murphy had sent to Mr. Heckenberger on March 19, 2019. Mr. Lindley added a header stating that the document was [redacted]

99. Mr. Murphy sought further input from Mr. Gears and responded to Mr. Lindley's comments late on March 27, 2019. The updated white paper provided substantial additional detail but stood by the original conclusion that the Holtec proposal was unacceptable. In a cover email, Mr. Murphy confirmed that the white paper is "not subject to privilege protection as it does not contain legal opinion or guidance." He also confirmed that Entergy "can use pricing details and company knowledge from [the northern fleet] to help us get better pricing down south." Finally, Mr. Murphy summarized the main difficulties with Holtec's proposal – "[t]here is also no good market data given the market. The only comparable detail is using a third party to validate Holtec costs (which also requires Holtec to accept this and to share their actual data) or to get a bid or indicative proposal from a non-Holtec vertical cask vendor. Our primary market point is the existing contract. For 10 years there has been no issue by Holtec with

[redacted]

escalation, pricing, terms, etc., and Holtec wants to continue with the same escalation and methods, albeit with a jump in the base price."

100. Mr. Lindley provided the updated white paper to Mr. Bakken late on March 27, 2019. The next day, Mr. Bakken said he had done an initial read and would read more closely in the evening but noted that there were "[a] lot of asks in here."

101. In early April, Entergy added the Holtec proposal and Entergy's internal white paper to the agenda for an April 22, 2019 meeting of the NSGB, Entergy's internal executive board to review and approve major procurement decisions. The agenda item stated that the Holtec proposal "did not address any of Entergy's stated commercial needs & expectations while offering significantly higher prices tied to a longer contract term. Given the significant gap between Entergy's expectations and Holtec's offer it is requested to present their proposal and Entergy's analysis to obtain executive feedback and direction on next steps." At this point, Mr. Murphy also advised Mr. Lindley that his role was shifting under a corporate reorganization, and that Mr. Murphy would begin involving another supply chain senior manager, George Shampy, who would be ready to take over responsibility for the contracting effort at the end of April.

102. On April 5, 2019, Mr. Lindley had separate conversations with Mr. Bakken and Mr. Heckenberger. Also on April 5th, Mr. Lindley advised Mr. Murphy that he had spoken with Mr. Bakken and received further input. Mr. Heckenberger and Chris Costanzo, another Entergy executive, would lead further discussions with Holtec. They would ask for additional explanation regarding the price increases. According to Mr. Lindley, Holtec had told Mr. Bakken that the price increases were the result of increases in raw material prices, especially [redacted]. Mr. Lindley explained to Mr. Bakken that any material price increases were already accounted for in the prior contract's escalation clauses, which Holtec did not propose to

[redacted]

change. Mr. Heckenberger and Mr. Costanzo would also communicate to Holtec that the "[d]eal needs to withstand public scrutiny." Mr. Bakken told Mr. Lindley that Holtec had offered to provide benchmarks to support the pricing. Finally, Mr. Heckenberger and Mr. Costanzo would advise Holtec that if the next proposal was "not acceptable then we would consider bid," though Mr. Lindley acknowledged that Entergy was "not keen on changing provider" and asking Mr. Murphy for further information on "other suppliers['] capabilities to educate us."

103. Later on April 5, 2019, Mr. Murphy sent a letter, reviewed by Mr. Lindley and Mr. Heckenberger, to Joy Russell, a Holtec executive, outlining Entergy's formal position regarding the February 25, 2019 proposal. The letter stated that Holtec's proposal "does not meet our expectations and is not acceptable as a starting point for further negotiations," pointing in particular to the "significant price increases without objective basis." Entergy requested an updated proposal by April 12, 2019, which should "provide objectively demonstrated value commensurate with the significant scope and scale of the business under consideration." The letter further reminded Holtec that "any Entergy agreement regarding spent fuel storage will need to withstand prudency reviews and public scrutiny associated with our cost recovery mechanisms."

104. While waiting on Holtec's updated proposal, Entergy staff provided Mr. Heckenberger with a list of requests to communicate in further conversations with Holtec. The document provided to Mr. Heckenberger included the following concerns – the February 25, 2019 proposal placed too much risk overall on Entergy compared to Holtec; Entergy should seek "preferred pricing" "that is lower than standard market pricing;" the contract should match or improve upon the terms established in the northern fleet dry fuel storage contracts executed in 2018; and the contract should address the fact that cask system prices are escalated based on

[redacted]

domestic [redacted] indices, even though Holtec uses foreign [redacted] at lower cost, allowing Holtec to "arbitrage the difference in price."

105. In light of the request for a new proposal, Entergy shifted consideration of the Holtec proposal from the April 22, 2019 NSGB agenda to the May 6, 2019 meeting. Mr. Lindley updated Mr. Bakken that the letter had been sent, and that subsequent calls were held between Entergy staff and Ms. Russell at Holtec, and between Entergy executives Mr. Heckenberger and Mr. Costanzo and Mr. Chaudhary at Holtec. Mr. Chaudhary requested additional time to prepare the updated proposal, which Entergy accepted, on the condition that the proposal be presented face-to-face.

v. *Second Holtec Proposal – April 2019*

106. Holtec submitted its second proposal to Entergy on April 23, 2019. Mr. Gears provided the initial summary to the staff level team – "Prices are exactly the same as what they provided on 2/25/2019. NO CHANGE. Proposal adds 12 extra pages of rationalization for high prices." Mr. Murphy passed along this information to Mr. Heckenberger and Mr. Lindley, suggesting that they may not want to keep the meeting scheduled for Holtec to present their updated proposal.

107. Mr. Murphy advised Mr. Lindley that Mr. Shampy and Mr. Madkin would be coordinating with Mr. Gears and his team "to look at strategy and needs forward based on a potential move to bid." Consistent with that message, Mr. Gears and Ms. Leblang compiled reference information [redacted] with Orano and NAC. Mr. Gears also reached out to NAC to see if they could provide updated pricing for NAC's high-capacity casks. Mr. Gears indicated that he would expect to see pricing in line with what NAC previously offered Entergy in October 2017 for dry fuel storage at its northern fleet, with

reasonable escalation. Mr. Gears also asked NAC to provide detailed physical information about its cask systems.

108. Mr. Gears forwarded the information he obtained from NAC to the larger Entergy team, including Mr. Heckenberger, Mr. Price, Mr. Kelley, Mr. Griffin, Mr. Murphy, Mr. Shampy, and Mr. Madkin. He observed that, accounting for transition costs, Holtec would need to propose much lower prices to equal NAC's estimated prices, approximately [redacted] for a HI-STORM FW PWR (MPC 37) cask and approximately [redacted] for a HI-STORM FW BWR (MPC 89) cask. Mr. Gears also provided [redacted] Finally, NAC estimated [redacted].

109. Separate from Mr. Gears' efforts, a senior Entergy executive, John Ventosa, reached out to George Vaughan, NAC's Vice President of Business Development, to note that Brand H, which Mr. Vaughan understood to mean Holtec, was "becoming 'expensive'" and Mr. Ventosa "encouraged [Mr. Vaughan] to think about submitting an unsolicited proposal" for the Entergy southern fleet dry fuel storage contract.

110. [redacted], on April 28, 2019, Mr. Murphy sent an email to Mr. Heckenberger and Mr. Griffin addressing the current status of the northern fleet transactions. Mr. Murphy presented the key takeaway – [redacted]

[redacted]

[redacted] Mr. Murphy opined that [redacted] Mark Osborne, an Entergy supply chain employee working on the northern fleet transactions, then responded to say that he could not confirm the price conditions that the various sale agreements and commitments are subject to.

111. On April 25, 2019, Mr. Murphy drafted a letter to Holtec for review by Mr. Heckenberger. The draft letter advised Holtec of the cancellation of their planned April 29, 2019 meeting because the updated proposal failed to address Entergy's concern. The letter also requested conversation about extending the existing southern fleet dry fuel storage agreement. This letter was never sent.

112. Instead, on April 25, 2019, Mr. Heckenberger advised the staff level team that there had been "several executive level discussions today [April 25th] regarding the proposal and its detail." Entergy would keep the April 29th meeting, but it would instead be an executive-only meeting, with Mr. Bakken (who ultimately did not attend), Mr. Heckenberger, Mr. Costanzo, and Mr. Griffin from Entergy meeting with Holtec executives. Mr. Heckenberger said he could not share the full details of the executive conversations "as they were not appropriate for our larger group." Mr. Heckenberger and Mr. Griffin continued to discuss through the weekend. In a separate email to Mr. Gears, Mr. Murphy said he wondered "who moved that to an exec only meeting . . . us or them . . . ."

113. Mr. Oneid, a Holtec executive, drafted a report of the meeting that he shared with the Holtec executive team. He reported the following – Mr. Heckenberger [redacted] He asked if this was our best and final, which will force them to go out-for-bid. Entergy does not wish to go out to bid

[redacted]

and requested a revised proposal. We asked if they are open to switching to FW while maintaining the price per [cell] and adding the escalation adjustments. All three Entergy participants were amenable to this approach."

114. On May 9, 2019, Mr. Oneid sent a text message to Mr. Heckenberger confirming that "Dr. Singh is fine in the approach we discussed."

115. After the April 29, 2019 meeting, Ms. Russell directed Mr. Kalfazade, another Holtec employee, to prepare a new proposal that would only include the higher capacity HI-STORM FW cask systems, whereas the previous proposals included prices for the lower capacity HI-STORM 100 cask systems as well. The proposal would include [redacted] to transition all sites to the new cask systems.

116. [redacted]

117. In developing the next iteration of the proposal, Mr. Tindal [redacted]

vi. *Third Holtec Proposal – May-June 2019*

118. On May 15, 2019, Holtec submitted its third proposal to Entergy. As discussed at the April 29, 2019 executive meeting, this proposal removed the offer to provide the existing HI-STORM 100 cask systems for the southern fleet and provided pricing exclusively for the HI-

[redacted]

STORM FW higher capacity casks, which would require Entergy to incur substantial costs to upgrade their equipment to be able to handle the larger casks. Holtec proposed to charge [redacted] per HI-STORM FW PWR (MPC 37) cask system, and [redacted] per HI-STORM FW BWR (MPC 89) cask system. Holtec also proposed to charge an additional [redacted] total for new equipment Entergy would need to purchase from Holtec to handle the new cask system.

119. Just as with the second Holtec proposal in April, Dr. Singh sent a copy of the third proposal directly to Mr. Bakken on May 16, 2019, a day after it was sent through the formal procurement channel.

120. On May 17, 2019, Mr. Shampy sent an email to Mr. Griffin summarizing the staff level team's preliminary analysis of the May 15th proposal. The preliminary review indicated that Holtec's new proposal did not maintain the promised cost per fuel assembly equivalency with the existing contract and would have required Entergy to pay [redacted] more over the life of the contract compared to the pricing under the expiring contract. Mr. Shampy stated that the team would more closely evaluate the NAC option to provide "a more detailed break-even point" for each of the options. Mr. Murphy recommended evaluating the May 15, 2019 proposal prices against three other benchmarks – the existing southern fleet contract that was expiring at the end of 2019, the northern fleet contracts executed with Holtec, and the NAC pricing.

121. On May 20, 2019, Mr. Gears sent the same preliminary analysis, comparing the per assembly and total lifecycle cost of the new proposal against the expiring contract, up his reporting chain to Mr. Heckenberger. Mr. Gears stated that his immediate supervisor, Mr. Kelley, had reviewed and concurred in the analysis. He understood that Mr. Heckenberger

[redacted]

would be discussing with senior Entergy executives above him. Mr. Heckenberger forwarded Mr. Gears's internal price analysis to Mr. Oneid at Holtec the next day, on May 21, 2019.

122. On May 23, 2019, Mr. Gears and Mr. Kelley had a phone call with Mr. Kalfazade at Holtec, discussing the Entergy price analysis and why Entergy did not believe the May 15, 2019 proposal presented justifiable prices for the HI-STORM FW cask systems. Mr. Kelley summarized that call in a follow-up email to Mr. Heckenberger. Mr. Kelley stated that "[t]here is still a large disparity in staying cost neutral on a per/[fuel assembly] perspective, which was the commitment." Mr. Kelley then noted that "Holtec believes we are cost neutral from a DOE reimbursement perspective for total lifecycle, though they could not quantify." At the end of the meeting, Holtec committed to "true up with their management on actual commitment on 'cost neutral' on [fuel assembly] pricing model," while Mr. Gears intended to "provide some additional analysis to reflect our cost neutral cask perspective."

123. Mr. Gears ultimately concluded that, to meet the per assembly cost neutral goal, Holtec would need to reduce its HI-STORM FW PWR (MPC 37) cask system price to [redacted], down from the [redacted] price in the May 15th proposal. That price could increase to [redacted] if the [redacted] in transition costs were allocated into the price of each cask. Mr. Gears similarly concluded that Holtec would need to reduce its HI-STORM FW BWR (MPC 89) cask system price to [redacted], down from the [redacted] price in the May 15th proposal. That price could increase to [redacted] if the transition costs were built into the cask price.

124. The same day as the May 23, 2019 meeting among Mr. Kelley, Mr. Gears, and Mr. Kalfazade, Mr. Heckenberger sent a text message to Mr. Oneid, advising him that Entergy's staff level team had "completed the validation of our understanding of your proposal. I'm told

[redacted]

the analysis I sent to you has been validated to be accurate. This means we need to have a dialogue about next steps with you[,] Chris C[ostanzo,] and I very soon next week as the proposal does not meet the intent we agreed on in Chris [Costanzo's] office a few weeks back." This was an apparent reference to the April 29, 2019 meeting in which [redacted] in which the Holtec and Entergy executives agreed that Holtec would provide pricing for the higher capacity HI-STORM FW casks with an equivalent price per fuel assembly compared to the existing contract.

125. Mr. Heckenberger and Mr. Oneid spoke directly by phone the next day, on May 24, 2019. Mr. Heckenberger reiterated that they were far apart on pricing for the HI-STORM FW PWR (MPC 37) casks in particular. Mr. Heckenberger also expressed concerns that the costs to transition to the higher capacity systems would not be reimbursed, presumably referring to this lawsuit. Later in the day, Mr. Heckenberger sent a text message to Mr. Oneid, stating that he was setting up another Entergy-Holtec call for Tuesday, May 29, 2019. Mr. Heckenberger told Mr. Oneid that "[w]e are aligned on keeping cost per fuel assembly the same from current contract. If that cannot be achieved other than the adders part of the discussion you will put me and Chris [Costanzo] in a bad spot. As I said we are willing to concede the efficiency for larger casks as part of the calculation but anything over that is going to be a problem in terms of our supply chain process in a regulated utility and a sole source justification to renew or extend the current contract. It's something we have not discussed since our face to face and I didn't want to lose the message."

126. In advance of the May 29, 2019 call, Mr. Gears distributed talking points to Mr. Heckenberger, Mr. Kelley, and Mr. Price. The talking points noted that Holtec had been offering

[redacted]

Entergy the HI-STORM FW PWR (MPC 37) cask system to Palisades during its operations since 2011, and both parties were aware of that contract price. The Palisades price should inform the price for the HI-STORM FW PWR (MPC 37) cask system at the southern fleet. The talking points also observed that Entergy should not undertake the costs of transitioning to the higher capacity cask systems if the cost of that transition did not create equivalent cost savings over the life of the plants. The talking points then stated that Entergy had valued the various "value add" items in Holtec's proposal at [redacted] per cask.

127. Also in advance of the May 29, 2019 call, Mr. Oneid exchanged text messages with Mr. Heckenberger. Mr. Oneid said he "wanted to align with [Mr. Heckenberger] on call objectives." He suggested that the call would not be "a negotiating session but a fact alignment call." Mr. Oneid said he could then discuss further directly with Mr. Heckenberger and Mr. Costanzo. Mr. Heckenberger responded and agreed "[t]hat's pretty close. If we get that far and are still not at equivalent costs per fuel assembly, then you and I and Chris [Costanzo] will need to talk because I believe we are getting close to putting us in that box we didn't want to be in."

128. In parallel with the Entergy-Holtec discussions, Entergy continued to explore the viability of the NAC option. On May 30, 2019, Entergy executives John Ventosa and Chris Costanzo met with NAC's representative George Vaughan, and Mr. Costanzo suggested that NAC consider submitting an unsolicited bid. Then, on June 5, 2019, NAC submitted a detailed unsolicited budgetary proposal for dry fuel storage services at Entergy's southern fleet. This submission proposed to offer a PWR cask system with a 37-assembly capacity at a cost of [redacted] per cask (compared to the [redacted] price for Holtec's equivalent 37-assembly capacity PWR cask system), and a BWR cask system with an 89-assembly capacity at a cost of

[redacted]

[redacted] per cask (compared to the [redacted] price for Holtec's equivalent 87-assembly capacity BWR cask system).

129. The NAC unsolicited proposal was distributed within Entergy to Mr. Madkin, Mr. Shampy, Mr. Murphy, Mr. Griffin, Mr. Lindley, Mr. Gears, Mr. Kelley, and Mr. Heckenberger. Mr. Lindley observed that he was not used to taking unsolicited proposals into account "in any formal evaluation process if not requested as part of a formal RFP/bid process." Mr. Griffin responded that his perspective was similar, but "[t]his one may be useful because of where we are with Holtec."

130. Mr. Gears performed a detailed price analysis of the NAC proposal compared to the Holtec proposal, which concluded that the total contract costs for dry fuel storage systems under the NAC proposal [redacted] and [redacted] Mr. Murphy forwarded this analysis to Mr. Lindley, Mr. Griffin, and Mr. Shampy on June 7, 2019. Mr. Murphy's email stated that this analysis had also been provided to Mr. Heckenberger for discussion with Mr. Costanzo. On June 11, 2019, Mr. Gears sent an email to Mr. Kelley and Mr. Murphy indicating that, [redacted] In summary, Mr. Gears concluded that [redacted]

131. Mr. Murphy spoke directly with Mr. Lindley on June 10, 2019, in which Mr. Lindley stated that he would be speaking with Mr. Bakken the next day, June 11th, regarding NSGB review of the southern fleet dry fuel storage contract. Mr. Murphy asked Mr. Madkin to

[redacted]

"get a spec ready to support activities in the event we need to go to bid," and to have "the other items needed for a bid ready and waiting so we can move quickly if that becomes the direction."

132. On June 12, 2019, Mr. Kelley asked Mr. Gears to look at the "option to put out an order for casks from Holtec while we transition." Mr. Gears responded with an analysis for each of the four southern fleet sites, considering a potential transition to the Holtec HI-STORM FW casks or to the NAC casks. He identified the next date by which casks would be needed for each site and how many casks should be ordered under the existing Holtec contract before it expired to ensure adequate continuity under either transition scenario. Mr. Gears [redacted] Mr. Kelley responded to state that he had passed the information along to Mr. Heckenberger.

C. Entergy-Holtec Price Agreement

133. While the Entergy staff were working to ensure that Entergy could quickly pivot to a competitive bid, Entergy executives remained focused on reaching agreement with Holtec. On June 3, 2019, Mr. Gears told Mr. Murphy that Mr. Heckenberger intended to seek input from Mr. Bakken and Mr. Costanzo, then some combination of Mr. Bakken or Mr. Costanzo would talk to Dr. Singh.

134. Consistent with Mr. Gears's understanding, on June 5, 2019 Mr. Heckenberger had a conversation with Mr. Bakken, after which Mr. Heckenberger forwarded to Mr. Bakken the analysis performed by Mr. Gears showing that Holtec's May 15, 2019 proposal would cost [redacted] more over the term of the contract compared to the existing contract with Holtec for the southern fleet. Mr. Bakken forwarded Mr. Gears's analysis to Dr. Singh at Holtec on June 6,

[redacted]

2019, with a note – "Another topic to discuss. As expected, we will have to find a way through this. Chat tonight."

135. At some point in late May or early June 2019, [redacted] In a June 3, 2019 email, Mr. Murphy wrote to Mr. Gears that Mr. Murphy [redacted] Mr. Gears "agree[d] with [Mr. Murphy's] logic [redacted]

136. On June 17, 2019 Mr. Bakken traveled alone to Holtec's headquarters in Camden, New Jersey, meeting with Dr. Singh, Mr. Tindal, Ms. Russell, and Mr. Kalfazade. Mr. Bakken said that in the meeting he was [redacted] On June 20, 2019 Mr. Heckenberger texted Mr. Oneid, saying that Mr. Bakken agreed with Dr. Singh [redacted]

137. Mr. Bakken, Mr. Griffin, Mr. Heckenberger, and Mr. Kelley traveled to Camden the next week, on June 28, 2019. Mr. Bakken met individually with Dr. Singh, while Mr. Griffin, Mr. Heckenberger, and Mr. Kelley met separately with Holtec personnel to [redacted] Holtec had prepared [redacted] An excerpt of the [redacted] is shown below (Mr. Kelley later advised Holtec that the numbers in the

[redacted]

proposed Entergy system price were incorrect and should have been [redacted] and [redacted] for the MPC-37 and MPC-89 items, respectively):

[redacted]

138. At the June 28th Camden meeting, Entergy asked Holtec [redacted] Recall that Entergy knew its Palisades contract price for the PWR cask system was approximately [redacted] In response to this request, Holtec did not [redacted] instead offering [redacted] Publicly available information published by the NRC listed which nuclear plants had loaded spent nuclear fuel into HI-STORM FW PWR (MPC 37) cask systems as of June 2019. [redacted]

139. In addition, Entergy ultimately accepted Holtec's proposal to remove [redacted] That clause had been included [redacted] If retained, the clause would have [redacted] The contract then would have [redacted]

[redacted] Had [redacted] clause been retained, [redacted]

D. Entergy Nonbid Justification

140. On July 18, 2019, Mr. Heckenberger and Mr. Griffin met with the staff level team that had been working on the southern fleet dry fuel storage procurement process for the past year. They advised the team that no further consideration would be given to the NAC proposal and that they would be executing a nonbid justification memo to submit to the NSGB to approve executing a direct contract with Holtec. [redacted] according to handwritten notes taken by Mr. Gears.

141. In deposition testimony, Mr. Heckenberger confirmed that Entergy agreed to pay the prices proposed by Holtec [redacted] even though Holtec was never able to resolve any of the other substantive concerns Entergy identified with the prices in the May 15, 2019 proposal.

142. Entergy and Holtec were scheduled to close on the Pilgrim sale on July 31, 2019, at which point Holtec was obligated to deliver its agreement to cover the $200 million shortfall in the Palisades decommissioning trust fund. The July 13, 2019 meeting, at which Entergy executives directed the staff to finalize the nonbid justification form for direct contracting with Holtec, was 13 days before the Pilgrim closing.

143. The nonbid justification form circulated at the July 18, 2019 meeting was drafted by management personnel. Mr. Murphy and Mr. Gears, the two employees who had performed

[redacted]

the most detailed analysis of the proposal and the other options available to Entergy, did not assist in drafting the nonbid justification, and neither ever saw the document as submitted to the NSGB or as ultimately executed. Mr. Griffin and Mr. Heckenberger advised the larger group that, [redacted] which was why Entergy leadership had elected to proceed with direct negotiations with Holtec.

144. In depositions taken to-date, no Entergy employee or executive has yet admitted to preparing the first draft of the nonbid justification form. Based on the evidence available, it was likely drafted by [redacted]. Much of the text in the executed version was added after the document was approved by the NSGB. In depositions, no Entergy employee or executive has claimed responsibility for drafting the additional material that appears in the executed nonbid justification form after NSGB approval.

145. After the July 18, 2019 meeting, presumably in response to one of the points in the draft nonbid justification form, Mr. Gears sent an email to the meeting participants, including Mr. Heckenberger and Mr. Griffin, stating that Orano's large-capacity cask systems (PWR-37 and BWR-89) "are licensed for heat loads of 50 kw and 47 kw, respectively, meeting or exceeding Holtec's heat loads." Publicly available NRC records confirm that, as of July 18, 2019, Orano's high capacity casks had higher heat loads than the HI-STORM FW casks as licensed. Orano's high capacity heat loads were also higher than the heat loads for which Holtec was seeking NRC approval as of 2019.

146. Mr. Griffin submitted the nonbid justification form to the NSGB on September 16, 2019, and the topic was considered by the NSGB on October 1, 2019. The NSGB approved the nonbid justification form as presented, with recommendations for further actions.

[redacted]

147. Entergy maintained formal meeting minutes of NSGB meetings, but those meeting minutes have since been lost and could not be produced in discovery. [redacted]

148. [redacted] on the nonbid justification form. The NSGB recommended making [redacted] The NSGB then directed that the nonbid justification form [redacted]

149. The final version of the nonbid justification form was signed on November 18, 2019. The document was signed by [redacted] All [redacted] testified at their depositions that they were relying on others to ensure the accuracy of the information contained in the document, and that they did not independently verify the accuracy of the complete document themselves. The United States has deposed every Entergy employee and executive involved in the southern fleet dry fuel storage contracting process. None has claimed responsibility for the substantial revisions between the version of the nonbid justification form that was submitted and approved by the NSGB and the executed version that was produced in discovery to the United States as documenting the reasons for contracting with Holtec on a sole-source basis.

[redacted]

## COUNT I

**(Forfeiture of Fraudulent Claims - 28 U.S.C. § 2514)**

150. The United States incorporates by reference the allegations set forth in paragraphs 36-149 above.

151. System Energy Resources, Inc. *et al.*, practiced or attempted to practice fraud against the United States in the proof, statement, establishment, or allowance of the submissions in this case. In particular, plaintiffs made false claims and practiced fraud against the United States when it presented false claims through the nonbid justification form with the intent to cause the United States to pay plaintiffs amounts to which plaintiffs knew it was not entitled.

152. Entergy submitted the signed nonbid justification form from November 2019 to the United States in response to the United States' discovery requests as a document supporting its claim to recover damages in this case. Multiple Entergy witnesses have testified in depositions that the nonbid justification form contains the complete explanation for why Entergy chose to accept Holtec's proposal for dry fuel storage services at the southern fleet without a formal bid process.

153. As early as March 2019, [redacted] Entergy executives, [redacted] the nonbid justification form would be a key part of the evidence required to support the recoverability of the Holtec cask system costs. [redacted]

[redacted]

154. The nonbid justification form contains a series of materially false statements, as outlined below, where in many cases the true information would have supported arguments by the United States in defense of Entergy's claim.

155. Paragraph 2 of the nonbid justification form "[d]escribes the unique features that make this product or service available only from this supplier." The document identifies two unique features of the Holtec HI-STORM FW casks – [redacted] The statement that these features of Holtec's systems were unique was false, and [redacted] knew the statements were false. Orano and NAC both offered 37-assembly capacity PWR casks, and Orano also offered 89-assembly capacity BWR casks. The [redacted] of Holtec's HI-STORM FW casks was not unique in the industry. In depositions, multiple Entergy witnesses have agreed.

156. The [redacted] of Holtec's HI-STORM FW casks also was not unique. After the initial draft of the nonbid justification form was circulated at the July 18, 2019 meeting, Mr. Gears emailed Mr. Griffin, Mr. Heckenberger, and others [redacted] That was true whether considering the HI-STORM FW cask systems as licensed or considering the Holtec's pending license amendment before the NRC to increase [redacted] of the HI-STORM FW casks. In either case, [redacted] of the HI-STORM FW casks was lower than the Orano casks licensed as of 2019. Thus, the assertion that [redacted] of the Holtec systems was a unique feature was knowingly false.

[redacted]

157. Finally, the rest of the language in paragraph 2 focuses on [redacted]. Many of the statements supporting this concept are false. The document states that [redacted] That was false. [redacted], and the [redacted] The document also states that [redacted] As a statement distinguishing unique features of the Holtec proposal, this was also false. [redacted] for transitioning to the Holtec high-capacity cask system, and Entergy staff's [redacted] Paragraph 2 falsely describes [redacted]

158. Paragraph 3 of the nonbid justification form "[d]escribes why these unique features are required." In part, the document states that [redacted] The statement that [redacted] was false. Everyone involved at Entergy knew [redacted]

[redacted]

[redacted]. Indeed, [redacted]. The statement that [redacted] was knowingly false.

159. Paragraph 4 of the nonbid justification form "[d]escribes the process used to select this product, service or supplier." The document states that [redacted] As described above, this statement was knowingly false. Orano's high-capacity cask systems met or exceeded Holtec's [redacted], which [redacted]

160. Paragraph 4 is also materially false in stating that [redacted] There is no evidence that [redacted] as a relevant consideration at all. From the start of the procurement process in June 2018 through the NSGB approval of the nonbid justification form in October 2019, no document or email discusses [redacted] as a relevant consideration. Indeed, the nonbid justification form submitted to the NSGB approval [redacted] as the reason to contract with Holtec. In response to the paragraph 2 prompt to describe the unique features of the product, the version submitted to the NSGB says [redacted] In response to the paragraph 4

[redacted]

prompt to describe the process used to select the product, the version submitted to the NSGB says that [redacted] The detailed explanations of the [redacted]

161. To the extent [redacted] is referenced at all in the discovery record, the minimal record contradicts the idea that [redacted] was relevant to Entergy' technical evaluation. During the proposal evaluation period in the spring of 2019, Mr. Gears advised Entergy personnel that the primary benefits of the [redacted] came after plant shutdown, when Entergy would be required to quickly remove all of the assemblies from the spent fuel pool as part of the site decommissioning process. During the operating period, the spent fuel assemblies stayed in the pool for much longer, obviating any need for the [redacted]. The 2020 southern fleet dry fuel storage contract only covered the operational period. It ended its term before Entergy would need to complete its spent fuel pool offload after shutdown. Thus, the benefits of [redacted] were largely irrelevant to the contract Entergy was executing with Holtec. This irrelevance was confirmed in the deposition testimony of Entergy operational staff who worked on the dry fuel storage campaigns after execution of this contract in 2020. None of those campaigns, while the plants were still operating, required anything [redacted] of the HI-STORM FW cask systems.

162. Finally paragraph 4 is materially false in relying on [redacted] to support the assertion that Holtec's technical offering justified a direct contract without a bid

[redacted]

process. [redacted]

Paragraph 4 is materially false in stating that [redacted]

163. Paragraph 5 of the nonbid justification form "[d]escribes the reason(s) for rejecting other products, services, or suppliers." Part of the document states that [redacted] As previously noted, this was equally true of the agreement to use the Holtec HI-STORM FW casks and presents a false reason for rejecting other suppliers.

164. Notably, the version of the nonbid justification submitted to the NSGB [redacted] This [redacted]

[redacted]

[redacted] Entergy's [redacted] renders the nonbid justification form materially false.

165. In addition, the nonbid justification form [redacted], particularly in light of the July 31, 2019 Pilgrim closing in which Holtec would deliver a commitment to relieve Entergy's $200 million decommissioning trust fund liability at Palisades. The original Entergy procurement strategy documents prepared in January 2019 [redacted] In both March 2019 and June 2019, [redacted]. Entergy's [redacted] renders the nonbid justification form materially false.

166. Paragraph 6 of the nonbid justification form "[p]rovides supporting evidence that due diligence has been performed in an objective manner and estimated pricing is fair and reasonable." The document states that [redacted] This language is materially false in several respects.

[redacted]

167. First, [redacted] Indeed, [redacted] repeatedly communicated to Holtec executives the problem that the per assembly pricing for the HI-STORM FW casks was not equivalent to the per assembly price under the existing contract. [redacted] specifically advised Holtec that this would be a problem in preparing the nonbid justification. Yet [redacted] knowing that the reference to [redacted] was false.

168. Second, [redacted] does nothing to support the reasonableness of the pricing. [redacted] less than price increase the nonbid justification form was purportedly justifying. The statement that [redacted] was knowingly false.

169. Third, and finally, the response describing the due diligence performed to determine the prices are reasonable and fair is materially false [redacted] The document [redacted] At a minimum, the NSGB [redacted] Rather than addressing that point in the document, [redacted] The document also fails to address Entergy's abdication of [redacted]

[redacted]

[redacted], which would have provided Entergy [redacted]

170. Taken as a whole, the response to paragraph 6 falsely states that [redacted] the due diligence work repeatedly exposed Holtec's pricing as too high. Rather than accepting the outcome of that due diligence work, [redacted] both believed [redacted]

171. Paragraph 7 of the nonbid justification form asks "[i]s this product or service proprietary?" The document states that [redacted] previously noted, Entergy did not rely on [redacted] to decide to contract with Holtec, and the response to paragraph 7 is false in that respect. The document is also false because Orano and NAC also supply [redacted] The discovery record shows no analysis by Entergy to assess the materials offered by the three companies or evaluate their performance. The document's [redacted]

172. Plaintiffs, therefore, are liable for the forfeiture of all of the claims brought pursuant to the Contract, in their entirety, pursuant to 28 U.S.C. § 2514.

[redacted]

Prayer for Relief

WHEREFORE, defendant requests that the Court enter judgment in its favor, order that ~~the complaint be dismissed~~plaintiffs' entire claim be forfeited due to fraud, pursuant to 28 U.S.C. § 2514, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

s/Evan Wisser
EVAN WISSER
Senior Trial Counsel
NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
JOSHUA D. TULLY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-3682
evan.wisser@usdoj.gov
*Attorneys for the United States*

OF COUNSEL:

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Office of the General Counsel

Dated: August 14, 2026

~~Respectfully submitted,~~

~~BRIAN M. BOYNTON~~
~~Principal Deputy Assistant Attorney General~~

[redacted]

OF COUNSEL:

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Office of the General Counsel

PATRICIA M. McCARTHY
Director

/s/Lisa L. Donahue
LISA L. DONAHUE
Assistant Director

/s/Natalee A. Allenbaugh
NATALEE A. ALLENBAUGH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 507-6058
Email: natalee.Allenbaugh@usdoj.gov

Dated: May 26, 2023

Attorneys for Defendant

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | No. 23-78C<br>Judge Holte |
| Defendant, | ) | |
| and | ) | |
| HOLTEC INTERNATIONAL, | ) | |
| Intervenor. | ) | |

**DEFENDANT'S FIRST AMENDED ANSWER AND AFFIRMATIVE DEFENSE**

For its answer to the complaint, defendant, the United States admits, denies, and alleges as follows:

1. The allegations in the first and second sentences of paragraph 1 are plaintiffs' characterization of their case to which no answer is required. Denies the allegation contained in the third sentence of paragraph 1 for lack of knowledge or information sufficient to form a belief as to its truth.

2. The allegations contained in paragraph 2 are plaintiffs' characterization of their case or a legal conclusion to which no answer is required. To the extent a response to these allegations is required, they are denied for lack of knowledge or information sufficient to form a belief as to their truth.

3. Denies the allegations in paragraph 3 for lack of knowledge or information sufficient to form a belief as to their truth.

[redacted]

4. Admits the allegations of paragraph 4.

5. The allegations contained in paragraph 5 are a legal conclusion to which no answer is required.

6. The allegations contained in paragraph 6 are conclusions of law to which no answer is required. To the extent a response to these allegations is required, they are admitted to the extent they are consistent with the court decisions cited, which are the best evidence of their contents.

7. Admits the allegations in paragraph 7 to the extent they are consistent with the standard contract published at 10 C.F.R. § 961.11, the contents of which are the best evidence thereof, and any construction of which is denied.

8. Admits the allegations contained in paragraph 8 to the extent supported by the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 8.

9. Denies the allegations contained in the first sentence of paragraph 9; avers that the Department of Energy and the nuclear industry together developed the Standard Contract. Admits the remaining allegations of paragraph 9 to the extent they are consistent with the contents of the standard contract published at 10 C.F.R. § 961.11, the contents of which are the best evidence thereof, and any construction of which is denied.

10. Admits the allegations in the first sentence of paragraph 10 to the extent they are consistent with the contents of the standard contract published at 10 C.F.R. § 961.11, the contents of which are the best evidence thereof, and any construction of which is denied. The remaining allegations in paragraph 10 constitute conclusions of law to which no response is required; to the extent a response is required, they are denied.

[redacted]

11. The allegations contained in the first and third sentences of paragraph 11 constitute conclusions of law and plaintiffs' characterization of the case, to which no response is required. To the extent a response to these allegations is required, they are denied. Admits the allegations contained in second sentence of paragraph 11 to the extent supported by the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, which is the best evidence of its contents; otherwise denies the allegations.

12. Admits the allegations in paragraph 12 to the extent they are consistent with the contents of the Final Interpretation of Nuclear Waste Acceptance Issues, the contents of which are the best evidence thereof, and any construction of which is denied.

13. Admits the allegations in paragraph 13 to the extent they are consistent with the contents of the court decisions cited, the contents of which are the best evidence thereof, and any construction of which is denied.

14. Admits that DOE has not yet begun the disposal of SNF under the standard contract published at 10 C.F.R. § 961.11. The remaining allegations contained in paragraph 14 are plaintiffs' characterization of this action to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

15. Admits the allegations in paragraph 15 to the extent they are consistent with the contents of the court decisions cited, the contents of which are the best evidence thereof, and any construction of which is denied.

16. Admits the allegations contained in paragraph 16 to the extent supported by the decisions issued by the Court and the United States Court of Appeals for the Federal Circuit in the "First-Round" case.

[redacted]

17. Admits the allegations contained in paragraph 17 to the extent supported by the decisions issued by the Court and the United States Court of Appeals for the Federal Circuit in the “Second-Round” case.

18. Denies that the “Third-Round” case was resolved following a trial and subsequent appeal. Avers that it was resolved on offer of judgment. Otherwise admits the allegations contained in paragraph 18 to the extent supported by the decisions issued by the Court and the United States Court of Appeals for the Federal Circuit in the “Third-Round” case.

19. The allegations contained in paragraph 19 constitute conclusions of law, to which no response is required. To the extent a response to these allegations is required, they are admitted to the extent consistent with the contents of the court decisions cited, the contents of which are the best evidence thereof, and any construction of which is denied.

20. Denies the allegations contained in paragraph 20.

21. Defendant incorporates by reference its responses to paragraph 1 through 20 of the complaint as though stated here in full.

22. The allegations contained in paragraph 22 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied for lack of knowledge or information sufficient to form a belief as to their truth.

23. The allegations contained in paragraph 23 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

24. The allegations contained in paragraph 24 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

25. Defendant incorporates by reference its responses to paragraph 1 through 24 of the complaint as though stated here in full.

[redacted]

26. The allegations contained in paragraph 26 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied. Avers that, at the direction of Congress, DOE is pursuing Federal consolidated interim storage for the acceptance of spent nuclear fuel (SNF) from the commercial industry using a consent-based siting process. DOE received appropriations for FY 2021 ($20M), FY 2022 ($20M), and FY 2023 ($53M) to fund such activities.

27. The allegations contained in paragraph 27 are conclusions of law to which no response is required. To the extent a response to these allegations is required, defendant admits that expenditures to date from the Nuclear Waste Fund have been less than the level of receipts into the Nuclear Waste Fund; otherwise denies the allegations in paragraph 27.

28. The allegations contained in paragraph 28 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied; defendant avers that the Department of Energy has not accepted any commercial spent nuclear fuel and/or high-level radioactive waste under the auspices of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270.

29. The allegations contained in paragraph 29 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

30. Defendant incorporates by reference its responses to paragraph 1 through 29 of the complaint as though stated here in full.

31. The allegations contained in paragraph 31 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

32. The allegations contained in paragraph 32 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

[redacted]

33. The allegations contained in paragraph 33 are conclusions of law to which no response is required. To the extent a response to these allegations is required, they are denied.

34. Denies that plaintiff is entitled to the relief set forth in the prayer for relief immediately following paragraph 33 or any relief whatsoever.

35. Denies each and every allegation not previously admitted or otherwise qualified.

## AFFIRMATIVE DEFENSES

### 28 U.S.C § 2514 - Forfeiture of Fraudulent Claims

A. General Background

i. *Relevant Parties and Nuclear Plants*

36. Entergy Corporation is a company engaged in the business of generating and distributing electric power. At times relevant to this defense, Entergy owned and operated a fleet of nuclear power plants across several states.

37. Entergy presently owns and operates a fleet of nuclear power plants in the southern United States – Arkansas Nuclear One Units 1 and 2 in Russellville, Arkansas; Grand Gulf Nuclear Station in Port Gibson, Mississippi; River Bend Station in St. Francisville, Louisiana; and Waterford 3 Steam Electric Station in Killona, Louisiana. These plants, referred to as Entergy's "southern fleet," are located in states with regulated electricity markets subject to similar state-level regulatory environments.

38. Entergy formerly owned and operated a fleet of nuclear power plants in the northern United States – Vermont Yankee Nuclear Power Plant in Vernon, Vermont; James A. FitzPatrick Nuclear Power Plant in Scriba, New York; Indian Point Energy Center in Buchanan, New York; Pilgrim Nuclear Power Station in Plymouth, Massachusetts; and Palisades Nuclear Generating Station in Covert, Michigan. These plants, referred to as Entergy's "northern fleet,"

[redacted]

were located in states with deregulated electricity markets subject to similar state-level regulatory environments.

39. Entergy sold the plants comprising its northern fleet in a series of transactions between 2017 and 2022. Entergy sold FitzPatrick to Exelon Generation on March 31, 2017. Entergy sold Vermont Yankee to subsidiaries of NorthStar Group Services on January 11, 2019. Entergy then sold Pilgrim and Indian Point to a joint venture owned by Holtec International and SNC-Lavalin. Pilgrim was sold on August 27, 2019, and Indian Point on May 28, 2021. Holtec later ended the joint venture with SNC-Lavalin and assumed full ownership and responsibility for Pilgrim and Indian Point, after which Entergy sold Palisades to Holtec on June 28, 2022.

40. Nuclear power plants generate power from the fission of uranium, which heats water to power a turbine. Uranium pellets are loaded into metal tubes that are arrayed in a lattice structure into a "fuel assembly," and multiple fuel assemblies are loaded into the power reactor to generate a self-sustaining chain reaction of nuclear fission. Fuel assemblies are engineered and constructed differently depending on whether they will be used in a boiling water reactor (BWR) or a pressurized water reactor (PWR). In BWR plants, the heat generated by the nuclear fission reaction boils water in the reactor to generate steam, which then spins a turbine to generate electricity. In PWR plants, the heat generated by the nuclear fission reaction heats water that is kept under pressure to prevent it from boiling. That pressurized water then transfers heat to a second, isolated set of water that boils and spins a turbine to generate electricity. Entergy's current and former nuclear fleets include both BWR and PWR plants.

41. After a few years within the reactor, a nuclear fuel assembly becomes "spent" and can no longer efficiently support the nuclear fission chain reaction necessary to generate power. Nuclear power plants remove those spent nuclear fuel assemblies and place them in a storage

[redacted]

pool (spent fuel pool) to cool, after which they can be loaded into storage cask systems, removed from the spent fuel pool, and stored elsewhere on site. Nuclear power plants must periodically remove spent fuel assemblies from the spent fuel pool and into dry fuel storage to ensure that there is sufficient space in the pool for the placement of new spent fuel assemblies as the plant continues operation.

42. At times relevant to this defense, Entergy contracted with Holtec International to provide dry fuel storage cask systems at its northern and southern nuclear fleets. Holtec's dry fuel storage systems include a canister, containing an internal scaffolding structure to hold individual spent fuel assemblies. The canister also contains a neutron poison, a material designed to absorb the neutrons emitted by the still radioactive spent fuel assemblies, to prevent a runaway fission chain reaction. Spent fuel canisters are engineered to hold certain numbers of either BWR or PWR assemblies. Canisters are then placed inside a metal and concrete overpack, which helps contain the heat and radiation generated by the spent fuel assemblies.

ii. *Entergy-Holtec Contracts for Dry Fuel Storage Executed Prior to 2019*

43. On February 2, 2009, Entergy and Holtec executed a 10-year contract for spent nuclear fuel dry storage services at Entergy's southern fleet, including the purchase of dry fuel storage cask systems (HI-STORM 100). The contract provided a discount for up to eight cask systems ordered in 2010, after which the parties agreed on base prices for the cask systems offered. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 PWR cask system (canister and overpack), with the option to provide a canister that could hold either 24 or 32 spent fuel assemblies. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 BWR cask system (canister and overpack), with a canister that could hold 68 spent fuel assemblies.

[redacted]

44. The 2009 southern fleet contract contained an agreed-upon escalation methodology, tied to specific Bureau of Labor Statistics indices, to calculate the selling price for the dry fuel storage casks systems in subsequent years after 2010. As of 2019, the prices in the 2009 contract had escalated to roughly [redacted] per HI-STORM 100 PWR cask system and [redacted] per HI-STORM 100 BWR cask system, an average aggregate increase of roughly [redacted] over the life of the 2009 contract.

45. The 2009 southern fleet contract also contained [redacted] Entergy had the right to [redacted] Entergy exercised this right [redacted]

46. On April 1, 2009, Entergy and Holtec executed a very similar 10-year contract for spent nuclear fuel dry storage services at Entergy's northern fleet, including the purchase of dry fuel storage cask systems. Just as with the southern fleet, the northern fleet included a discount for initial cask system purchases in 2010, after the parties agreed on base prices for the cask systems offered. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 PWR cask system (canister and overpack), with the option to provide a canister that could hold either 24 or 32 spent fuel assemblies, the same price agreed to for the southern fleet. Entergy agreed to pay Holtec [redacted] per HI-STORM 100 BWR cask system (canister and overpack), with a canister that could hold 68 spent fuel assemblies, again the same price agreed to for the southern fleet.

[redacted]

Different from the southern fleet contract, the northern fleet contract also offered higher capacity casks for use at Palisades, the HI-STORM FW cask system, which included a canister capable of holding up to 37 PWR spent fuel assemblies. After a discount for initial purchases, Entergy agreed to pay Holtec [redacted] per HI-STORM FW PWR cask system beginning in 2011.

47. As in the 2009 southern fleet contract, the 2009 northern fleet contract contained an agreed-upon escalation methodology, tied to specific Bureau of Labor Statistics indices, to calculate the selling price for the dry fuel storage casks systems in subsequent years after 2010. The selected indices and weights were virtually identical between the northern and southern fleet contracts. The one exception was the selection of indices for the neutron absorber material used in the canisters. The southern fleet contract specified the [redacted] while the northern fleet contract specified a weighted combination of the [redacted]

48. The 2009 northern fleet contract also contained [redacted]

49. As discussed in more detail below, in the mid-2010s Entergy decided to sell the nuclear plants in its northern fleet. To facilitate those sales, at various times Entergy and Holtec removed individual plants from the scope of the 2009 northern fleet 10-year contract for dry fuel storage services and executed standalone contracts for each plant. As relevant to this defense, on

[redacted]

July 26, 2018, Entergy and Holtec executed a standalone contract for Palisades, the site that had begun using the newer HI-STORM FW cask system. In this contract, Entergy agreed to pay Holtec a fixed price of [redacted], which could increase to [redacted] per cask system depending on the need for additional features.

50. On February 8, 2019, Holtec provided to Entergy a spreadsheet showing the historical movement of cask system prices under escalation provisions in the 2009 contracts for northern and southern fleets. That spreadsheet showed that, applying the escalation provisions from the 2009 contract, the Palisades cask systems would have cost [redacted] in 2018 under the 2009 northern fleet contract. Instead, Entergy agreed to pay Holtec a base price of only [redacted] when renegotiating the Palisades contract in 2018, [redacted] less than what Entergy would have been required to pay Holtec under the contract already in place for Palisades.

51. When the 2009 northern fleet contract was amended in 2011 to include the sale of HI-STORM FW casks, Palisades was an operating plant. When the new 2018 contract was executed, Palisades was planning to shut down, and the 2018 contract was intended to provide dry fuel storage cask systems sufficient to store all of the remaining fuel at the site. In depositions, witnesses for both Holtec and Entergy testified as to the general understanding in the industry that dry fuel storage cask systems typically cost less for shut down sites because the scope is more certain. That is, the dry fuel storage contract price for operating plants incorporates the uncertainty regarding future events inherent in an operating plant. As noted above, the 2018 shutdown price Holtec charged Entergy at Palisades was [redacted] less than the 2018 operating price Holtec was charging Entergy at Palisades under the 2009 base contract for the northern fleet.

[redacted]

iii. *Entergy-Holtec Contract for Dry Fuel Storage at the Southern Fleet Executed in 2020*

52. On May 15, 2020, Entergy and Holtec executed a new dry fuel storage contract for Entergy's southern fleet, which Entergy continued to own and operate after selling its northern fleet plants. Under this contract, Entergy agreed to pay Holtec a new base price of [redacted] for HI-STORM FW PWR (MPC 37) casks. Entergy also agreed to pay Holtec a new base price of [redacted] for HI-STORM FW BWR (MPC 89) casks.

53. When the northern fleet contract fully expired in 2019, the final escalated price for HI-STORM FW PWR (MPC 37) casks under that contract was [redacted]. There was no existing price under any Entergy fleetwide operating contracts for the HI-STORM FW BWR (MPC 89) casks, but under the 2009 contracts for both the northern and southern fleets, the price difference between PWR casks and BWR casks ranged between [redacted] and [redacted], depending on the particular escalation year. Conservatively taking the higher [redacted] price difference, and applying it to the HI-STORM FW PWR (MPC 37) 2019 cask prices reflected in the Entergy-Holtec northern fleet contract, the equivalent 2019 cask prices for the HI-STORM FW BWR (MPC 89) would have been [redacted]

54. Entergy's southern fleet contract price for the HI-STORM FW PWR (MPC 37) casks, [redacted], exceeded the price for the same cask under the just-expired northern fleet contract by [redacted], or [redacted]. Entergy's southern fleet contract price for the HI-STORM FW BWR (MPC 89) casks, [redacted], exceeded the implied price for the same cask based upon the just-expired northern fleet contract by [redacted], or [redacted]

55. To reiterate, between 2009 and 2019, Holtec's dry fuel storage cask prices under the Entergy northern and southern fleet contracts increased on average [redacted] Holtec

[redacted] then requested that Entergy agree to an approximately [redacted] increase in HI-STORM FW cask system prices in one year, between 2019 and 2020.

56. The extensive discovery record in this case shows that Entergy employees and executives knew that the cask system prices in the Entergy-Holtec southern fleet 2020 dry fuel storage contract were too high. Entergy personnel estimated that over the life of the contract, Entergy would pay Holtec at least [redacted] more than necessary.

57. Entergy expected that these expenses would ultimately be borne by Federal taxpayers through these present lawsuits, as well as future lawsuits while the contract was in effect.

58. Lower-level Entergy employees attempted to persuade Holtec to lower their prices or, alternatively, to persuade Entergy executives to authorize a competitive bid process. Entergy executives focused on [redacted]

59. Ultimately, Entergy executives directed the preparation of a nonbid justification memo to explain why it was appropriate to contract with Holtec at inflated prices. The nonbid justification memo was submitted to the United States in this case as providing the necessary support for Entergy's claim for reimbursement of the Holtec contract costs. The nonbid justification form contains several materially false statements, presenting a fundamentally false picture of the reasons Entergy chose to agree to Holtec's inflated prices. The true reasons, if properly documented, would have supported the United States' defenses to Entergy's claim. Entergy's falsification and submission of the nonbid justification form gives rise to the United States' affirmative defense of forfeiture under 28 U.S.C. § 2514.

[redacted]

60. The following sections summarize the relevant facts demonstrating the falsity of the nonbid justification form.

61. The following sections refer to various individuals involved in the dry fuel storage contracting process at Entergy. The organization chart below identifies the primary individuals and their relationship to each other in Entergy's corporate structure. The names marked with asterisks had the most direct involvement in the Holtec negotiation process. The names above the dashed lined are individuals referred to as senior Entergy executives in this answer. The names below the dashed line are individuals referred to as staff level employees in this answer.

[redacted]

[redacted]

B. Entergy-Holtec Contract Negotiation Process

i. *Pre-Proposal Discussions – June 2018-February 2019*

62. The Entergy-Holtec 2009 southern fleet contract for dry fuel storage services expired at the end of 2019. In June 2018, ahead of the upcoming expiration, Entergy personnel, including Mr. Gears, Ms. Leblang, Mr. Murphy, and Mr. Madkin, met to "discuss the agreements with Holtec and align on the path forward" regarding the procurement process. Mr. Murphy sent a summary email after the meeting, in which he stated his understanding that "we are all in agreement on the need to bid the work if only to send a message to Holtec and drive pricing." Mr. Murphy then advised the group that the final decision would be made by the Nuclear Supplier Governance Board (NSGB), a new executive-level board that would make a decision on the procurement strategy. Mr. Murphy instructed the team to begin developing a white paper to support the presentation to the NSGB.

63. On August 1, 2018, Entergy issued a press release announcing their agreement to sell two northern fleet plants, Pilgrim and Palisades, to Holtec.

64. Also on August 1, 2018, Mr. Murphy sent an email to his immediate and second-level superiors in the supply chain group, Mr. Griffin and Mr. Lindley. Mr. Murphy said that he had spoken with Mr. Heckenberger, and based on that call he wanted input from Mr. Griffin and Mr. Lindley about whether they should present a recommendation to put the southern fleet dry fuel storage contract out to bid "in light of the news today." Mr. Murphy acknowledged that "there are still strategic parts of the business that could impact this [bid/no bid decision] that I am not privy to and are not shared."

65. In response, Mr. Murphy's immediate supervisor, Mr. Griffin, asked if Mr. Murphy had quantified the potential benefit of bidding. Mr. Murphy responded that the "benefit

[redacted]

is to drive competitive pressure to Holtec to improve where we are." He cited high costs and performance concerns. He specifically noted that Entergy could leverage the volume of business it was providing Holtec to "drive better pricing, reduce mark-ups . . . , and improve performance." Mr. Murphy then cited a recent example where Entergy bid work for the Vermont Yankee ISFSI. Holtec's pricing was "$5 million more than the lower bidder even though they could use existing resources at the site, needed less training, and should be more efficient (things that should have made them very competitive). Their cost was high because they outsourced the whole job and marked it up 20%-30%." Mr. Griffin responded that, based on the information Mr. Kelley provided, the decision on whether to bid the southern fleet dry fuel storage contract was "worthy of a conversation."

66. Mr. Lindley, Mr. Murphy's second-line supervisor, then responded suggesting that Mr. Murphy consult with the team handling the northern fleet plant sales to see if there were any terms in the contracts with Holtec for the northern fleet sales that would impact the procurement decision. Mr. Murphy said he would do so.

67. Through the fall of 2018, Mr. Murphy, Mr. Madkin, Mr. Gears, Ms. Leblang, and others at Entergy worked to develop the plans for the southern fleet dry fuel storage procurement. These efforts included outreach to other utilities, including Exelon, which had recently transitioned some plants to Holtec dry fuel storage cask systems. Several Entergy employees, including Mr. Madkin and Mr. Gears, had been evaluating the capabilities of another competitor, NAC International, and in early October Entergy staff discussed with NAC potential opportunities for NAC to do work for the southern fleet.

68. On October 17, 2018, Mr. Murphy asked Mr. Madkin and Mr. Gears to begin drafting a white paper "to be used in support of a brief to [Mr.] Bakken and [Mr.] Lindley to get

[redacted]

their thoughts on the options of bid or bilaterial negotiations with Holtec." Mr. Murphy further noted that [redacted] Mr. Murphy asked that the white paper address "the impact (positive and negative of a potential bid award of [dry fuel storage] to someone other than Holtec. What i[t] means in regards to licensing, site work to convert, equipment to procure, other site impacts (training, impacts on planned campaigns, etc.), how we would approach this commercially with NAC or Orano (get them to switch us for free as part of a long term commitment, etc.), the advantages/disadvantages of the change, and any relevant OE we can get (such as impact of other plants/fleets converting, the recent Exelon experience, etc.)."

69. The next day, October 18, 2018, Mr. Madkin prepared a preliminary draft of the white paper requested by Mr. Murphy. The draft identified the main "concern" prompting a decision that the southern fleet dry fuel storage contract [redacted] The draft identified factors in favor of a bid process, including [redacted] The draft cons listed, as the first consideration against a bid process, [redacted]

70. While the staff level team was engaged on the items identified by Mr. Murphy, the executive-level conversation between Entergy and Holtec was different. Even though the team was still working to prepare the bid/no-bid white paper to present to Mr. Bakken and Mr. Lindley for decision, during the week of October 12, 2018, [redacted]

[redacted]

71. At some point after October, the executive preference for no bid was communicated to the staff-level team. On December 11, 2018, Mr. Madkin spoke with Thomas Duberville, Holtec's on-site liaison with Entergy, and advised him that Holtec should submit a proposal to renew the contract, which [redacted]

72. On January 3, 2019, Mr. Madkin re-sent to Mr. Gears the preliminary draft white paper he originally sent on October 18, 2018, but he acknowledged "the circumstances have changed since the last time we discussed this project. Maybe we should reflect that in this document?"

73. An updated version of the white paper was distributed on January 11, 2019, which [redacted] The updated white paper acknowledged that [redacted] Nonetheless, the white paper identified risks of a bid process, primarily that [redacted] The updated draft identified as further risks the need to evaluate [redacted] and the [redacted]

[redacted] Mr. Gears added further material to the draft on January 15, 2019, [redacted] and a list of [redacted], including [redacted] and [redacted]

74. Also on January 11, 2019, Steven Scheurich, one of the Entergy executives involved in the northern fleet sale process, wrote to Peter Norgeot, the senior Vice President with responsible for the fleetwide divestment process. Mr. Norgeot had no role in the management of the southern fleet. Mr. Scheurich advised Mr. Norgeot that Entergy's supply chain team had requested a proposal from Entergy for the southern fleet dry fuel storage contract. Mr. Scheurich stated that [redacted] apparently unaware of [redacted] Mr. Scheurich suggested that Mr. Norgeot have a [redacted] Mr. Norgeot responded saying that he had [redacted] Mr. Norgeot then stated that he [redacted]

75. This January 11, 2019 email exchange was forwarded to Mr. Lindley, who acknowledged the direction and said that he [redacted] Mr. Lindley then forwarded the thread to Mr. Griffin and Mr. Madkin, advising that "[t]here will be a need for confidentiality," directing them to confer with Mr. Scheurich to [redacted]

[redacted]

[redacted]

76. In further follow up to the January 11, 2019 email thread, Mr. Murphy, who had been leading the efforts for the southern fleet dry fuel storage procurement, reassured Mr. Lindley that he had been engaged with Mr. Scheurich and the team handling the northern fleet sales, including the [redacted] Mr. Murphy specifically stated that his team had been [redacted]

77. Mr. Murphy further informed Mr. Lindley that he had advised Holtec that Entergy "will in no way re-sign and extend the current deal" and that "[t]he fear of going out to bid and the desire of NAC and Orano to get the business is our most critical point of leverage." Mr. Murphy reported that after "ongoing discussions with Holtec on performance, current contract issues, and how we need to do business differently going forward," Holtec had "offered to provide a first step proposal to us that would address the points of our discussions." Mr. Murphy stated that the team's plan was to use the anticipated proposal form Holtec as "a point of discussion with them and a point to help us finalize our bid/no-bid decision," and that afterward the team would come to the NSGB for concurrence. In response, Mr. Lindley asked for more information about the NAC alternative, and Mr. Murphy said his team could provide that information.

ii. *First Holtec Proposal – February-March 2019*

78. On February, 25, 2026, Holtec submitted its proposal to Mr. Madkin for a new contract for dry fuel storage services at Entergy's southern fleet. That evening, Holtec's CEO,

[redacted]

Krishna Singh, sent a copy of the proposal directly to Mr. Bakken and Mr. Norgeot. Mr. Norgeot testified that he had no role in the southern fleet dry fuel storage contracting process, but he was responsible for Entergy's overall northern fleet divestment strategy, including the sale of Pilgrim, Palisades, and Indian Point to Holtec. Dr. Singh stated that he would call both Mr. Bakken and Mr. Norgeot the next day "to touch base."

79. The February 25, 2019 proposal was reviewed by Entergy's staff level team over the following three weeks. Personnel involved in the review included Ms. Leblang, Mr. Gears, and Mr. Kelley on the technical side, and Mr. Madkin, Mr. Murphy, and Mr. Shampy on the supply chain side. To inform this review, the staff level personnel reviewed Entergy's contracts with Holtec for dry fuel storage at the northern fleet and technical information about alternative casks available from NAC.

80. The staff level review culminated in a three-page white paper submitted by Mr. Murphy to Mr. Heckenberger on March 19, 2019. Mr. Murphy stated that, as planned, the team would be going to the NSGB for direction on how to proceed in light of the Holtec proposal.

81. The March 19, 2019 white paper recapped the set of issues discussed between Entergy and Holtec in the fall off 2018, and which Entergy expected would be addressed in the February 25, 2019 proposal, including a "[r]eduction in cask pricing" for the new contract, "pricing improvements based on Holtec's stated efficiencies," "a performance mechanism to address NRC violations and equipment/quality issues," and Holtec's markups on subcontracted work.

82. The March 19, 2019 white paper concluded that Holtec's February 25, 2019 proposal "was not in line with expectations and did not address items long under discussion." The first critical element was the pricing – despite Entergy's request for lower prices, in the new

[redacted]r proposal Holtec substantially increased its cask system prices above the existing southern fleet contract and the recently executed northern fleet contracts. The white paper observed that for every cask type, the proposal sought a one-year price increase greater than the total price increase across the prior 10-year contract for the southern fleet. The white paper included a detailed cost comparison on the third page, which showed that, over the anticipated duration of the contract, the new prices would cost Entergy [redacted] more than the current contract prices and would cost Entergy [redacted] more than the prices Holtec had offered Entergy for the northern fleet plants just one year earlier.

83. The March 19, 2019 white paper identified a number of other issues with the Holtec February 25, 2019 proposal – the pricing was twice as high as unsolicited bids provided by NAC in connection with the northern fleet contracting process; the contract attempted to lock in the prices through the entire life of the plants, which was more favorable to Holtec than what had been negotiated for the northern fleet in 2018; the proposal lacked liquidated damages or other provisions addressing NRC violations or quality issues, as Entergy had requested; and Holtec had not made any changes to its subcontractor markups, which Entergy had identified as excessive [redacted]

84. In a separate document, also drafted on March 19, 2019, the staff level team prepared a list of items Entergy would want to see in a future dry fuel storage contract with Entergy. Mr. Murphy stated that Mr. Heckenberger had requested this information to "support some further discussions he will have." This March 19, 2019 list of "DFS Contract Considerations" included the following negotiation requests – cask pricing should "match or improve upon what is in NDO contracts;" "establish [liquidated damages] for NRC violations received that are caused by Holtec work (engineering analyses and/or licensing documents that

[redacted] the NRC doesn't accept);" [redacted] and, if Entergy accepts Holtec's proposal for a contract extending through the life of the southern fleet plans, Entergy should include a provision to renegotiate pricing for the end-of-live spent fuel pool defueling "as was done for NDO contracts."

85. After receiving these various materials from Mr. Murphy on March 19, 2019, on March 20th Mr. Heckenberger had a conversation with Mr. Duberville, Holtec's on-site liaison at Entergy's offices. According to notes from the meeting taken by Mr. Duberville, Mr. Heckenberger "expressed his concern over the prices presented in our proposal." Mr. Heckenberger stated that Holtec needed to consider "the DOJ who holds Entergy's feet to the fire for every DOE reimbursement, and the PUC [public utility commission]. He said that we already know how difficult it can be to justify costs to the DOJ," and that it was going to be [redacted] to DOE . . . ." Mr. Heckenberger was "surprised that [Holtec] took this approach . . . . No one saw this coming (referring to the price increases). In his mind it [throws] the no-bid process up in the air."

86. At Mr. Heckenberger's suggestion during the March 20, 2019 conversation, Mr. Duberville next walked over to speak with Mr. Murphy. According to notes from that meeting taken by Mr. Duberville, Mr. Murphy "admitted that he knows (or suspects) that there are a lot of conversations, discussions, negotiations going on at levels that are way far above him" and Mr. Duberville. Mr. Murphy stated, and Mr. Duberville agreed, that "given all the activities that Holtec is involved [with] at Entergy, he can only surmise as to what is on or off the table." Regardless, Mr. Murphy said "he just can't imagine that the prices [Holtec] submitted would stay as they are; in his opinion, the prices are just too extreme." Finally, Mr. Murphy acknowledged

[redacted]

that, based on his experience, [redacted]

87. Mr. Duberville forwarded his meeting notes to his superiors at Holtec and summarized other key points from the February 25, 2019 proposal that Entergy was considering– the large volume of casks contemplated by the new proposal; for the HI-STORM FW PWR (MPC 37) cask systems, difference between the [redacted] price in the southern fleet proposal and the [redacted] price agreed to one year earlier for Palisades in the northern fleet; and for the HI-STORM 100 PWR (MPC 32M) cask system, the difference between the [redacted] price in the southern fleet proposal and the [redacted] price agreed to one year earlier for northern fleet plants.

88. Mr. Duberville concluded his report to his superiors at Holtec by saying "it['s] hard for me to recommend a next step as I don't really know what other discussions might be taking place. Dr. Singh [Holtec's CEO] may already know all about this and he may be working through Chris Bakken [Entergy's Chief Nuclear Officer]."

iii. *Entergy-Holtec Northern Fleet Negotiations – March 2019*

89. Mr. Murphy's suspicion relayed to Mr. Duberville on March 20, 2019 that there were other negotiations occurring far above him was correct.

90. In the next few days following Mr. Duberville's conversations with Mr. Heckenberger and Mr. Murphy regarding the unacceptability of the prices in Holtec's February 25, 2019 proposal, senior Entergy and Holtec executives resolved a major sticking point in the negotiation for the sale of Pilgrim and Palisades from Entergy to Holtec.

[redacted]

91. Under Nuclear Regulatory Commission regulations, owners of nuclear power plants must provide "reasonable assurance that funds will be available" to decommission the site. 10 C.F.R. § 50.75(a). Entergy, like most utilities, meets this requirement by establishing a decommissioning trust fund for each nuclear power plant site. *See id.* § 50.75(e)(1). Entergy deposits in the trust a portion of the money earned from the power generation at the site, saving over time so that at the end of the plant's life there will be enough funds in the trust to pay for decommissioning.

92. Due to poor economic conditions for nuclear power in the 2010s, Entergy shut down Palisades 13 years before its planned license expiration. That meant that the Palisades trust fund was missing 13 years of planned contributions. Entergy and Holtec both estimated that the Palisades trust fund would be $200 million short of the amount required to decommission the site. The Pilgrim trust fund, by contrast, was overfunded by more than $200 million, in part because Entergy required Boston Edison Company to deposit additional money into the trust fund when Entergy acquired Pilgrim in 1999. Thus, Entergy and Holtec agreed on a paired deal – Holtec would acquire both Palisades, with its $200 million unfunded trust fund liability, and Pilgrim, with its overfunded trust fund, which was more than sufficient to cover the shortfall at Palisades.

93. Entergy and Holtec later agreed that Holtec would purchase the two reactors at Indian Point as well, and the parties agreed on 4-year paced closing schedule. They would close on the sale of Pilgrim's single nuclear reactor and its overfunded trust fund first, in July of 2019. Then they would close on the two Indian Point reactors in 2020 and 2021. Finally, they would close on the single Palisades reactor and its underfunded trust fund in 2022.

[redacted]

94. Mr. Norgeot, who led these negotiations from Entergy's side, had serious concerns that Holtec would get Pilgrim and its overfunded trust fund first and then have little incentive to close on the Palisades site and its underfunded trust fund three years later. To mitigate that concern, Mr. Norgeot insisted that Holtec agree to some form of closing assurance, which would require Holtec to cover the $200 million Palisades shortfall regardless of whether that deal closed. The parties agreed that Holtec would provide a $200 million closing assurance note for the Palisades transaction.

95. In March 2019, as the Entergy staff were evaluating Holtec's southern fleet dry fuel storage contract, Entergy and Holtec executives were negotiating over a Letter Agreement, ultimately executed on March 21, 2019, outlining each party's commitments in the event that the Pilgrim deal did not close by July 31, 2019 as scheduled. On March 29, 2019, Mr. Scheurich, who was involved in the northern fleet sale negotiations, wrote to Mr. Lindley that "we reached agreement on certain terms with Holtec on 3/21 which improves the potential to transact on the Contract Date (7/31/19)."

iv. *Entergy Rejects Holtec's First Proposal – March-April 2019*

96. The same week that Mr. Scheurich reported that Entergy and Holtec had reached agreements that increased the likelihood of closing the Pilgrim transaction on the July 31, 2019 contract date, Mr. Bakken inquired with Mr. Lindley about the status of the southern fleet dry fuel storage contract with Holtec. On March 26, 2019, Mr. Bakken asked Mr. Lindley for an update, stating that "[w]e received a bid late last month and I'd like to understand timeline to closure and any concerns you might have." Mr. Lindley responded that he would "look in to this," and Mr. Bakken replied "[i]t's pretty urgent."

[redacted]

97. Mr. Murphy supplied a high-level summary to pass along to Mr. Bakken, with the bottom line that [redacted] After Mr. Lindley forwarded this information, Mr. Bakken responded to say "[m]ay be best if you and I have a chat." Mr. Lindley and Mr. Bakken agreed to speak that evening, on March 26, 2019.

98. The next day, March 27, 2019, Mr. Lindley provided comments to Mr. Murphy on the white paper that the Entergy staff had prepared to support the NSGB review, and which Mr. Murphy had sent to Mr. Heckenberger on March 19, 2019. Mr. Lindley added a header stating that the document was [redacted]

99. Mr. Murphy sought further input from Mr. Gears and responded to Mr. Lindley's comments late on March 27, 2019. The updated white paper provided substantial additional detail but stood by the original conclusion that the Holtec proposal was unacceptable. In a cover email, Mr. Murphy confirmed that the white paper is "not subject to privilege protection as it does not contain legal opinion or guidance." He also confirmed that Entergy "can use pricing details and company knowledge from [the northern fleet] to help us get better pricing down south." Finally, Mr. Murphy summarized the main difficulties with Holtec's proposal – "[t]here is also no good market data given the market. The only comparable detail is using a third party to validate Holtec costs (which also requires Holtec to accept this and to share their actual data) or to get a bid or indicative proposal from a non-Holtec vertical cask vendor. Our primary market point is the existing contract. For 10 years there has been no issue by Holtec with

[redacted]

escalation, pricing, terms, etc., and Holtec wants to continue with the same escalation and methods, albeit with a jump in the base price."

100. Mr. Lindley provided the updated white paper to Mr. Bakken late on March 27, 2019. The next day, Mr. Bakken said he had done an initial read and would read more closely in the evening but noted that there were "[a] lot of asks in here."

101. In early April, Entergy added the Holtec proposal and Entergy's internal white paper to the agenda for an April 22, 2019 meeting of the NSGB, Entergy's internal executive board to review and approve major procurement decisions. The agenda item stated that the Holtec proposal "did not address any of Entergy's stated commercial needs & expectations while offering significantly higher prices tied to a longer contract term. Given the significant gap between Entergy's expectations and Holtec's offer it is requested to present their proposal and Entergy's analysis to obtain executive feedback and direction on next steps." At this point, Mr. Murphy also advised Mr. Lindley that his role was shifting under a corporate reorganization, and that Mr. Murphy would begin involving another supply chain senior manager, George Shampy, who would be ready to take over responsibility for the contracting effort at the end of April.

102. On April 5, 2019, Mr. Lindley had separate conversations with Mr. Bakken and Mr. Heckenberger. Also on April 5th, Mr. Lindley advised Mr. Murphy that he had spoken with Mr. Bakken and received further input. Mr. Heckenberger and Chris Costanzo, another Entergy executive, would lead further discussions with Holtec. They would ask for additional explanation regarding the price increases. According to Mr. Lindley, Holtec had told Mr. Bakken that the price increases were the result of increases in raw material prices, especially [redacted]. Mr. Lindley explained to Mr. Bakken that any material price increases were already accounted for in the prior contract's escalation clauses, which Holtec did not propose to

[redacted]

change. Mr. Heckenberger and Mr. Costanzo would also communicate to Holtec that the "[d]eal needs to withstand public scrutiny." Mr. Bakken told Mr. Lindley that Holtec had offered to provide benchmarks to support the pricing. Finally, Mr. Heckenberger and Mr. Costanzo would advise Holtec that if the next proposal was "not acceptable then we would consider bid," though Mr. Lindley acknowledged that Entergy was "not keen on changing provider" and asking Mr. Murphy for further information on "other suppliers['] capabilities to educate us."

103. Later on April 5, 2019, Mr. Murphy sent a letter, reviewed by Mr. Lindley and Mr. Heckenberger, to Joy Russell, a Holtec executive, outlining Entergy's formal position regarding the February 25, 2019 proposal. The letter stated that Holtec's proposal "does not meet our expectations and is not acceptable as a starting point for further negotiations," pointing in particular to the "significant price increases without objective basis." Entergy requested an updated proposal by April 12, 2019, which should "provide objectively demonstrated value commensurate with the significant scope and scale of the business under consideration." The letter further reminded Holtec that "any Entergy agreement regarding spent fuel storage will need to withstand prudency reviews and public scrutiny associated with our cost recovery mechanisms."

104. While waiting on Holtec's updated proposal, Entergy staff provided Mr. Heckenberger with a list of requests to communicate in further conversations with Holtec. The document provided to Mr. Heckenberger included the following concerns – the February 25, 2019 proposal placed too much risk overall on Entergy compared to Holtec; Entergy should seek "preferred pricing" "that is lower than standard market pricing;" the contract should match or improve upon the terms established in the northern fleet dry fuel storage contracts executed in 2018; and the contract should address the fact that cask system prices are escalated based on

[redacted]

domestic [redacted] indices, even though Holtec uses foreign [redacted] at lower cost, allowing Holtec to "arbitrage the difference in price."

105. In light of the request for a new proposal, Entergy shifted consideration of the Holtec proposal from the April 22, 2019 NSGB agenda to the May 6, 2019 meeting. Mr. Lindley updated Mr. Bakken that the letter had been sent, and that subsequent calls were held between Entergy staff and Ms. Russell at Holtec, and between Entergy executives Mr. Heckenberger and Mr. Costanzo and Mr. Chaudhary at Holtec. Mr. Chaudhary requested additional time to prepare the updated proposal, which Entergy accepted, on the condition that the proposal be presented face-to-face.

v. *Second Holtec Proposal – April 2019*

106. Holtec submitted its second proposal to Entergy on April 23, 2019. Mr. Gears provided the initial summary to the staff level team – "Prices are exactly the same as what they provided on 2/25/2019. NO CHANGE. Proposal adds 12 extra pages of rationalization for high prices." Mr. Murphy passed along this information to Mr. Heckenberger and Mr. Lindley, suggesting that they may not want to keep the meeting scheduled for Holtec to present their updated proposal.

107. Mr. Murphy advised Mr. Lindley that Mr. Shampy and Mr. Madkin would be coordinating with Mr. Gears and his team "to look at strategy and needs forward based on a potential move to bid." Consistent with that message, Mr. Gears and Ms. Leblang compiled reference information from [redacted] with Orano and NAC. Mr. Gears also reached out to NAC to see if they could provide updated pricing for NAC's high-capacity casks. Mr. Gears indicated that he would expect to see pricing in line with what NAC previously offered Entergy in October 2017 for dry fuel storage at its northern fleet, with

[redacted]

reasonable escalation. Mr. Gears also asked NAC to provide detailed physical information about its cask systems.

108. Mr. Gears forwarded the information he obtained from NAC to the larger Entergy team, including Mr. Heckenberger, Mr. Price, Mr. Kelley, Mr. Griffin, Mr. Murphy, Mr. Shampy, and Mr. Madkin. He observed that, accounting for transition costs, Holtec would need to propose much lower prices to equal NAC's estimated prices, approximately [redacted] for a HI-STORM FW PWR (MPC 37) cask and approximately [redacted] for a HI-STORM FW BWR (MPC 89) cask. Mr. Gears also provided [redacted] Finally, NAC estimated [redacted].

109. Separate from Mr. Gears' efforts, a senior Entergy executive, John Ventosa, reached out to George Vaughan, NAC's Vice President of Business Development, to note that Brand H, which Mr. Vaughan understood to mean Holtec, was "becoming 'expensive'" and Mr. Ventosa "encouraged [Mr. Vaughan] to think about submitting an unsolicited proposal" for the Entergy southern fleet dry fuel storage contract.

110. [redacted], on April 28, 2019, Mr. Murphy sent an email to Mr. Heckenberger and Mr. Griffin addressing the current status of the northern fleet transactions. Mr. Murphy presented the key takeaway – [redacted]

[redacted]

[redacted] Mr. Murphy opined that [redacted] Mark Osborne, an Entergy supply chain employee working on the northern fleet transactions, then responded to say that he could not confirm the price conditions that the various sale agreements and commitments are subject to.

111. On April 25, 2019, Mr. Murphy drafted a letter to Holtec for review by Mr. Heckenberger. The draft letter advised Holtec of the cancellation of their planned April 29, 2019 meeting because the updated proposal failed to address Entergy's concern. The letter also requested conversation about extending the existing southern fleet dry fuel storage agreement. This letter was never sent.

112. Instead, on April 25, 2019, Mr. Heckenberger advised the staff level team that there had been "several executive level discussions today [April 25th] regarding the proposal and its detail." Entergy would keep the April 29th meeting, but it would instead be an executive-only meeting, with Mr. Bakken (who ultimately did not attend), Mr. Heckenberger, Mr. Costanzo, and Mr. Griffin from Entergy meeting with Holtec executives. Mr. Heckenberger said he could not share the full details of the executive conversations "as they were not appropriate for our larger group." Mr. Heckenberger and Mr. Griffin continued to discuss through the weekend. In a separate email to Mr. Gears, Mr. Murphy said he wondered "who moved that to an exec only meeting . . . us or them . . . ."

113. Mr. Oneid, a Holtec executive, drafted a report of the meeting that he shared with the Holtec executive team. He reported the following – Mr. Heckenberger [redacted] He asked if this was our best and final, which will force them to go out-for-bid. Entergy does not wish to go out to bid

[redacted]

and requested a revised proposal. We asked if they are open to switching to FW while maintaining the price per [cell] and adding the escalation adjustments. All three Entergy participants were amenable to this approach."

114. On May 9, 2019, Mr. Oneid sent a text message to Mr. Heckenberger confirming that "Dr. Singh is fine in the approach we discussed."

115. After the April 29, 2019 meeting, Ms. Russell directed Mr. Kalfazade, another Holtec employee, to prepare a new proposal that would only include the higher capacity HI-STORM FW cask systems, whereas the previous proposals included prices for the lower capacity HI-STORM 100 cask systems as well. The proposal would include [redacted] to transition all sites to the new cask systems.

116. [redacted]

117. In developing the next iteration of the proposal, Mr. Tindal [redacted]

vi. *Third Holtec Proposal – May-June 2019*

118. On May 15, 2019, Holtec submitted its third proposal to Entergy. As discussed at the April 29, 2019 executive meeting, this proposal removed the offer to provide the existing HI-STORM 100 cask systems for the southern fleet and provided pricing exclusively for the HI-

[redacted]

STORM FW higher capacity casks, which would require Entergy to incur substantial costs to upgrade their equipment to be able to handle the larger casks. Holtec proposed to charge [redacted] per HI-STORM FW PWR (MPC 37) cask system, and [redacted] per HI-STORM FW BWR (MPC 89) cask system. Holtec also proposed to charge an additional [redacted] total for new equipment Entergy would need to purchase from Holtec to handle the new cask system.

119. Just as with the second Holtec proposal in April, Dr. Singh sent a copy of the third proposal directly to Mr. Bakken on May 16, 2019, a day after it was sent through the formal procurement channel.

120. On May 17, 2019, Mr. Shampy sent an email to Mr. Griffin summarizing the staff level team's preliminary analysis of the May 15th proposal. The preliminary review indicated that Holtec's new proposal did not maintain the promised cost per fuel assembly equivalency with the existing contract and would have required Entergy to pay [redacted] more over the life of the contract compared to the pricing under the expiring contract. Mr. Shampy stated that the team would more closely evaluate the NAC option to provide "a more detailed break-even point" for each of the options. Mr. Murphy recommended evaluating the May 15, 2019 proposal prices against three other benchmarks – the existing southern fleet contract that was expiring at the end of 2019, the northern fleet contracts executed with Holtec, and the NAC pricing.

121. On May 20, 2019, Mr. Gears sent the same preliminary analysis, comparing the per assembly and total lifecycle cost of the new proposal against the expiring contract, up his reporting chain to Mr. Heckenberger. Mr. Gears stated that his immediate supervisor, Mr. Kelley, had reviewed and concurred in the analysis. He understood that Mr. Heckenberger

[redacted]

would be discussing with senior Entergy executives above him. Mr. Heckenberger forwarded Mr. Gears's internal price analysis to Mr. Oneid at Holtec the next day, on May 21, 2019.

122. On May 23, 2019, Mr. Gears and Mr. Kelley had a phone call with Mr. Kalfazade at Holtec, discussing the Entergy price analysis and why Entergy did not believe the May 15, 2019 proposal presented justifiable prices for the HI-STORM FW cask systems. Mr. Kelley summarized that call in a follow-up email to Mr. Heckenberger. Mr. Kelley stated that "[t]here is still a large disparity in staying cost neutral on a per/[fuel assembly] perspective, which was the commitment." Mr. Kelley then noted that "Holtec believes we are cost neutral from a DOE reimbursement perspective for total lifecycle, though they could not quantify." At the end of the meeting, Holtec committed to "true up with their management on actual commitment on 'cost neutral' on [fuel assembly] pricing model," while Mr. Gears intended to "provide some additional analysis to reflect our cost neutral cask perspective."

123. Mr. Gears ultimately concluded that, to meet the per assembly cost neutral goal, Holtec would need to reduce its HI-STORM FW PWR (MPC 37) cask system price to [redacted], down from the [redacted] price in the May 15th proposal. That price could increase to [redacted] if the [redacted] in transition costs were allocated into the price of each cask. Mr. Gears similarly concluded that Holtec would need to reduce its HI-STORM FW BWR (MPC 89) cask system price to [redacted], down from the [redacted] price in the May 15th proposal. That price could increase to [redacted] if the transition costs were built into the cask price.

124. The same day as the May 23, 2019 meeting among Mr. Kelley, Mr. Gears, and Mr. Kalfazade, Mr. Heckenberger sent a text message to Mr. Oneid, advising him that Entergy's staff level team had "completed the validation of our understanding of your proposal. I'm told

[redacted]

the analysis I sent to you has been validated to be accurate. This means we need to have a dialogue about next steps with you[,] Chris C[ostanzo,] and I very soon next week as the proposal does not meet the intent we agreed on in Chris [Costanzo's] office a few weeks back." This was an apparent reference to the April 29, 2019 meeting in which [redacted] and in which the Holtec and Entergy executives agreed that Holtec would provide pricing for the higher capacity HI-STORM FW casks with an equivalent price per fuel assembly compared to the existing contract.

125. Mr. Heckenberger and Mr. Oneid spoke directly by phone the next day, on May 24, 2019. Mr. Heckenberger reiterated that they were far apart on pricing for the HI-STORM FW PWR (MPC 37) casks in particular. Mr. Heckenberger also expressed concerns that the costs to transition to the higher capacity systems would not be reimbursed, presumably referring to this lawsuit. Later in the day, Mr. Heckenberger sent a text message to Mr. Oneid, stating that he was setting up another Entergy-Holtec call for Tuesday, May 29, 2019. Mr. Heckenberger told Mr. Oneid that "[w]e are aligned on keeping cost per fuel assembly the same from current contract. If that cannot be achieved other than the adders part of the discussion you will put me and Chris [Costanzo] in a bad spot. As I said we are willing to concede the efficiency for larger casks as part of the calculation but anything over that is going to be a problem in terms of our supply chain process in a regulated utility and a sole source justification to renew or extend the current contract. It's something we have not discussed since our face to face and I didn't want to lose the message."

126. In advance of the May 29, 2019 call, Mr. Gears distributed talking points to Mr. Heckenberger, Mr. Kelley, and Mr. Price. The talking points noted that Holtec had been offering

[redacted]

Entergy the HI-STORM FW PWR (MPC 37) cask system to Palisades during its operations since 2011, and both parties were aware of that contract price. The Palisades price should inform the price for the HI-STORM FW PWR (MPC 37) cask system at the southern fleet. The talking points also observed that Entergy should not undertake the costs of transitioning to the higher capacity cask systems if the cost of that transition did not create equivalent cost savings over the life of the plants. The talking points then stated that Entergy had valued the various "value add" items in Holtec's proposal at [redacted] per cask.

127. Also in advance of the May 29, 2019 call, Mr. Oneid exchanged text messages with Mr. Heckenberger. Mr. Oneid said he "wanted to align with [Mr. Heckenberger] on call objectives." He suggested that the call would not be "a negotiating session but a fact alignment call." Mr. Oneid said he could then discuss further directly with Mr. Heckenberger and Mr. Costanzo. Mr. Heckenberger responded and agreed "[t]hat's pretty close. If we get that far and are still not at equivalent costs per fuel assembly, then you and I and Chris [Costanzo] will need to talk because I believe we are getting close to putting us in that box we didn't want to be in."

128. In parallel with the Entergy-Holtec discussions, Entergy continued to explore the viability of the NAC option. On May 30, 2019, Entergy executives John Ventosa and Chris Costanzo met with NAC's representative George Vaughan, and Mr. Costanzo suggested that NAC consider submitting an unsolicited bid. Then, on June 5, 2019, NAC submitted a detailed unsolicited budgetary proposal for dry fuel storage services at Entergy's southern fleet. This submission proposed to offer a PWR cask system with a 37-assembly capacity at a cost of [redacted] per cask (compared to the [redacted] price for Holtec's equivalent 37-assembly capacity PWR cask system), and a BWR cask system with an 89-assembly capacity at a cost of

[redacted]

[redacted] per cask (compared to the [redacted] price for Holtec's equivalent 87-assembly capacity BWR cask system).

129. The NAC unsolicited proposal was distributed within Entergy to Mr. Madkin, Mr. Shampy, Mr. Murphy, Mr. Griffin, Mr. Lindley, Mr. Gears, Mr. Kelley, and Mr. Heckenberger. Mr. Lindley observed that he was not used to taking unsolicited proposals into account "in any formal evaluation process if not requested as part of a formal RFP/bid process." Mr. Griffin responded that his perspective was similar, but "[t]his one may be useful because of where we are with Holtec."

130. Mr. Gears performed a detailed price analysis of the NAC proposal compared to the Holtec proposal, which concluded that the total contract costs for dry fuel storage systems under the NAC proposal [redacted] and [redacted] Mr. Murphy forwarded this analysis to Mr. Lindley, Mr. Griffin, and Mr. Shampy on June 7, 2019. Mr. Murphy's email stated that this analysis had also been provided to Mr. Heckenberger for discussion with Mr. Costanzo. On June 11, 2019, Mr. Gears sent an email to Mr. Kelley and Mr. Murphy indicating that, [redacted] In summary, Mr. Gears concluded that [redacted]

131. Mr. Murphy spoke directly with Mr. Lindley on June 10, 2019, in which Mr. Lindley stated that he would be speaking with Mr. Bakken the next day, June 11th, regarding NSGB review of the southern fleet dry fuel storage contract. Mr. Murphy asked Mr. Madkin to

[redacted]

"get a spec ready to support activities in the event we need to go to bid," and to have "the other items needed for a bid ready and waiting so we can move quickly if that becomes the direction."

132. On June 12, 2019, Mr. Kelley asked Mr. Gears to look at the "option to put out an order for casks from Holtec while we transition." Mr. Gears responded with an analysis for each of the four southern fleet sites, considering a potential transition to the Holtec HI-STORM FW casks or to the NAC casks. He identified the next date by which casks would be needed for each site and how many casks should be ordered under the existing Holtec contract before it expired to ensure adequate continuity under either transition scenario. Mr. Gears [redacted] Mr. Kelley responded to state that he had passed the information along to Mr. Heckenberger.

C. <u>Entergy-Holtec Price Agreement</u>

133. While the Entergy staff were working to ensure that Entergy could quickly pivot to a competitive bid, Entergy executives remained focused on reaching agreement with Holtec. On June 3, 2019, Mr. Gears told Mr. Murphy that Mr. Heckenberger intended to seek input from Mr. Bakken and Mr. Costanzo, then some combination of Mr. Bakken or Mr. Costanzo would talk to Dr. Singh.

134. Consistent with Mr. Gears's understanding, on June 5, 2019 Mr. Heckenberger had a conversation with Mr. Bakken, after which Mr. Heckenberger forwarded to Mr. Bakken the analysis performed by Mr. Gears showing that Holtec's May 15, 2019 proposal would cost [redacted] more over the term of the contract compared to the existing contract with Holtec for the southern fleet. Mr. Bakken forwarded Mr. Gears's analysis to Dr. Singh at Holtec on June 6,

[redacted]

2019, with a note – "Another topic to discuss. As expected, we will have to find a way through this. Chat tonight."

135. At some point in late May or early June 2019, [redacted] In a June 3, 2019 email, Mr. Murphy wrote to Mr. Gears that Mr. Murphy "[redacted] Mr. Gears "agree[d] with [Mr. Murphy's] logic [redacted]

136. On June 17, 2019 Mr. Bakken traveled alone to Holtec's headquarters in Camden, New Jersey, meeting with Dr. Singh, Mr. Tindal, Ms. Russell, and Mr. Kalfazade. Mr. Bakken said that in the meeting he was [redacted] On June 20, 2019 Mr. Heckenberger texted Mr. Oneid, saying that Mr. Bakken agreed with Dr. Singh [redacted]

137. Mr. Bakken, Mr. Griffin, Mr. Heckenberger, and Mr. Kelley traveled to Camden the next week, on June 28, 2019. Mr. Bakken met individually with Dr. Singh, while Mr. Griffin, Mr. Heckenberger, and Mr. Kelley met separately with Holtec personnel to [redacted] Holtec had prepared [redacted] An excerpt of the [redacted] is shown below (Mr. Kelley later advised Holtec that the numbers in the

[redacted] proposed Entergy system price were incorrect and should have been [redacted] and [redacted] for the MPC-37 and MPC-89 items, respectively):

[redacted]

138. At the June 28th Camden meeting, Entergy asked Holtec [redacted] Recall that Entergy knew its Palisades contract price for the PWR cask system was approximately [redacted]. In response to this request, Holtec did not [redacted] instead offering [redacted] Publicly available information published by the NRC listed which nuclear plants had loaded spent nuclear fuel into HI-STORM FW PWR (MPC 37) cask systems as of June 2019. [redacted]

139. In addition, Entergy ultimately accepted Holtec's proposal to remove [redacted] That clause had been included [redacted] If retained, the clause would have [redacted] The contract then would have [redacted]

[redacted]. Had [redacted] clause been retained, [redacted]

D. Entergy Nonbid Justification

140. On July 18, 2019, Mr. Heckenberger and Mr. Griffin met with the staff level team that had been working on the southern fleet dry fuel storage procurement process for the past year. They advised the team that no further consideration would be given to the NAC proposal and that they would be executing a nonbid justification memo to submit to the NSGB to approve executing a direct contract with Holtec. [redacted] according to handwritten notes taken by Mr. Gears.

141. In deposition testimony, Mr. Heckenberger confirmed that Entergy agreed to pay the prices proposed by Holtec [redacted] even though Holtec was never able to resolve any of the other substantive concerns Entergy identified with the prices in the May 15, 2019 proposal.

142. Entergy and Holtec were scheduled to close on the Pilgrim sale on July 31, 2019, at which point Holtec was obligated to deliver its agreement to cover the $200 million shortfall in the Palisades decommissioning trust fund. The July 13, 2019 meeting, at which Entergy executives directed the staff to finalize the nonbid justification form for direct contracting with Holtec, was 13 days before the Pilgrim closing.

143. The nonbid justification form circulated at the July 18, 2019 meeting was drafted by management personnel. Mr. Murphy and Mr. Gears, the two employees who had performed

[redacted]

the most detailed analysis of the proposal and the other options available to Entergy, did not assist in drafting the nonbid justification, and neither ever saw the document as submitted to the NSGB or as ultimately executed. Mr. Griffin and Mr. Heckenberger advised the larger group that, [redacted], which was why Entergy leadership had elected to proceed with direct negotiations with Holtec.

144. In depositions taken to-date, no Entergy employee or executive has yet admitted to preparing the first draft of the nonbid justification form. Based on the evidence available, it was likely drafted by [redacted]. Much of the text in the executed version was added after the document was approved by the NSGB. In depositions, no Entergy employee or executive has claimed responsibility for drafting the additional material that appears in the executed nonbid justification form after NSGB approval.

145. After the July 18, 2019 meeting, presumably in response to one of the points in the draft nonbid justification form, Mr. Gears sent an email to the meeting participants, including Mr. Heckenberger and Mr. Griffin, stating that Orano's large-capacity cask systems (PWR-37 and BWR-89) "are licensed for heat loads of 50 kw and 47 kw, respectively, meeting or exceeding Holtec's heat loads." Publicly available NRC records confirm that, as of July 18, 2019, Orano's high capacity casks had higher heat loads than the HI-STORM FW casks as licensed. Orano's high capacity heat loads were also higher than the heat loads for which Holtec was seeking NRC approval as of 2019.

146. Mr. Griffin submitted the nonbid justification form to the NSGB on September 16, 2019, and the topic was considered by the NSGB on October 1, 2019. The NSGB approved the nonbid justification form as presented, with recommendations for further actions.

[redacted]

147. Entergy maintained formal meeting minutes of NSGB meetings, but those meeting minutes have since been lost and could not be produced in discovery. [redacted]

148. [redacted] The NSGB recommended [redacted] The NSGB then directed that the nonbid justification form [redacted]

149. The final version of the nonbid justification form was signed on November 18, 2019. The document was signed by [redacted] All [redacted] testified at their depositions that they were relying on others to ensure the accuracy of the information contained in the document, and that they did not independently verify the accuracy of the complete document themselves. The United States has deposed every Entergy employee and executive involved in the southern fleet dry fuel storage contracting process. None has claimed responsibility for the substantial revisions between the version of the nonbid justification form that was submitted and approved by the NSGB and the executed version that was produced in discovery to the United States as documenting the reasons for contracting with Holtec on a sole-source basis.

[redacted]

## COUNT I

**(Forfeiture of Fraudulent Claims - 28 U.S.C. § 2514)**

150. The United States incorporates by reference the allegations set forth in paragraphs 36-149 above.

151. System Energy Resources, Inc. *et al.*, practiced or attempted to practice fraud against the United States in the proof, statement, establishment, or allowance of the submissions in this case. In particular, plaintiffs made false claims and practiced fraud against the United States when it presented false claims through the nonbid justification form with the intent to cause the United States to pay plaintiffs amounts to which plaintiffs knew it was not entitled.

152. Entergy submitted the signed nonbid justification form from November 2019 to the United States in response to the United States' discovery requests as a document supporting its claim to recover damages in this case. Multiple Entergy witnesses have testified in depositions that the nonbid justification form contains the complete explanation for why Entergy chose to accept Holtec's proposal for dry fuel storage services at the southern fleet without a formal bid process.

153. As early as March 2019, Entergy's [redacted] Entergy executives, [redacted] knew that the nonbid justification form would be a key part of the evidence required to support the recoverability of the Holtec cask system costs. [redacted]

[redacted]

154. The nonbid justification form contains a series of materially false statements, as outlined below, where in many cases the true information would have supported arguments by the United States in defense of Entergy's claim.

155. Paragraph 2 of the nonbid justification form "[d]escribes the unique features that make this product or service available only from this supplier." The document identifies two unique features of the Holtec HI-STORM FW casks – [redacted] The statement that these features of Holtec's systems were unique was false, and [redacted] knew the statements were false. Orano and NAC both offered 37-assembly capacity PWR casks, and Orano also offered 89-assembly capacity BWR casks. The [redacted] of Holtec's HI-STORM FW casks was not unique in the industry. In depositions, multiple Entergy witnesses have agreed.

156. The [redacted] of Holtec's HI-STORM FW casks also was not unique. After the initial draft of the nonbid justification form was circulated at the July 18, 2019 meeting, Mr. Gears emailed Mr. Griffin, Mr. Heckenberger, and others [redacted] That was true whether considering the HI-STORM FW cask systems as licensed or considering the Holtec's pending license amendment before the NRC to increase [redacted] of the HI-STORM FW casks. In either case, [redacted] of the HI-STORM FW casks was lower than the Orano casks licensed as of 2019. Thus, the assertion that [redacted] of the Holtec systems was a unique feature was knowingly false.

[redacted]

157. Finally, the rest of the language in paragraph 2 focuses on [redacted] Many of the statements supporting this concept are false. The document states that [redacted] That was false. Mr. Gears had [redacted], and the [redacted] The document also states that [redacted] As a statement distinguishing unique features of the Holtec proposal, this was also false. [redacted] for transitioning to the Holtec high-capacity cask system, and Entergy staff's [redacted] Paragraph 2 falsely describes [redacted]

158. Paragraph 3 of the nonbid justification form "[d]escribes why these unique features are required." In part, the document states that [redacted] The statement that [redacted]. Everyone involved at Entergy [redacted]

[redacted]. Indeed, [redacted] The statement that contracting [redacted] was knowingly false.

159. Paragraph 4 of the nonbid justification form "[d]escribes the process used to select this product, service or supplier." The document states that [redacted] As described above, this statement was knowingly false. Orano's high-capacity cask systems met or exceeded Holtec's [redacted], which Mr. [redacted]

160. Paragraph 4 is also materially false in stating that [redacted]. There is no evidence that [redacted] as a relevant consideration at all. From the start of the procurement process in June 2018 through the NSGB approval of the nonbid justification form in October 2019, no document or email discusses [redacted] as a relevant consideration. Indeed, the nonbid justification form submitted to the NSGB approval [redacted] as the reason to contract with Holtec. In response to the paragraph 2 prompt to describe the unique features of the product, the version submitted to the NSGB says [redacted] In response to the paragraph 4

[redacted]

prompt to describe the process used to select the product, the version submitted to the NSGB says that [redacted] The detailed explanations of the [redacted]

161. To the extent [redacted] is referenced at all in the discovery record, the minimal record contradicts the idea that [redacted] was relevant to Entergy' technical evaluation. During the proposal evaluation period in the spring of 2019, Mr. Gears advised Entergy personnel that the primary benefits of the [redacted] came after plant shutdown, when Entergy would be required to quickly remove all of the assemblies from the spent fuel pool as part of the site decommissioning process. During the operating period, the spent fuel assemblies stayed in the pool for much longer, obviating any need for the [redacted]. The 2020 southern fleet dry fuel storage contract only covered the operational period. It ended its term before Entergy would need to complete its spent fuel pool offload after shutdown. Thus, the benefits of [redacted] were largely irrelevant to the contract Entergy was executing with Holtec. This irrelevance was confirmed in the deposition testimony of Entergy operational staff who worked on the dry fuel storage campaigns after execution of this contract in 2020. None of those campaigns, while the plants were still operating, required anything [redacted] load of the HI-STORM FW cask systems.

162. Finally paragraph 4 is materially false in relying on [redacted] to support the assertion that Holtec's technical offering justified a direct contract without a bid

[redacted] process. [redacted]

Paragraph 4 is materially false in stating that [redacted]

163. Paragraph 5 of the nonbid justification form "[d]escribes the reason(s) for rejecting other products, services, or suppliers." Part of the document states that [redacted] As previously noted, this was equally true of the agreement to use the Holtec HI-STORM FW casks and presents a false reason for rejecting other suppliers.

164. Notably, the version of the nonbid justification submitted to the NSGB [redacted] This [redacted]

[redacted]

[redacted] Entergy's [redacted], renders the nonbid justification form materially false.

165. In addition, the nonbid justification form [redacted] particularly in light of the July 31, 2019 Pilgrim closing in which Holtec would deliver a commitment to relieve Entergy's $200 million decommissioning trust fund liability at Palisades. The original Entergy procurement strategy documents prepared in January 2019 [redacted]. In both March 2019 and June 2019, [redacted]. Entergy's [redacted] renders the nonbid justification form materially false.

166. Paragraph 6 of the nonbid justification form "[p]rovides supporting evidence that due diligence has been performed in an objective manner and estimated pricing is fair and reasonable." The document states that [redacted] This language is materially false in several respects.

[redacted]

167. First, [redacted] Indeed, [redacted] repeatedly communicated to Holtec executives the problem that the per assembly pricing for the HI-STORM FW casks was not equivalent to the per assembly price under the existing contract. [redacted] specifically advised Holtec that this would be a problem in preparing the nonbid justification. Yet [redacted] knowing that the reference to [redacted] was false.

168. Second, [redacted], does nothing to support the reasonableness of the pricing. [redacted] less than price increase the nonbid justification form was purportedly justifying. The statement that [redacted] was knowingly false.

169. Third, and finally, the response describing the due diligence performed to determine the prices are reasonable and fair is materially false [redacted]. The document [redacted] At a minimum, the NSGB [redacted]. Rather than addressing that point in the document, [redacted] The document also fails to address Entergy's abdication of [redacted]

[redacted] which would have provided Entergy [redacted]

170. Taken as a whole, the response to paragraph 6 falsely states that [redacted], the due diligence work repeatedly exposed Holtec's pricing as too high. Rather than accepting the outcome of that due diligence work, [redacted] both believed [redacted].

171. Paragraph 7 of the nonbid justification form asks "[i]s this product or service proprietary?" The document states that [redacted] As previously noted, Entergy did not rely on [redacted] to decide to contract with Holtec, and the response to paragraph 7 is false in that respect. The document is also false because Orano and NAC also supply [redacted] discovery record shows no analysis by Entergy to assess the materials offered by the three companies or evaluate their performance. The document's [redacted].

172. Plaintiffs, therefore, are liable for the forfeiture of all of the claims brought pursuant to the Contract, in their entirety, pursuant to 28 U.S.C. § 2514.

[redacted]

Prayer for Relief

WHEREFORE, defendant requests that the Court enter judgment in its favor, order that plaintiffs' entire claim be forfeited due to fraud, pursuant to 28 U.S.C. § 2514, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

s/Evan Wisser
EVAN WISSER
Senior Trial Counsel
NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
JOSHUA D. TULLY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-3682
evan.wisser@usdoj.gov
*Attorneys for the United States*

OF COUNSEL:

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Office of the General Counsel

Dated: August 14, 2026

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C and 24-118C<br>(Consolidated)<br>Judge Holte |
| ENTERGY LOUISIANA, LLC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED ANSWER AND RESPONSE TO PLAINTIFFS' CROSS-MOTION TO STRIKE**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

EVAN WISSER
Senior Trial Counsel
Commercial Litigation Branch,
Civil Division, U.S. Department of Justice

OF COUNSEL:

NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
Trial Attorneys

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy

[redacted]

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ 2

TABLE OF AUTHORITIES ........ 3

ARGUMENT ........ 3

II. The United States' Motion for Leave to Amend Our Answer was not Unduly Delayed and Does not Unduly Prejudice Entergy ........ 3

A. The United States Filed Our Motion Promptly After Receiving Critical Evidence Supporting the Fraud Allegations in March 2026 ........ 3

B. Entergy Has Not Been Prejudiced by the Timing of the United States' Filing ........ 6

II. The United States Satisfied the Requirement under RCFC 9(b) to Plead Fraud with Particularity ........ 9

III. The Proposed Affirmative Defense is Not Futile or Offered in Bad Faith ........ 11

A. The United States' Proposed Forfeiture Defense is Fully Consistent with the Federal Circuit's Interpretation of Section 2514 in *Kellogg Brown & Root* ........ 13

B. The Nonbid Justification Form is an Essential Element of Entergy's Proof in Support of its Claim to Recover the Costs Paid to Holtec ........ 15

IV. Entergy's Cross-Motion to Strike is Procedurally Improper and Should be Denied ........ 18

CONCLUSION ........ 18

[redacted]

**TABLE OF AUTHORITIES**

Cases

*Arunachalam v. Int'l Bus. Machines Corp.*,
989 F.3d 988 (Fed. Cir. 2021) ........ 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 10

*Bluebonnet Sav. Bank FSB v. United States*,
67 Fed. Cl. 231 (2005) ........ 13

*Carolina Power & Light Co. v. United States*,
115 Fed. Cl. 57 (2014) ........ 13

*Energy Nw. v. United States*,
641 F.3d 1300 (Fed. Cir. 2011) ........ 13, 16

*Essani v. Earley*,
No. 13-cv-3424, 2018 WL 3785109 (E.D.N.Y. Aug. 9, 2018),
*report & recommendation adopted*,
No. 13-cv-3424, 2018 WL 4100483 (E.D.N.Y. Aug. 28, 2018) ........ 8

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ........ 9, 10

*Fisherman's Harvest, Inc. v. United States*,
74 Fed. Cl. 681 (2006) ........ 18

*Foman v. Davis*,
371 U.S. 178 (1962) ........ 6

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001) ........ 13

*Hanover Ins. Co. v. United States*,
134 Fed. Cl. 51 (2017) ........ 3, 6

*Hardy v. United States*,
153 Fed. Cl. 624 (2021) ........ 18

*In re BP Lubricants USA Inc.*,
637 F.3d 1307 (Fed. Cir. 2011) ........ 9

*Ind. Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) ........ 13

[redacted]

*Kamen Soap Prods. Co. v. United States*,
124 F. Supp. 608 (Ct. Cl. 1954) ........ 10, 13, 17

*Kellogg Brown & Root Services, Inc. v. United States*,
728 F.3d 1348 (Fed. Cir. 2013) ........ 2, 14

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*,
464 F.3d 1339 (Fed. Cir. 2006) ........ 12

*King v. United States*,
119 Fed. Cl. 51 (2015) ........ 7

*Landmark Land Co. v. Federal Deposit Ins. Corp.*,
256 F.3d 1365 (Fed. Cir. 2001) ........ 12

*LW Constr. of Charleston, LLC v. United States*,
139 Fed. Cl. 254 (2018) ........ 3

*Meyer Grp., Ltd. v. United States*,
115 Fed. Cl. 645 (2014) ........ 12

*NVF Co. v. New Castle Cnty.*,
276 B.R. 340 (D. Del. 2002) ........ 8

*O'Brien Gear & Machine Co. v. United States*,
591 F.2d 666 (Ct. Cl. 1979) ........ 13, 18

*Shoshone Indian Tribe of the Wind River Reservation v. United States*,
71 Fed. Cl. 172 (2006) ........ 12

*Southern Nuclear v. United States*,
637 F.3d 1297 (Fed. Cir. 2011) ........ 12

*St. Paul Fire & Marine Ins. Co. v. United States*,
31 Fed. Cl. 151 (1994) ........ 6

*Standard Oil Co. of Kan. v. United States*,
47 F. Supp. 120 (Ct. Cl. 1942) ........ 10, 13, 17

*Underwood v. O'Reilly Auto Enters., LLC*,
342 F.R.D. 338 (D. Nev. 2022) ........ 9

*Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee, LLC*,
683 F.3d 1330 (Fed. Cir. 2012) ........ 16

*Williams v. Cost-ULess, Inc.*,
No. 2011-cv-025, 2014 WL 2993667 (D.V.I. July 3, 2014) ........ 8

[redacted]

*Yankee Atomic Elec. Co. v. United States*,
536 F.3d 1268 (Fed. Cir. 2008)........................................................................................ 13

Statutes

28 U.S.C. § 2514.............................................................................................................. 18

Rules

RCFC 9(b)....................................................................................................................... 10

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM ENERGY RESOURCES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | Nos. 23-78C and 24-118C<br>(Consolidated)<br>Judge Holte |
| ENTERGY LOUISIANA, LLC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOLTEC INTERNATIONAL,<br><br>Intervenor. | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED ANSWER AND RESPONSE TO PLAINTIFFS' CROSS-MOTION TO STRIKE**

Pursuant to Rule 7.2 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests submit this reply in support of our motion for leave to file an amended answer to the complaint filed by plaintiffs System Energy Resource,

[redacted]

Inc., *et al*., and Entergy Louisiana (Entergy), and our response to plaintiffs' cross-motion to strike.

Entergy offers three arguments in its response, none of which provide a basis for the Court to deny our motion.

*First*, Entergy contends that our motion was unduly delayed, resulting in prejudice to Entergy. ECF No. 175 at 29-38. Yet in discussions following the United States's April 22, 2026 disclosure of our intent to assert the forfeiture defense, counsel for Entergy acknowledged that Entergy had flagged this potential defense when the United States first began inquiring more deeply into the circumstances surrounding the Entergy-Holtec contract in late 2024 and early 2025. Entergy cannot now claim prejudice from our assertion of a defense that Entergy itself had flagged in its own case evaluation. Further, Entergy's contentions regarding undue delay are inconsistent with the relevant legal standard, as discussed below.

*Second*, Entergy contends that the United States' 137 paragraph proposed pleading is not specific enough regarding the nature of the alleged fraud. ECF No. 175 at 22-28. As explained below, the pleading more than meets the particularity requirements of RCFC 9(b).

*Third*, Entergy contends that, as a matter of law, the alleged falsities in the nonbid justification cannot be considered fraud or attempted fraud in the "proof, statement, establishment, or allowance" or Entergy's claim. ECF No. 175 at 16-22; 28 U.S.C. § 2514. In support of this argument, Entergy relies on a misreading of *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013), which supports the United States' assertion of the forfeiture defense. There is no dispute that Entergy knew it needed to provide a proper justification to support its claim to recover in this litigation the costs it paid to Holtec for dry fuel storage casks. Indeed, Entergy and Holtec spent four months in a protracted discussion of cask

[redacted]

prices in part because Entergy's [redacted] The proposed answer alleges that the nonbid justification form was prepared in full expectation of litigation, and that key Entergy witnesses testified in deposition that the nonbid justification form contained the complete justification for Entergy's decision to accept Holtec's prices. As explained further below, that is sufficient to qualify the nonbid justification as part of the "proof" or "establishment" of Entergy's claim before this Court under section 2514.

## ARGUMENT

### II. The United States' Motion for Leave to Amend Our Answer was not Unduly Delayed and Does not Unduly Prejudice Entergy

#### A. The United States Filed Our Motion Promptly After Receiving Critical Evidence Supporting the Fraud Allegations in March 2026

As explained in our motion, ECF No. 160 at 18-19, a fraud pleading by the United States at the close of fact discovery is not typically held to be unduly delayed because the United States must investigate the relevant facts known to the plaintiff through discovery. *LW Constr. of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 304 (2018); *Hanover Ins. Co. v. United States*, 134 Fed. Cl. 51, 60-61 (2017). Delay is determined not based on when the United States first became aware of the basis of Entergy's claim, but when the facts suggesting fraud were uncovered. *Hanover*, 134 Fed. Cl. at 61 ("Even assuming, without deciding, that defendant was fully aware of the basis for Lodge's and Hanover's claims, the facts suggesting fraud were not uncovered until after discovery began, nor could they have been."). Entergy's response largely ignores this distinction – the facts necessary to substantiate our fraud defense were known to Entergy but not the United States until the completion of fact discovery. Discovery was required for the United States to learn those facts and confirm a sufficient legal basis to assert the forfeiture defense.

[redacted]

Entergy contends that the United States must have known of the basis for our forfeiture defense in late 2024 or early 2025, presumably suggesting that this motion should have been filed then. ECF No. 175 at 29-33. Entergy overreads the United States' disclosure that our suspicions were aroused in the fall of 2024. ECF No. 160 at 19. At that time, the parties had already held discussions about the high prices Entergy had paid for Holtec's dry fuel storage cask systems. During the informal discovery period, Entergy initially explained that the cost increases were the result of [redacted]. That was a superficially plausible explanation. However, by the fall of 2024, the United States realized that [redacted] was not the cause of the price increases, based in part on confidential commercial information provided by Holtec in the *Holtec Pilgrim* litigation and analysis of the [redacted]. At that point, the case shifted to formal discovery so the United States could inquire further into the reasons Entergy had agreed to the increased prices.

At the start of 2025, the discovery record did not clearly establish a basis for fraud. The United States began receiving relevant documents through the summer and fall of 2025 and began deposing the relevant witnesses. Through those discovery efforts it became apparent that there was strong disagreement within Entergy about the acceptability of Holtec's prices. Entergy's ultimate decision to accept Holtec's proposal over internal objections supports our defenses that the increased costs are not recoverable. But that is not the same as alleging that Entergy created false evidence to support its claims.

The discovery record began to shift in early 2026. The United States deposed Mr. Bakken, who was the first witness to suggest [redacted] dictated the need to retain Holtec, despite the increased costs. That was a different explanation

[redacted]

from the one provided in the nonbid justification form. And additional emails produced on March 26, 2026,[1] revealed evidence [redacted], which Entergy witnesses had denied in depositions. For example, these documents revealed that Entergy was prepared to begin a competitive bid process for the southern fleet procurement in the summer of 2018, [redacted]

The March 2026 email production also contained direct evidence that the Entergy executives who signed the nonbid justification knew that information contained in the document was false. For example, the nonbid justification relies primarily on the allegedly unique [redacted] offered by Holtec's cask system relative to its competitors. A July 18, 2019 email, produced on March 26, 2026, documented that several Entergy personnel, including [redacted] were aware that another vendor, Orano, offered casks with [redacted]. This supports the United States' allegation that the [redacted] relied upon in the nonbid justification form could not have been the real reason for Entergy's decision, and that [redacted] knowing that its discussion of Holtec's [redacted] was untrue. This critical piece of evidence supporting the knowledge and intent elements of the fraud defense was unavailable to the United States until March 26, 2026.

Other documents produced in March 26, 2026, provided necessary support for the United States' allegation that Entergy knowingly falsified its nonbid justification form in an attempt to

[1] The March 26, 2026 production contained documents that Entergy only produced in response to the United States' motion to compel, after which the Court required Entergy to run ESI searches with search terms agreed to by the parties.

[redacted]

improve its likelihood of recovery in this case. The March 2026 production disclosed that Entergy sent the draft nonbid justification form to [redacted] While it is not improper for Entergy to solicit [redacted] input, this piece of evidence demonstrates that Entergy knew at the time that the nonbid justification form would likely later serve as part of its proof in this lawsuit, another critical piece of evidence supporting knowledge and intent to defraud.

The United States decided to assert the forfeiture defense, obtained necessary supervisory approvals, and communicated our intent to assert the defense to Entergy within 30 days of obtaining these critical documents in the March 26, 2026 production. This explanation of specific evidence supporting the defense obtained late in discovery is sufficient to demonstrate that our motion is not unduly delayed. *Hanover*, 134 Fed. Cl. at 60-61 (itemizing evidence supporting the forfeiture defense that was obtained over the course of discovery); *accord St. Paul Fire & Marine Ins. Co. v. United States*, 31 Fed. Cl. 151, 154 (1994) ("[D]efendant's reasonable and careful investigation into the merits of its counterclaim, after receiving *all* relevant probative data, for a period of six months, is not *prima facie* indicia of a calculated intent to delay trial nor an intent to injure plaintiff's ability to adequately and effectively prepare its case[;] . . . it reflects a calculated search for the true facts which will facilitate 'a proper decision on the merits.'" (quoting *Foman v. Davis*, 371 U.S. 178, 181 (1962) (emphasis in original)).

**B. Entergy Has Not Been Prejudiced by the Timing of the United States' Filing**

Our motion further explained that every pleading amendment results in some degree of prejudice to an opposing party, and as a result the law requires that Entergy demonstrate undue prejudice, greater than ordinary prejudice, to properly oppose our motion. ECF No. 160 at 19-20. Here, even ordinary prejudice is absent because nearly all the evidence the United States

[redacted]

intends to offer in support of our forfeiture defense will also be introduced at trial to support our other defenses to Entergy's claim for recovery of the Holtec cask costs. The trial evidence will already demonstrate that Entergy knowingly paid Holtec more than it should have for the cask systems due to [redacted] and that the nonbid justification form is inaccurate. The only additional evidence necessary for the forfeiture defense is the proof that the Entergy executives knew that the nonbid justification form was false and knew that the form would be used to support Entergy's claim for recovery in this lawsuit.

The case on which Entergy principally relies to support its claim of undue prejudice, *King v. United States*, 119 Fed. Cl. 51 (2015), is not analogous to this one. There, the United States sought to raise a new defense based on the Government's own information, not information learned from the plaintiffs through discovery. *Id.* at 55-56. Further, the proposed affirmative defense would have substantially expanded the time period at issue in the case and prompted an additional retaliation claim from the plaintiffs. *Id.* at 56-57. Finally, the United States had another procedural avenue available to bring the claims it sought to introduce into the plaintiffs' case. *Id.* at 57. None of these factors are present here. In particular, the United States would have no way to vindicate its interest in holding Entergy accountable for attempting to recover fraudulent claims except through this case.

Even if the Court credits Entergy's prejudice arguments, they cannot provide a basis to deny our motion because any prejudice was caused by Entergy's litigation choices, not by the timing of our motion. Entergy's prejudice arguments focus on the fact that our motion was filed after the close of fact discovery and after the death of Mr. Bakken. ECF No. 175 at 33-38. Entergy fails to disclose its prior admission to the United States that Entergy's counsel was

[redacted]

aware of the possibility we might consider the forfeiture defense by late 2024 or early 2025. Thus, Entergy's choices in discovery were made with full awareness of the possibility that the United States would assert a forfeiture defense. In addition, as described above, much of the critical evidence establishing knowledge and intent was not produced to the United States by Entergy until March 26, 2026, three weeks before the close of fact discovery, and after the United States was forced to file a motion to compel to obtain those documents. Entergy chose not to search for critical documents or not to produce critical documents until the very end of fact discovery. The United States filed our motion less than 30 days after receiving those documents. Any prejudice to Entergy from the timing of our motion was caused by Entergy's own discovery delays.

Nor does Mr. Bakken's unavailability provide a basis to deny our motion. As shown by the cases cited in Entergy's opposition, the key question in assessing prejudice from a witness's death is whether the parties had the opportunity obtain the witness's testimony through a deposition before his death. Entergy relies on two cases that found undue prejudice where a plaintiff sought leave to add new causes of action, expanding the pool of relevant witnesses to include witnesses who had died and were not deposed. *Essani v. Earley*, No. 13-cv-3424, 2018 WL 3785109, at *8 (E.D.N.Y. Aug. 9, 2018), *report & recommendation adopted*, No. 13-cv-3424, 2018 WL 4100483 (E.D.N.Y. Aug. 28, 2018); *Williams v. Cost-ULess, Inc.*, No. 2011-cv-025, 2014 WL 2993667, at *6 (D.V.I. July 3, 2014).[2] Here, Mr. Bakken was deposed prior to his death, mitigating any prejudice.

[2] *NVF Co. v. New Castle Cnty.*, 276 B.R. 340, 356 (D. Del. 2002) addressed prejudice in evaluating a laches argument on a motion for summary judgment, not in a motion to amend a pleading under Rule 15.

[redacted]

Indeed, Entergy misplaces its reliance on *Underwood v. O'Reilly Auto Enters., LLC*, 342 F.R.D. 338 (D. Nev. 2022), which fully supports the United States' position. There, in granting a plaintiff's motion to amend under Rule 15 to add new causes of action, the Court observed that "[a] finding of undue prejudice does not flow automatically from [the death of a party or witness.]" *Id.* at 343. The Court found no undue prejudice because the witness was deposed before his death and other witnesses and documents were available to address the matters relevant to the deceased witness. Here, Mr. Bakken was deposed. The United States is still working with the parties to schedule the deposition of Holtec's CEO, Dr. Singh, who was party to many of the relevant discussions with Mr. Bakken. The document record pertaining to Mr. Bakken is admittedly limited, but that is only because his documents, which were preserved and in existence at the time these cases were filed, were later lost in April 2024. To the extent that document destruction heightens Entergy's prejudice from Mr. Bakken's death, that prejudice was again not caused by the timing of our motion.

Thus, Entergy has failed to demonstrate that the United States' motion to amend our answer was unduly delayed or was the cause of Entergy's claimed prejudice.

## II. The United States Satisfied the Requirement under RCFC 9(b) to Plead Fraud with Particularity

Under RCFC 9(b), any allegation of fraud must be pled with particularity. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009). The main purpose of the particularity requirement is to "assure that only viable claims alleging fraud or mistake are allowed to proceed to discovery" to prevent an unfounded fraud allegation from permitting a party to "us[e] discovery as a fishing expedition." *In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1310 (Fed. Cir. 2011). A party cannot "simply aver[] the substantive elements of [a fraud claim], without setting forth the particularized factual bases for the allegation." *Exergen*, 575 F.3d at

[redacted]

1326-27. The pleading must specify the "who, what, when, where, and how of the material misrepresentation or omission." *Id.* at 1327.

However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." RCFC 9(b). This language "excuses a party from pleading [intent] under an elevated pleading standard." *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). A party only must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Exergen*, 575 F.3d at 1327. And at the pleading stage, the Court can make this reasonable inference without requiring the kind of clear and convincing evidence that is necessary at trial. *Id.* at 1329 n.5. This is consistent with the Court's observation in section 2514 cases that "[f]raud becomes impossible of proof, and cheap indeed, if nothing but a confession by the one obviously guilty will prove it," *Standard Oil Co. of Kan. v. United States*, 47 F. Supp. 120, 141 (Ct. Cl. 1942), and as a result "[o]rdinarily fraud can only be established from circumstances." *Kamen Soap Prods. Co. v. United States*, 124 F. Supp. 608, 620 (Ct. Cl. 1954).

The United States has satisfied the requirements of RCFC 9(b) here. The United States alleges [redacted] executed a nonbid justification form that contained materially false statements or other omissions that rendered the document materially false. The proposed amended answer identifies the specific statements and omissions the United States contends are material and false, and the evidence supporting the allegations that the executives had actual knowledge about the false statements and omissions. ECF No. 160-2 ¶¶ 152-171. The proposed amended answer also alleges that [redacted] to the nonbid justification form knew that the United States and this Court would require Entergy to adequately justify its decision to accept Holtec's inflated prices,

[redacted]

and that the proposal information submitted by Holtec was likely insufficient to support a claim for reimbursement. *Id.* ¶¶ 85, 102-03, 113, 116, 122, 124-25, 135, 140. More specifically, the proposed answer alleges that [redacted]. In depositions, [redacted], pointed to the nonbid justification form as containing the complete explanation of their claimed reasons for accepting Holtec's proposal, further cementing the fact that Entergy intended to rely on the nonbid justification as part of its proof in these cases to support its recovery for the amounts Entergy paid for the Holtec dry fuel storage cask systems.

The United States also has alleged sufficient facts to infer the necessary knowledge and intent. There can be no question that the United States has stated our fraud allegations with enough specificity for Entergy to determine which individuals allegedly committed which acts with the requisite knowledge and intent to defraud. [redacted], all of whom knew of the material falsities in the nonbid justification form. [redacted] but at a minimum [redacted] all knew that Entergy faced litigation risk in attempting to recover as damages the inflated costs associated with the Holtec contract. [redacted]. These facts are sufficient to infer the necessary knowledge and intent.

## III. The Proposed Affirmative Defense is Not Futile or Offered in Bad Faith

Entergy's final argument against our motion is that our allegations, even if true, are legally insufficient to support forfeiture under section 2514. ECF No. 175 at 14-22. Although

[redacted]

Entergy disputes many of the United States' factual allegations in its statement of the case, *id.* at 4-11, Entergy correctly does not rely on its factual disputes as a basis to deny the United States' motion. The Court must accept our allegations as true, the same as it would in reviewing a motion to dismiss under RCFC 12(b)(6). *Meyer Grp., Ltd. v. United States*, 115 Fed. Cl. 645, 650 (2014) (citing *Iqbal*, 556 U.S. at 678; *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 71 Fed. Cl. 172, 176 (2006)).

Entergy makes two legal arguments in support of its contention that the United States' proposed amendment is legally futile: (1) the United States' proposed defense conflicts with the Federal Circuit's opinion in *Kellogg Brown & Root*, ECF No. 175 at 16-18, and (2) Entergy is not relying on the nonbid justification form as part of the proof of its claims. *Id.* at 18-21. Both arguments are mistaken.

As an initial matter, Entergy's futility arguments fundamentally ignore the background legal principles informing its damages claims, which Entergy is familiar with. At times, Entergy appears to contend that because it is claiming as damages the actual amount it paid to Holtec, Entergy could not have been attempting to defraud the United States. In doing so, Entergy ignores its evidentiary burdens as a spent nuclear fuel plaintiff to prove that the type and magnitude of the costs it seeks to recover were caused by the breach and were foreseeable at the time of contracting. *Southern Nuclear v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011); *Landmark Land Co. v. Federal Deposit Ins. Corp.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001); *Carolina Power & Light Co. v. United States*, 115 Fed. Cl. 57, 59 (2014) (citing *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Entergy "[a]s the party with the burden or proof, [must] prove that it is not seeking to recover any improper costs." *Energy*

[redacted]

*Nw. v. United States*, 641 F.3d 1300, 1307 (Fed. Cir. 2011). Without the complete set of evidence necessary to compare Entergy's "condition with full Government performance, the Court of Federal Claims [can] not perform the necessary comparison between the breach and non-breach worlds and thus [can] not accurately assess [Holtec's] damages." *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008) (citing *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001); *Bluebonnet Sav. Bank FSB v. United States*, 67 Fed. Cl. 231, 238 (2005)). The nonbid justification form is a key document establishing these elements of Entergy's affirmative claim for damages. Thus, falsifications to the document fall directly within the ambit of section 2514 as fraud in connection with the "proof" or "establishment" of Entergy's claim.

### A. The United States' Proposed Forfeiture Defense is Fully Consistent with the Federal Circuit's Interpretation of Section 2514 in *Kellogg Brown & Root*

Entergy criticizes the United States for failing to cite to *Kellogg Brown & Root* in our motion. ECF No. 175 at 16. We instead cited more directly relevant appellate precedents concerning the scope and application of section 2514: *O'Brien Gear & Machine Co. v. United States*, 591 F.2d 666 (Ct. Cl. 1979); *Kamen Soap*, 124 F. Supp. 608; *Standard Oil*, 47 F. Supp. 120. But *Kellogg Brown & Root* further supports our claim that Entergy's conduct falls within the type of behavior section 2514 plainly prohibits.

The main significance of *Kellogg Brown & Root* was that it resolved an issue of statutory interpretation that had divided judges of the Court of Federal Claims – whether section 2514 could be invoked in cases where the United States did not allege that any part of the plaintiff's claim in this Court was fraudulent, but where there was evidence of fraud in the formation or performance in the contract underlying the claim. 728 F.3d at 1365-66. The Federal Circuit rejected the broader reading of the statute that section 2514 applies when "fraud is *practiced*

[redacted]

during the contract performance *or* in the making of the claim." *Id.* at 1366 n.18 (quotation omitted) (citing cases) (emphasis in original). Instead, the Federal Circuit affirmed that, to assert the forfeiture defense under section 2514, the United States must allege fraud in the claim that was filed with the Court. *Id.* at 1366.

That is precisely what the United States has alleged here. Entergy committed fraud because it knew it was overpaying Holtec and it knew it was improperly attempting to recover those inflated costs through its damages claim against the United States. Thus, the facts of this case align with the Federal Circuit's description of what was missing in *Kellogg Brown & Root*. There, the United States argued that by proving that a subcontract was executed due to an improper kickback, the Court could presume that invoices seeking reimbursement for the costs of that tainted contract were overstated. *Id.* at 1367. The Court disagreed, holding that the United States was still obligated to allege and prove that the claim was actually inflated, and that the plaintiff knew it was submitting improperly inflated costs. *Id.* That is our allegation here – Entergy knew it was paying inflated costs to Holtec, and Entergy falsified the key justification document to ensure that it could recover in this lawsuit the full amount of the inflated Holtec costs. That is the precise set of allegations the Federal Circuit explained would be necessary to properly allege fraud.

Moreover, *Kellogg Brown & Root* refutes Entergy's suggestion that it cannot be liable for fraud by attempting to recover amounts it actually paid. There, the Court suggested that the deficiency in the United States' claim was that the United States did not allege that the plaintiff knew it was submitting inflated costs. Entergy's agreement to pay an amount it knew to be inappropriately high, combined with the falsification of the justification to hide Entergy's understanding that it was paying too much, is sufficient to support a defense under section 2514.

[redacted]

Thus, *Kellogg Brown & Root* is fully consistent with the United States' invocation of section 2514 here.

**B. The Nonbid Justification Form is an Essential Element of Entergy's Proof in Support of its Claim to Recover the Costs Paid to Holtec**

Entergy's other argument for legal futility is that Entergy never intended the nonbid justification form to be used in support of its claim. ECF No. 175 at 18-21. As an initial matter, this is a dispute of fact that is not a proper basis to deny our motion. As outlined in our proposed answer, the United States alleges that Entergy knew it needed to document a valid business justification to support its recovery of Holtec's inflated costs in this lawsuit. Entergy's executives also knew that the relevant staff [redacted] And Entergy's [redacted] Rather than taking any of the legitimate options available – insisting that Holtec lower its prices, moving to a competitive bid, or even accepting Holtec's prices with the acknowledgement that Entergy would not be able to recover the full amount in this lawsuit – Entergy chose to prepare a knowingly false justification document to enhance its likelihood of litigation recovery. Those factual allegations are presumed true (and all find support in the discovery record in any event). That alone is sufficient to reject Entergy's factual dispute that the nonbid justification form was not intended to be used in support of Entergy's claims in these lawsuits.

Even if the Court considers the substance of Entergy's argument that the nonbid justification form was not part of Entergy's proof in support of its claim, that argument is easily refuted. Entergy knew that it had the legal burden to demonstrate that it had not agreed to an excessive payment. The Federal Circuit had previously denied Entergy recovery for excessive

[redacted]

state-mandated payments that the Court described as a "form of blackmail." *Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee, LLC*, 683 F.3d 1330, 1346 (Fed. Cir. 2012). The Court explained that it may have been "in the best interests of the company" to make the demanded payment, but it was not foreseeable at the time of contracting that the United States would be required to reimburse Entergy for such gratuitous payments in the event of a breach. *Id.* at 1347-48.

From that experience, Entergy understood that it could not simply defer to its business judgment to justify the amount it chose to pay Holtec. As explained above, Entergy had to justify the amount as reasonable and a foreseeable consequence of the breach and to "prove that it is not seeking to recover any improper costs." *Energy Nw.*, 641 F.3d at 1307. Without the nonbid justification form, Entergy would be unable to meet its burden of proof – there is no other document that purports to explain why Entergy chose to pay the price premium it did. If the nonbid justification document were removed from the record, Entergy would be unable to recover its costs paid to Holtec at all for lack of proof demonstrating its affirmative burden that the costs were foreseeable and caused by the breach. Thus, Entergy's assertion that the nonbid justification is not a key element of its proof must be rejected in light Entergy's evidentiary burdens in spent nuclear claims.[3]

[3] The [redacted] specifically cited the nonbid justification form as the key document that explained Entergy's reasons for accepting the excessive prices Holtec was charging. [redacted] ("[The] sole source justification would have been a document – and I signed it after reading it very carefully at the time – the document and the logic and the reasoning behind the decision."); [redacted] ("I used this type of justification to . . . document why you make that decision, and you don't spend time and money going to bid."); [redacted] ("SGB was a new process, and I want to reinforce that process as a critical step in the decision-making process. The reason for that is that the rationale is laid out clearly, the justifications are laid out clearly . . . .").

[redacted]

Finally, Entergy is incorrect to suggest that the false nonbid justification form is somehow distinct from other corporate records that the Court has relied on to support a finding of forfeiture under section 2514. In both *Standard Oil* and *Kamen Soap*, plaintiffs' claims were initially denied by the United States due to the absence of corporate records supporting them. In response, the plaintiffs falsified the necessary records and submitted them in support of their claims – in *Standard Oil* the falsified corporate documents were board meeting minutes, 47 F. Supp. at 136-39, and in *Kamen Soap* the falsified corporate documents were interoffice memoranda. 124 F. Supp. at 620-21. The only difference here is that Entergy, with its long experience in spent nuclear fuel cases, knew that the United States would request something like the nonbid justification form to support its claim for the Holtec costs, and so Entergy generated the false document before the United States asked for it. The issue is not whether the document is an "authentic" document as opposed to a forgery, as Entergy contends. The issue is whether the document was falsified by Entergy to support its claim. The only difference between the nonbid justification form here and the meeting minutes in *Standard Oil* or the memoranda in *Kamen Soap* is that the falsification here occurred before the United States requested the document instead of after.

Ultimately, the statute does not support Entergy's efforts to finely parse which exact kinds of documents give rise to section 2514 liability. The statute speaks in broad terms – "A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof." 28 U.S.C. § 2514. In *O'Brien Gear & Machine*, the Court of Claims, remarking on Congress' intent in the original 1863 legislation, explained that "[t]he breadth of the application of the section is repeatedly seen in the forcible

[redacted]

quality of the phrases used." 591 F.2d at 679. The United States alleges that the nonbid justification form was falsified as part of the proof that Entergy was required to offer in support of its claim. That is sufficient to invoke the forfeiture defense under section 2514.

**IV. Entergy's Cross-Motion to Strike is Procedurally Improper and Should be Denied**

"A motion to strike must be directed to a 'pleading,' which term has been construed narrowly by the courts. Other court documents may not be attacked by a motion to strike. In particular, a motion to strike may not be used to strike another motion." *Fisherman's Harvest, Inc. v. United States*, 74 Fed. Cl. 681, 690 (2006) (citations omitted). The Court reached the same conclusion in *Hardy v. United States*, 153 Fed. Cl. 624, 626-27 (2021), one of two cases cited in support of Entergy's cross-motion to strike. The only other authority relied upon by Entergy is a Federal Circuit opinion in which the court struck offensive and irrelevant material that was included in a brief filed by a *pro se* litigant. *Arunachalam v. Int'l Bus. Machines Corp.*, 989 F.3d 988, 999-1002 (Fed. Cir. 2021). The United States assumes that Entergy is not comparing our motion to a *pro se* filing.

The United States requests that Entergy's cross-motion be denied and that the Court preclude Entergy from filing a reply in support of its procedurally improper cross-motion. The Court should instead treat the cross-motion to strike as part of Entergy's response to our motion. *See Fisherman's Harvest*, 74 Fed. Cl. at 690 ("The Court treats the arguments contained in Plaintiffs' motion to strike as a response to Weeks Marine's motion.").

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that Court grant our motion for leave to file an amended answer.

Respectfully submitted,

[redacted]

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

LISA L. DONAHUE
Assistant Director

s/Evan Wisser
EVAN WISSER
Senior Trial Counsel
NATALEE A. ALLENBAUGH
LAURA O. ARADI
DANIEL D. FALKNOR
KRISTEN E. OLSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-3682
evan.wisser@usdoj.gov
*Attorneys for the United States*

OF COUNSEL:

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Office of the General Counsel

Dated: September 18, 2026

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 18th day of September, 2026, I sent via email a copy of the foregoing document to plaintiff's counsel, pursuant to paragraph 2 of the Court's Amended General Order No. 2026-01.

s/Evan Wisser